MISSISSIPPI VALLEY GENERATING
CO., on Its Own Behalf and to the
Use of Others

v.

UNITED STATES.

No. 479–55.

United States Court of Claims.

July 15, 1959.

John T. Cahill and William C. Chanler, New York City, for plaintiffs. Robert G. Zeller, New York City, was on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. John B. Miller, Herman Wolkinson and Robert E. Kaufman, Washington, D. C., were on the brief.

MADDEN, Judge.

The plaintiff, an Arkansas corporation, made a contract with the United States, dated November 11, 1954. The Atomic Energy Commission, (AEC), was the agency which acted for the Government in the transaction. The contract required the plaintiff to build and operate a large plant for the generation of electricity, the plant to be located at West Memphis, Arkansas, across the Mississippi River from Memphis, Tennessee, and to sell the electrical energy there generated to the United States. After the site for the plant had been acquired and some preliminary work had been done by the plaintiff, but before any considerable amount of construction of the plant had taken place, an important event occurred which eliminated the Government's need for the electricity which it had contracted to buy from the plaintiff.

Because of the elimination of its need for the electricity, the Government, through the AEC, on July 11, 1955, orally, and on August 1, 1955, by letter, notified the plaintiff that the Government was terminating the contract. On November 23, 1955, the AEC wrote the plaintiff that the Government had concluded that there had never been a valid contract between the parties. The Government's position is that, there never having been a valid contract, it is not liable to the plaintiff for any costs incurred by the plaintiff prior to the termination of the contract nor for any damages caused to the plaintiff by its termination. The plaintiff's position is that the contract was valid, and that the Government is liable to the plaintiff for the costs which the plaintiff incurred in connection with the contract.

The Tennessee Valley Authority, (TVA), an agency of the United States, operates the largest unified enterprise in the country for the generation and distribution of electricity. Its general field of operation is the area drained by the Tennessee River and its tributaries. Since its establishment in 1933, it has constantly expanded its operations as the demand for electricity has increased. The AEC uses a large amount of electricity in its three plants at Oak Ridge, Tennessee, Paducah, Kentucky and Portsmouth, Ohio. TVA supplied the current used at the Oak Ridge plant and a considerable part of that used at the Paducah plant. The Portsmouth plant was supplied by the Ohio Valley Electric Corporation, (OVEC), a corporation formed by several nearby private utilities in 1952 for the purpose of contracting with the AEC and building a generating plant to supply electricity to the AEC's Portsmouth establishment.

TVA was supplying some 1,000,000 kw of electricity to AEC at Paducah, from

TVA's generating plant at Shawnee, Kentucky. To meet the growing demands upon it, particularly in and about Memphis, Tennessee, TVA desired to build a new plant, to be operated by steam, at Fulton, Tennessee, on the Mississippi River upstream from Memphis, with a capacity of about 450,000 kw. Both houses of Congress had in 1952, however, rejected proposed amendments to TVA appropriation bills which amendments would have appropriated money to start construction of the Fulton plant.

The policy of the Eisenhower Administration, which took office in January 1953, was to have either private enterprise or local communities, rather than the United States, provide electric power generating facilities. The President's State of the Union message of February 2, 1953, announced this policy. The President's new Director of the Budget, Mr. Joseph Dodge, eliminated from the 1954 fiscal year budget the appropriation for the Fulton plant, which appropriation President Truman had proposed in that budget.

The Administration's policy with regard to public power was observed with approval by Mr. George D. Woods, chairman of the board of directors of First Boston Corporation, one of the leading investment banking concerns in the United States. First Boston had its offices in New York. Mr. Woods wanted to help to make the policy succeed. He obtained an appointment with Mr. Dodge, the Director of the Budget, and offered the services of First Boston. Mr. Dodge, a Detroit banker, new in the Government, wanted to have a study made to determine the controverted question of the extent to which the Government was really subsidizing the TVA. He needed a man experienced in public utility financing and expert in accounting and problems of the cost of money, and had not found such a man. Mr. Woods said that First Boston had such a man, Mr. Adolphe Wenzell, and he would see if Wenzell would undertake the work.

Wenzell was willing and, with the approval of his other superiors, he did accept the assignment. He served as a part-time consultant to the Bureau of the Budget, without compensation, but was to have $10 per day in lieu of subsistence, and reimbursement of his transportation expenses. It was understood that Wenzell would not sever his connection with First Boston and that he would continue to receive his regular salary from it. Wenzell began this work on May 20, 1953, and made his report to Dodge about September 20. In all, he spent 29 days in the Bureau of the Budget, and became acquainted with many of its staff. He had access to all pertinent reports and documents. His report, not surprisingly, indicated that the Government was, to a considerable extent, subsidizing the TVA. When he made his report to Dodge, he asked for and received permission to retain a copy, but was told that it was a confidential Bureau document and should not be shown to anyone else. Some time later Woods asked Wenzell to see the report and Wenzell let him read it.

The work which Wenzell did for the Bureau of the Budget in 1953 resulted in his getting acquainted with Rowland R. Hughes, then the Assistant Director, later the Director, who, as we shall see, was a principal actor in the events in 1954 leading to the contract here in litigation.

In the fall of 1953 the Bureau of the Budget decided that it would not include money for the Fulton plant, desired by TVA, in the TVA appropriation figure to be presented to Congress in 1954, for the fiscal year ending June 30, 1955. Mr. Gordon Clapp, the General Manager of TVA, when he learned of this Budget decision, took the position that TVA must be allowed to reduce the amount of electricity it was supplying to AEC so that it would have electricity to satisfy the growing needs of other patrons. The Bureau began to draft language to be included in the President's budget message to the effect that an attempt would be made to relieve TVA of some of its power delivery to AEC, and that if that

could not be done, the problems of the Fulton plant would be reconsidered.

Director Dodge in December of 1953 suggested to Admiral Lewis I. Strauss, Chairman of the AEC, and Mr. Walter J. Williams, AEC's General Manager, that capital expenditures by the Government for the Fulton plant could be avoided if AEC would contract with private industry for the construction of a generating plant that would supply 450,000 kw of power to AEC at its Paducah plant and thereby release the power which TVA was supplying there, so that that power could be used by TVA for its other requirements. Mr. Dodge reminded these men that, in two other instances, private utilities had made long-term contracts to supply power to AEC. Mr. Williams said he would consult with Mr. McAfee, who was president of one of the companies referred to by Dodge. McAfee's response was encouraging.

Dodge delegated to Hughes, the Assistant Director, the responsibility for the Bureau's part in pursuing the inquiry. AEC's only interest was in being assured an adequate supply of power. The interest of the Bureau of the Budget was that the necessary power be obtained, if possible, in a manner consistent with the Administration's policy of promoting a private enterprise economy and keeping Government expenditures as low as possible.

Edgar H. Dixon, president of Middle South Utilities, Inc., which owned utilities operating in Arkansas, Louisiana and Mississippi, learned from McAfee that AEC might be seeking an additional source of power in the Paducah area. He was interested because of the possibility of selling power and because he, like Woods of First Boston, wanted to lend a hand to the Administration in its effort to put the business of generating power into private hands. Dixon went to see Strauss, and conferred with him and his principal assistants. Hughes, at the Bureau of the Budget, learned of the meeting. He requested AEC to proceed with negotiations with private interests

with a view to having additional power available not later than the fall of 1957. McAfee and Dixon were invited to a meeting to be held in Strauss's office on January 20, 1954.

About January 15, 1954, Hughes suggested to Dodge that Wenzell be again requested to assist the Bureau, because of his study of TVA and his knowledge of commercial transactions. By that time, the Administration had decided that the AEC should make a contract to purchase power from private sources, and that the Fulton plant would not be built. The Administration's fixed purpose, by that time, was to find private enterprisers willing to contract with it, and to make a fair and prudent bargain with them. Wenzell had had no part in those decisions.

For the Bureau of the Budget to know what would be a fair bargain, it had to know what interest rate the enterprisers would have to pay on the bonds which they would have to sell to finance the project. Wenzell was an officer of First Boston, a large enterprise whose business it was to find purchasers for such bonds. Since Hughes knew him and trusted him, it was natural that he should look to him for advice on the cost of money. Wenzell came to Washington on January 18, 1954, and conferred with Hughes. Hughes told him of the meeting with Dixon and McAfee, arranged for the 20th. He learned that Wenzell knew both these men, and asked him to attend the meeting and use his influence to impress upon them the need for prompt action on their part in getting up a proposition to the AEC. Hughes then arranged for Wenzell to see Strauss, whom he had not met before. Strauss also emphasized to Wenzell the necessity for prompt action.

At the January 20 meeting, McAfee and Dixon pointed out that if an additional generating plant should be built near Paducah, and the AEC should later need less power, there would be no other market for the power in that area. It was recognized that the real need for power was in the Memphis area, some

200 miles from Paducah, and that the new power, though bought and paid for by AEC, would be delivered to TVA and used by it to supply its customers. Dixon thought a more logical arrangement would be for TVA to contract directly for the needed power, rather than have AEC contract for it. The meeting moved to Hughes' office in the Bureau of the Budget. It was decided that Dixon would prepare a study of what it would cost for his company to construct a plant, across the river from Memphis in the territory of his Middle South company, capable of generating some 450,000 to 600,000 kw of power. To the suggestion of McAfee and Dixon that the arrangement of having AEC contract for power to be delivered to and used by TVA was awkward, Hughes responded that the decision as to what agency of the Government would make the contract would be made by the Government.

At the close of the meeting in Hughes' office, Wenzell and Dixon agreed that Wenzell would meet with a Mr. Seal of Ebasco, a company which performed engineering services for Dixon's companies, to enlighten Seal and thus expedite the study which Dixon was to make. Wenzell met with Seal in New York and reported to him the substance of the discussions up to date. He urged him to get to work on the study which Dixon had promised. On January 27 Seal and a Mr. Canaday, a vice president and director of Dixon's Middle South company, went to Wenzell's office in New York. They were engaged in formulating a plan for the project. Wenzell told them he would give them any help he could on the subject of the cost of money for the project. On January 29, Hughes telephoned Wenzell to find out what had happened at Wenzell's meeting with Canaday and Seal.

Wenzell had another meeting with Canaday and Seal, other visits with Hughes, and received a request from Dixon that Wenzell get the opinion of First Boston on what the interest rates would be on the bonds in such a project. Wenzell called together the First Boston

experts on the subject, and telephoned the answer to Dixon. During the following days, Wenzell had several meetings with representatives of the interested private utilities at some of which other representatives of the Government were present. All these meetings were held either at the request of or with the knowledge of Hughes with whom Wenzell was in frequent touch by telephone.

When McAfee learned that the proposed plant was to be located in the Memphis area, he lost interest because that location was outside the area of the companies in which he was interested. Another company showed some interest in collaborating with Dixon, but shortly abandoned the idea. Hughes was disturbed because he feared that if Dixon could not get another company to join in the project, he might abandon it. About February 18, Dixon told Wenzell that he was to have a meeting the next day at the offices of The Southern Company, the owner of public utility companies operating, generally, in Georgia, Alabama and Mississippi. Wenzell reported this to Hughes who asked him to attend the meeting. Eugene A. Yates was the chairman of the board of directors of Southern, and was at the meeting, as were the other important officials of Southern.

Wenzell had known Yates for many years but had not, before this meeting, talked to him about the project here in question. Dixon made an earnest plea that Southern join in the project. Wenzell telephoned Hughes, reporting what occurred at the meeting. About February 20 Southern decided to take part in the project. Yates immediately notified Hughes. Dixon's Middle South and Yates' Southern are sometimes hereinafter called the sponsors.

Canaday and Seal had been working up a proposal and, on February 20, after Southern had agreed to join in the project, they began to put the proposal in draft form. On February 23, Dixon and Wenzell met Hughes at the Bureau of the Budget. Dixon showed Hughes an early draft of the proposal. On the same day

Dixon, Yates, Kenneth D. Nichols, the General Manager of AEC, Wenzell and Mr. McCandless of the Bureau of the Budget reviewed the tentative draft to see whether it was complete enough to merit consideration by AEC. The draft which was reviewed said that it assumed a cost of money which had been given to it by responsible financial specialists, and that the offer was conditioned upon the sponsors' being able to obtain the money at those rates. In fact, the advice as to the cost of money had been given orally by Wenzell to Dixon, and had been incorporated in a draft of a letter written by Wenzell and addressed to Dixon on February 23, intended to be signed by First Boston, but never actually so signed or delivered.

On February 25, Dixon's Middle South company and Yates' Southern company submitted to AEC a formal proposal offering to form a new corporation which would finance and construct generating facilities from which 600,000 kw of electric power would be delivered to TVA at the middle of the Mississippi River at Memphis, the power to be paid for by AEC. The proposal went into detail as to the terms of the contract, the method of computation of the charges for the power, reimbursement for taxes, etc. When AEC received the proposal, it asked the Bureau of the Budget for its opinion. Hughes introduced Canaday, Seal, and Barry of Southern, to Mr. Schwartz, Chief of the Resources and Civil Works Division of the Bureau. Hughes told Schwartz that he wanted an analysis of the proposal by March 2, and that the men whom he had introduced would be available to answer questions. The Bureau staff commenced the study. The AEC staff began a similar study.

Hughes advised Schwartz that Wenzell would come to see him on March 1. When he arrived, the staff was completing the study and preparing the memorandum which Hughes had requested. Wenzell sat in the conference and took the position that the estimates of costs in the proposal were too high.

On March 2 there was a meeting of the Bureau staff and Wenzell and Seal of Ebasco. Seal was shown the proposed staff memorandum and was questioned about various items in the proposal of February 25. After Seal had left, the staff, with Wenzell participating, completed its memorandum, which said that it did not have sufficient information to make a close analysis, comparing costs with those of TVA, and that active participation by TVA would be required for such an analysis. The memorandum concluded by saying: "We believe that the rates involved are sufficiently close that negotiations should be entered into by the parties concerned." Wenzell then went to Seal's office, told him that the memorandum had been completed, and that Clapp of TVA and Nichols of AEC were to meet with Hughes on March 3.

Between March 3 and March 9, Wenzell, in New York, had telephone conversations with Hughes, Schwartz, Canaday, Seal, Yates and Dixon. All of these conversations related in some way to the project. On March 9, representatives of the Bureau of the Budget, AEC and TVA met and reviewed the draft of the analysis of the February 25 proposal. Wenzell was not present. Later in the day, in the Bureau, the completed draft was distributed to a group which included Wenzell, and a member of the staff gave an oral summary of the analysis. All present were of the opinion that the estimated costs in the proposal were too high. Wenzell was asked to so advise Seal and to find out whether the sponsors would make a better proposal. Wenzell advised Seal that the estimated costs were too high. Wenzell discussed with Dodge the subject of the estimated costs, told him that he, Wenzell, was not qualified to advise the Bureau on that subject, and suggested that the services of Francis L. Adams, Chief of the Bureau of Power, Federal Power Commission, be obtained. Dodge said he would find out whether Adams would be available.

On March 10, Dixon and Yates met with Mr. Linsley, chairman of First Bos-

ton's executive committee, in Linsley's office. Wenzell was present. Dixon was well acquainted with Linsley and had frequently asked for his opinion on security issues and the condition of the money market. Dixon wanted Linsley's opinion on the current situation with regard to financing a project such as the OVEC, which First Boston had assisted in financing some years before, and which was comparable to the proposed project.

On March 11 Wenzell attended a meeting of the staff of the Budget Bureau. As a result of the meeting, an AEC representative, Mr. Cook, telephoned Dixon and told him wherein the estimated costs were too high. A copy of the AEC-TVA analysis was given to Seal and Canaday who were asked to study it, and submit their comments, together with the sponsors' minimum cost proposal by March 15 or 16. On March 16, Dixon, Yates, and their principal assistants met with Dodge. In preparation for this meeting, Dixon and his associates had met in his hotel room and prepared a draft of a letter to be sent to AEC in reply to the AEC-TVA analysis. Wenzell may have been present at the meeting. In any event, he was given a copy of the draft and made changes on it in his handwriting. The letter was never put in final form, signed, or delivered to AEC. Wenzell was present at the meeting with Dodge. Dixon and his associates urged Dodge to have an analysis made of their February 25 proposal by someone other than the AEC-TVA group. Wenzell renewed his suggestion that Adams of the Federal Power Commission be requested to make such an analysis. On March 19 Adams began to do that. On March 24 Adams and representatives of the Bureau of the Budget met with Seal, and Adams told him that the figures in the February 25 proposal were too high, and asked him to have the sponsors submit new estimates of costs. Adams had, on March 23, discussed with Wenzell the subject of the cost of money for the project. Wenzell, between March 17 and March 30, had telephone conversations with representatives of the sponsors, and of the Bureau. On March 30 he was asked by the Bureau to be present at a meeting on April 3.

The sponsors had become aware that their February 25 proposal would not be acceptable. They prepared new cost estimates and submitted them to Hughes, Adams and others on April 3, at the meeting which Wenzell had been requested by the Bureau to attend and did attend. The sponsors were told that if they would submit a new firm proposal based upon their revised cost estimates, it would deserve serious consideration. It is probable that during this meeting Wenzell stated to Dixon, Yates and Hughes that the information which he had previously given them with regard to the interest rate on the bonds of the proposed project was still valid.

Also on April 3d Wenzell talked to Nichols at AEC. Nichols told him that the sponsors' new figures were close to being acceptable. He asked Wenzell to encourage the sponsors to refine their figures and to submit a proposal based on a fixed price for the construction of the new facilities, with details as to the basis on which the charges for power would be calculated. He told Wenzell that AEC could not consider a proposal which was not firm as to capital costs, nor one which did not contain cancellation provisions acceptable to the AEC. After the meeting with Nichols, Wenzell returned to New York, and did not make any more trips to Washington in connection with the project here involved.

The sponsors prepared a new proposal, after numerous discussions in Washington involving representatives of the sponsors, the Bureau of the Budget, and AEC. Dixon delegated a representative to inquire of various investment bankers and institutional investors as to the cost of money for such a project. This inquiry showed that the rate of interest would be about 3½%, which was the figure that Wenzell had on prior occasions given to Hughes and to the sponsors.

On April 12, 1954, the sponsors submitted their new proposal, which was dated April 10. A representative of the sponsors had, some days before the submission, informed Wenzell that it contained a statement that the sponsors' offer was conditioned upon their being able to arrange financing upon the terms which responsible financial specialists had advised them would be available. On the morning of April 12, before the sponsors went to Washington to submit their proposal, they met in Linsley's office at First Boston. Wenzell was present. Linsley was requested to and agreed to give them a written opinion, signed by First Boston, confirming Wenzell's prior statements as to the current rate of interest on bonds for such projects.

The April 10 proposal received intensive study and analysis by the Bureau of the Budget, AEC and TVA, and representatives of the sponsors were called in for information and discussion. On April 24 Hughes, who had, on April 16, 1954, succeeded Dodge as Director of the Bureau, recommended to the President that the Bureau be authorized to instruct AEC to proceed to negotiate a contract with the sponsors, and to instruct AEC and TVA to work out the necessary interagency arrangements. On May 27 a proposal was received from another group headed by a Mr. Von Tresckow. This proposal was studied, and on June 14 Hughes and Strauss presented summary analyses of the Dixon-Yates proposal, the Von Tresckow proposal and of the cost of the proposed Fulton TVA plant, to congressional leaders in conference with the President.

On June 16, with the approval of the President, Hughes gave to AEC and TVA the instructions which, he had, on April 24, recommended to the President. On June 30, AEC wrote the sponsors that their April 10 proposal "constitutes a satisfactory basis for negotiation of a definitive contract", and that AEC was ready to begin negotiations. Negotiations began on July 7 and ended with the signing of the contract here in litigation on November 11, 1954.

### The Conflict of Interest Defense

Adolphe Wenzell's study of TVA for the Bureau of the Budget in 1953 is of significance in this case only as background. Through that work he became acquainted with Dodge, Hughes and others of the Bureau staff. He became recognized by Hughes as a man sympathetic to the Administration's purposes and policy with regard to public power and private enterprise. His company, First Boston, was expert in the financing of large utility enterprises. When the Administration decided that it would, if it proved feasible, obtain the needed additional electric power by contracting with a private generating enterprise, Hughes thought of Wenzell as a possible useful consultant and obtained Dodge's permission to employ him.

It hardly needs to be said that Wenzell and his permanent employer, First Boston, wanted the explorations into the possibility of making a contract for the erection of a generating plant with private capital to eventuate in a contract. Their enthusiasm in this purpose equalled, no doubt, but could hardly have exceeded, that of the President of the United States and his Director of the Bureau of the Budget. Wenzell was not hired by the Director to discover reasons why a contract should not be made. He was hired because he was a knowledgeable person and was on the Administration's side of the political-economic controversy about public versus private generation of electric power. It could hardly have been expected that the Administration would hire as a consultant an expert from the ranks of the enthusiasts for public power. The Administration's policy was a perfectly legitimate one, and it had a right to use all legitimate means to make its policy succeed. Its powerful urge to get a contract put it at a possible bargaining disadvantage, but no claim is made in this case that the contract which was made was an improvident one.

514

Wenzell's function of advising the Government as to the cost of money, a large element in the cost of electric power produced by a plant built with borrowed money, was not an arduous one. A few well placed telephone calls by any responsible person would probably have obtained such information.

Hughes really used Wenzell as an expediter. When Hughes learned that Wenzell knew McAfee, Dixon, and other important utility executives who showed an interest in the project which the Administration hoped to consummate, he used Wenzell to keep their interest alive and to get it into the form of a proposal which the Government could consider. Time was important. The construction of the needed plant would take years after a contract had been made. Those who preferred that the additional power should be obtained from a plant built by TVA with Government money were politically powerful, and were able and persistent. If the need became pressing, and there was no promise that private enterprise would satisfy it, the Administration's policy could not be maintained.

Wenzell discussed the subject freely with the representatives of the private sponsors. At the stage of proceedings during which he was employed by the Bureau of the Budget, there were no secrets. Every intelligent person knew that the Administration wanted to make a contract, and was anxious that private enterprise come forward with a proposal that would be acceptable. Hughes directed Wenzell to sit in the meetings of the sponsors and report to Hughes what he heard. He participated in the conferences of the agency staffs. He, no doubt, was able to give to Hughes a better overall view of events than any other person, and did, we should suppose, expedite the formulation of the proposal which formed the basis for the later negotiation of details and exact figures.

Wenzell had substantially nothing to do with the substance of the contract. He knew little about construction costs and said so, recommending Adams to the

Bureau for that function. The cost of money was determined by forces beyond the control of the contracting parties. While the contract itself contained nothing of Wenzell's work, the fact that it was made at all may have been a result of his work. At any rate, he served the Administration faithfully in the tasks it assigned to him.

The Government says that the contract is invalid because of Wenzell's activities. It says that he had conflicting interests. As between the parties, the Government and the plaintiff which succeeded to the interest of the Dixon-Yates sponsors, we see not the slightest conflict of interest in Wenzell's position. The interest which he shared with the President and the Bureau of the Budget, that the negotiations should produce a contract, was the Government's interest, though it coincided with the sponsors' interest. He served the Government, did what he was assigned to do, did nothing for the Dixon-Yates interest and received nothing from it.

The Government says that a conflict of interest resulted from Wenzell's position with First Boston. When the Government hired Wenzell, it knew of his position with First Boston, and it knew what business First Boston was in. It wanted Wenzell's advice as to the cost of money borrowed to build generating plants. There was, of course, a substantial possibility that if the Administration's hope that private capital would build the necessary plant should be realized, First Boston, as one of the largest and most experienced firms engaged in arranging the financing of such enterprises, might be employed by the company which got the contract. As early as January 1954, it occurred to Mr. James, counsel for Dixon, that because of the public versus private power controversy which lay behind the whole project, and because First Boston would be a logical choice of the sponsors to manage the financing of the enterprise, if a contract should be made, critics of the project might make something of Wenzell's participation. At his

counsel's suggestion, Dixon spoke to Wenzell, calling attention to the possibility of criticism, and suggesting that Wenzell discuss the matter with the Bureau of the Budget and with his counsel. Wenzell on the same day, February 23, spoke to Hughes about the matter, saying that it might become a matter of embarrassment to the Administration, and suggesting that Hughes discuss the subject with his political advisers. Hughes said that Wenzell was exaggerating the importance of the matter, but advised him to discuss it with his principals in First Boston and with First Boston's lawyers, and then talk to Dodge about it. Wenzell, on February 23, discussed the subject with Mr. Coggeshall, President of First Boston, who arranged for him to talk to Mr. Raben of Sullivan and Cromwell, First Boston's counsel. Wenzell told Raben that he had orally advised Dixon as to the cost of money borrowed for such projects, and had written a draft of a letter containing the same information. He said that First Boston had not been employed by the sponsors to handle the financing, but that it might be requested to do so if the Government and the sponsors should succeed in making a contract. Raben advised Wenzell to terminate his employment as consultant in the Bureau of the Budget forthwith, and in writing; to advise First Boston that if it was later requested to handle the financing, if a contract should be made, it should consider whether it would be wise to do so, or, at least, whether it would be wise to accept a fee for doing so. Raben also told Wenzell to keep Dodge and Hughes informed of any developments in the matter. Raben telephoned to his senior partner, Arthur Dean, who was in Washington. Dean said he did not think there was a conflict of interest, but there was a problem of policy. He confirmed Raben's advice as to what should be done.

Wenzell did not resign from the Bureau of the Budget immediately, but continued to work for it until April 3. Hughes did not call upon him for any services after that date. He never submitted a written resignation.

At least as early as April 12, Wenzell was of the opinion that if the Government and the sponsors made a contract, First Boston would be asked to undertake the financial arrangements for the sponsors. As it turned out, his assumption was unfounded, because, a month after that time, Dixon felt perfectly free to place 40 percent of the financing business with Lehman Brothers, and would, apparently, have felt perfectly free to place all of it elsewhere than with First Boston if he had so desired.

As we have said, the Government pleads the activities of Wenzell as a justification for its repudiation of its contract with the plaintiff. This presents a problem which obviously requires exploration. Ordinarily, in a conflict of interest case, there is a person who is acting for the Government in the negotiation of a contract but, who at the same time, has an interest in the other party to the contract which interest would cause him, or tempt him, to promote the contract, or permit favorable terms to be inserted in it, because that other party, and he through it, would profit by his acts. Ordinarily the conflicting interest of such a person is unknown to his superiors, or to those of his superiors who are faithful to their duties to the Government.

The instant situation is unusual in several respects. Wenzell had no interest in the plaintiff, which the Government seeks to make the victim of Wenzell's situation. He was not hired by the plaintiff; he owned no stock in the plaintiff. He had an interest in First Boston which company, by the logic of circumstances, might be offered the work of arranging the financing of the project when and if a contract for the project should be made. The sponsors had, during the time that Wenzell had been working for the Bureau of the Budget, made no commitment to or had any discussion with First Boston about handling the financing of

the hoped for project. That the sponsors did not feel that they were, somehow, under an unexpressed but honorary commitment to First Boston is evident from the fact that, when the time came, in May, to make arrangements for the financing of the hoped for project, Dixon, as we have seen, insisted over the objection of First Boston that Lehman Brothers should have a 40 percent interest in the financing, because that firm had some special talents that might be of use.

The sponsors, though they had not employed Wenzell, nor given him any interest in their enterprise, were the first to see the possibility that criticism might be directed at Wenzell's activities. They, rightly as it seems to us, saw the problem not as a conflict of interests problem but as a political public versus private power problem which presaged a fight with no holds barred. They in effect told Wenzell that he ought to get out. They could not fire him because they hadn't hired him. Wenzell reported the sponsors' admonition to Hughes, who saw no reason for alarm and kept on assigning tasks to Wenzell, and to First Boston, which obtained advice of counsel that Wenzell ought to get out, but did not follow it up by getting him out. So the two entities that had the power to remove Wenzell from the scene, the Government and First Boston, did not do so, and the entity that urged his removal but had no power to effect it, is sought to be made the victim of his nonremoval. Wenzell is sought to be assigned the role of a fifth-column, a secret weapon fortunately though without evil purposes planted by the Government, but adequate to destroy the enemy if it became necessary to resort to such a weapon. There is, it seems to us, something essentially cynical about the Government's Wenzell defense.

The Government concedes that the contract which it seeks to repudiate was an honest one, arrived at after hard and skilful bargaining by representatives of the Government who had complete fidelity to their trust, and which became useless to the Government only because of the intervention of a *force majeure*, the decision of the City of Memphis to generate its own power. The purpose of the contract being thus frustrated, the Government summons, in order to escape its responsibilities under its honest contract, the great moral and legal generalization that a servant cannot faithfully serve two masters. We think the applicability of the generalization to the instant situation must be carefully scrutinized, lest, not uniquely, a worthy principle be used to arrive at an unworthy result.

Suppose the Government wanted to determine the feasibility of building a bridge in a difficult location. An experienced and reputable bridge engineer is an official of a steel company. The Government employs him as a consultant to work with Government staff engineers and other consultants to determine whether, and how, the bridge could be built, and to work out the terms of a contract with a contractor who has shown an interest in building the bridge. The consultant works through the feasibility stage of the investigation, and during the preliminary stage of negotiation with the contractor, when the question was whether the bridge could be built at a price which the Government would consider it prudent to pay. Then the consultant ceases his work. The terms and details of the contract are laboriously worked out by faithful representatives of the Government and the contractor. The contract is signed. The contractor then begins to place its orders for the steel which it will need to build the bridge. It, for good business reasons, orders some of the steel from the company whose engineer had been employed by the Government as a consultant. Some event intervenes which convinces the Government that the bridge ought not to be built at all, and it cancels the contract. The contractor has been subjected to expense by the steps it took toward performance before the contract was canceled. It requests reimbursement for those expenses. The Government dis-

claims liability, on high moral principles. It concedes that the contract was an honest one, fairly negotiated and agreed upon. It is obvious that if its intervening change of mind had not occurred, and the contract had continued to be regarded as advantageous to the Government, the Government would have insisted upon performance and would have sought to recover damages from the contractor if it had refused or failed to perform. But, it says, we, with full knowledge of the possibility that his company might make a profit by selling steel to the contractor if it should be decided that it was feasible to build the bridge, and if a contract to build it should be made, employed a consultant who had a part in the early stages of the deliberations about the bridge. The purported contract is, therefore, for moral reasons, a nullity.

In the hypothetical case, and in our instant case, the possibility of the consultant's principal employer's indirectly making a profit out of the project about which he was consulted, would extend to almost any conceivable private industry from which a competent consultant could be obtained. If an industry is not engaged in the kind of business about which the Government needs practical advice, it will not be called upon to furnish a consultant. If, then, the Government intends to treat the possible indirect interest of a consultant's employer as injecting a taint of illegality into any contract which might eventuate, the whole transaction becomes futile nonsense, a nullity before the beginning of even preliminary discussion. The Government itself has introduced the impurity into the draught, and later spurns it, because it itself has polluted it.

In Muschany v. United States, 324 U.S. 49, 66–67, 65 S.Ct. 442, 451, 89 L.Ed. 744, the Supreme Court said, with regard to the Government's argument that the contracts there in question were in violation of public policy and were therefore void:

> "Our inquiry at this point, since corruption is not shown, is as to whether the likelihood of disadvantage to the Government is so menacing as to prohibit such contracts regardless of the effect in a particular case.
>
> "* * * Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Vidal v. Mayor, Aldermen and Citizens of Philadelphia, 2 How. 127, 197, 11 L.Ed. 205. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112; Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500. It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy."

Our conclusion is that Wenzell's activities were not within the prohibition of the statute, 18 U.S.C. § 434,[1] on which the Government relies, nor were they

---

1. "Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both."

such as to render the contract in question unenforcible on grounds of public policy.

We think that, to reach the conclusion that the criminal statute here in question had in fact been violated, we would have to discard all the precedents with regard to the proper interpretation of criminal statutes. We would have to conclude that 18 U.S.C. § 434 was intended by Congress to be an expansive net long enough and broad enough to catch a Government employee and subject him to fine or imprisonment if he saw in the transaction a possibility that it might eventuate in a profit to him, or if he thought, mistakenly, that it would eventuate in a profit to him.

As we have seen, Wenzell's employer, First Boston, through which Wenzell's criminal conduct must be established, if it is established, did not have an interest in the Dixon-Yates transaction until after Wenzell's Government employment had terminated. There is not a shadow of evidence that it had any agreement or commitment, written or oral, formal or informal, contingent or otherwise that, in the event that the proposal which was in preparation when Wenzell's Government employment ended should result in negotiations which should, in the course of events, result in a contract, First Boston would be given the opportunity to earn a commission by selling the bonds of the corporation which would be formed to sign and perform the contract. The evidence is perfectly plain that there was no such agreement or understanding. As we have seen, a month after Wenzell's Government employment had terminated, Dixon-Yates felt perfectly free to give the bond-selling business to whomever it pleased.

To treat such a prospect, or hope, or even mistaken belief in a nonexistent understanding, as a direct or indirect interest, subjecting the possessor of it to a fine or imprisonment or both, would seem to us to require that we discard all that the Supreme Court has taught us as to how to interpret a criminal statute. Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52; United States v. Halseth, 342 U.S. 277, 72 S.Ct. 275, 96 L.Ed. 308; Federal Communications Commission v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356.

It is suggested that there is something sinister about the fact that Wenzell did not, as the lawyers for First Boston advised him to do on February 26, resign from his Government work "immediately, and in writing." Three days earlier, Wenzell had discussed with Hughes the possibility that if a contract should be made with the sponsors, First Boston might be asked to participate in the financing of it. Hughes thought that Wenzell was exaggerating the importance of the matter, and kept on calling on Wenzell to do chores for him in connection with the contract, until April 3. The fact that Wenzell did not resign "in writing", he having been employed by means of a telephone call, and all of his assignments having been given him orally, shows that he did not understand the importance which the lawyers attached to having documentary evidence in the file for a possible Congressional investigation or a lawsuit. We see nothing sinister in his not being cagy. The lawyers did not advise Wenzell to resign because they saw in his situation a conflict of interest. They saw in it a question of policy, for First Boston. On March 9 Wenzell was told by Dodge, the Director of the Bureau of the Budget, that since there was, at that time, not even a proposal which could be used as a basis for negotiation, and in any event a long period of negotiation would precede the making of a contract and its financing, there was no immediate problem with regard to First Boston's possible participation in the financing. He said that if there was a possibility that First Boston might participate in the financing, Wenzell should wind up his

work for the Bureau of the Budget as soon as possible. As we have seen, Hughes, Dodge's Assistant Director, kept on giving Wenzell chores to do for some three weeks longer, until April 3. We think that Wenzell's failure to resign ostentatiously and immediately, as a lawyer might have done, is of no significance.

The Government urges, in effect, that the doctrine which it calls to its defense is a prophylactic generalization which must be applied in cases of honest transactions in order to keep it available and effective in cases of dishonest transactions. The thought is that the Government, like the infant and the idiot, must have the protection of a broad legal incapacity. In this case the actor for the United States was the Director of the Budget, acting immediately under and on behalf of the President of the United States. What he did was done legally, honestly, and with complete fidelity to the interests of the Government. The powers of even the Government's highest officials are defined by statute. We do not see in the case before us an instance in which the Government needs, as additional protection against the honest acts of its highest officials, a diaphanous cloak of immunity woven from an asserted vague and undefined public policy. We point again to the language of the Supreme Court in the Muschany case.

The Government has interposed other defenses, in addition to the one founded upon the activities of Adolphe Wenzell. Because this opinion is already long, our treatment of these defenses will be brief.

### The "Replacement" Defense

█ █ The Government says that section 164 of the Atomic Energy Act of 1954, 68 Stat. 951, 42 U.S.C.A. § 2204, did not authorize the AEC to make the contract here in question. We quote the part of the section here pertinent in a footnote.[2] The argument, in brief, is that the electric power contracted for in the contract in question was not to be used by AEC, and was not to be furnished to TVA "in replacement" of power furnished by TVA to AEC. The legislative history of section 164 shows that its language was written for the purpose of authorizing the very kind of a contract that was eventually made. If furnishing power to TVA at Memphis so that TVA could continue to furnish power to AEC at Paducah without neglecting to fulfill the expanding needs of its existing customers is not aptly describable as replacing to TVA power furnished by it to AEC, then Congress can be said to have used inept language. That would, if true, be no reason for a court to frustrate the undoubted intention of Congress.

### The "Waiver" Defense

█ The Government says that certain statutory requirements of section 164 of the Atomic Energy Act of 1954, supra, were not complied with, and that the contract, as a consequence, never became effective. It relies on the following language in section 164:

> "Any contract hereafter entered into by the Commission pursuant to this section shall be submitted to the Joint Committee and a period of

2. "The Commission is authorized in connection with the construction or operation of the Oak Ridge, Paducah, and Portsmouth installations of the Commission * * * to enter into new contracts or modify or confirm existing contracts to provide for electric utility services for periods not exceeding twenty-five years * * *. The authority of the Commission under this section to enter into new contracts or modify or confirm existing contracts to provide for electric utility services includes, in case such electric utility services are to be furnished to the Commission by the Tennessee Valley Authority, authority to contract with any person to furnish electric utility services to the Tennessee Valley Authority in replacement thereof."

thirty days shall elapse while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of adjournment for more than three days) before the contract of the Commission shall become effective: Provided, however, That the Joint Committee, after having received the proposed contract, may by resolution in writing, waive the conditions of or all or any portion of such thirty-day period."

The contract here in question was submitted to the Joint Committee on Atomic Energy on November 11, 1954, the day the contract was signed. Congress was not in session at that time, and that Congress did not reconvene. The new Congress convened on January 5, 1955. The Joint Committee had been in session for some days before November 11, considering drafts of the contract, and considering whether the committee should waive the 30-day waiting period. On November 13 the committee adopted, by a 10 to 8 vote, a resolution waiving the waiting period. On January 28, 1955, the Joint Committee adopted, by a vote of 10 to 8, a resolution rescinding the resolution of waiver of November 13, 1954.

The Government says that the Joint Committee had no authority to sit when Congress was not in session and that the purported submission of the contract to the committee on November 11, and the committee's purported waiver of the waiting period on November 13, were ineffective. AEC, in a brief filed with the Securities and Exchange Commission in proceedings in January 1955, seeking that Commission's approval of the plaintiff's equity financing, took the position that the Joint Committee had the power, though Congress was not in session, to waive the 30-day waiting period. The defendant herein, the United States, took the same position in a brief filed as *amicus curiae* with the United States Court of Appeals for the District of Co-

lumbia, in proceedings to review the SEC's order approving the plaintiff's equity financing. The General Counsel of the AEC, and the Assistant Comptroller General of the United States, in formal official opinions, took the same position. We agree with these several opinions of representatives of the United States, rendered *ante litem motam.*

### The "Indemnity" Defense

■ The Government says that the contract in question violated the following provision of section 12(a) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79*l*(a):

"It shall be unlawful for any registered holding company, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly, to borrow, or to receive any extension of credit or indemnity, from any public-utility company in the same holding-company system or from any subsidiary company of such holding company * * *."

In order to insure that the plaintiff would have sufficient income to amortize its bonds, as payments for that purpose came due, an agreement between the plaintiff and the operating subsidiaries of the sponsors was drafted, under which the subsidiaries agreed to take and pay for any surplus power which the plaintiff might have on hand because of the failure of TVA to take the agreed amount, and the subsidiaries also agreed to make up any shortage of power which the plaintiff might incur because of, for example, the disabling of its generators. The sponsors guaranteed the performance of the agreement by their respective subsidiaries. This agreement was called the "back-up and surplus power agreement." The making of this agreement was required by section 2.02 of the contract here in suit. The agreement was never actually executed because the Government's cancellation of the plaintiff's contract intervened.

The Government says that this agreement was a violation of section 12(a) of the Holding Company Act, quoted above. The SEC in its decision approving the plaintiff's equity financing, expressly held that the back-up and surplus power agreement was not a violation of section 12(a) of the Holding Company Act. The interpretation of that provision of that Act, and its application to various possible arrangements within utility systems, is peculiarly a subject for the expert handling of the Securities and Exchange Commission. We are not persuaded that its decision was erroneous.

#### The "Regulatory Approvals" Defense

■ The Government says that the contract had not become effective because the plaintiff had not, at the time the Government terminated the contract, secured all the regulatory approvals which were required. The Government refers to section 8.15 of the contract which reads as follows:

> *"Regulatory Approvals and Indebtedness*: The obligations of the parties hereunder shall be subject to the following:

> "(1) the receipt of all regulatory approvals, in form and substance satisfactory to the Company, necessary to permit the Company to perform all the duties and obligations to be performed by it hereunder or necessary to permit it to issue shares of its capital stock to the Sponsoring Companies and to issue the indebtedness referred to herein;

> "(2) the execution and performance by institutional investors and banks of contracts or commitments, in form and substance satisfactory to the Company, providing for the issuance by the Company and the purchase by such investors and banks of the indebtedness referred to in the recitals of this contract; * * ."

The Government points out that, though the SEC had approved the plaintiff's equity financing, that approval had been appealed to the United States Court of Appeals for the District of Columbia; that though the plaintiff had applied to the SEC for approval of its bank loan agreements and bond sale agreements, the SEC had not yet acted upon this application. It urges that since the regulatory approvals had to be "in form and substance satisfactory to the Company" (plaintiff), not only had the contract not become effective in point of time, but it was invalid for lack of mutuality, since the plaintiff could escape liability under it by being dissatisfied with the approvals which the pertinent regulatory bodies would give it.

The parties expressly agreed, as shown in our findings 8, 9 and 191, that the contract became effective December 17, 1954. They must, therefore, have construed the provisions of section 8.15, quoted above, as conditions subsequent. As such, they would mean that the plaintiff could escape liability only if it could not, after diligent effort, obtain regulatory approvals which would be satisfactory to a reasonable person, in the circumstances. There is no indication that the plaintiff was not diligent in seeking the necessary regulatory approvals, or would have been dissatisfied with such approvals as were practically attainable. So far as appears, the only reason the plaintiff did not get the approvals was that the Government's cancellation of the contract rendered the plaintiff's applications moot.

We conclude that none of the Government's defenses is valid, and that it is liable to the plaintiff for its breach of the contract.

#### The Measure of Damages

■■ The plaintiff does not seek to have its damages measured by the usual rule, which would entitle it to the profits which it would have made if it had been allowed to perform its contract and receive the compensation provided in the contract. The plaintiff says that the contract in question provided its own

agreed measure of damages in case the Government should cancel the contract. It points to section 7.07 of the contract, entitled "Cancellation Prior to Completion." That section, which is quoted in full in finding 205, provides in paragraph 1 that if, prior to the commencement of commercial operation of the third unit of the plant, the power requirements of AEC should be so reduced that it no longer needed the power contracted for, and if TVA did not elect to take the power, AEC should be entitled to cancel the contract by written notice, the effect of the cancellation being stated in paragraph 2.

Paragraph 2 of section 7.07 provides that if the notice of cancellation should be delivered prior to the time when the plaintiff had incurred expenditures of $40,000,000 on the project, then

"the AEC shall pay to the Company as cancellation costs such amount or amounts that there shall be available for distribution to the Sponsoring Companies net assets, including at cost to the Company land acquired for the site of the Facilities, equivalent to the investment of the Sponsoring Companies in the equity of the Company up to the effective date of such cancellation, after payment and satisfaction of all reasonable liabilities, costs, indebtedness, cancellation or revocation costs and damages, and all other reasonable costs, expenses, charges and losses resulting from such cancellation, including carrying charges on indebtedness of the Company to the earliest practicable date for the retirement thereof after the receipt of payment by the AEC under this paragraph, together with any premium payable upon the redemption of such indebtedness; * * * "

The Government points out that there was no reduction in the power requirements of the AEC, hence the Government could not have canceled and did not cancel the contract pursuant to the provisions of section 7.07. The plaintiff says that it has the right to waive the wrongfulness of the cancellation and have its damages measured by the provisions agreed upon for cases of rightful cancellation.

The Government's insistence that its cancellation was a breach of contract, rather than a cancellation permitted by the contract, is an attempt by the Government to profit from its own wrong. We say this because we suppose that the Government would not take this position unless it thought it saw in it an advantage to be gained by having the damages determined by a measure other than that agreed upon in section 7.07 of the contract.

We think that paragraph 1 of section 7.07, fairly, though not literally, read, was applicable to the cancellation here in question. The cancellation took place because the Government no longer needed the power contracted for. The indirect and awkward arrangement of the contract was to have AEC purchase power to be delivered to and used by TVA. Section 7.07(1) said that if AEC's power requirements were reduced so that it did not need the power contracted for, and if, then, TVA did not elect to take it, AEC might cancel the contract, with the cancellation consequences provided in section 7.07(2). In fact, as both parties knew, AEC was never intended to get the power, and the lack of need for it by TVA would be the event that would necessitate and justify the cancellation of the contract. The essential purpose of section 7.07 was to provide a method of measuring damages if cancellation should occur, as it did, before the plant was built and put in operation.

We further think that the plaintiff's argument that the condition upon which the Government might lawfully cancel the contract, with a defined and limited liability for damages, was a condition which it could insist upon, or waive, at its election, and that the Government cannot elect to be a wrongdoer, an unjustified

contract breaker, in order to gain some real or supposed advantage from its assumed turpitude, is a valid argument.

If the parties had foreseen what in fact occurred, and had covered that occurrence by an agreement specifically and unquestionably applying to the events that occurred, as to how to measure the damages, we do not see how the Government could have urged that it should pay less for a wrongful cancellation than for a rightful one. That much, at least, may be said for the fairness of the plaintiff's contention. In any event, the measuring of damages for the breach of a contract which is to be performed over many years, here 25 years, is a speculative and unsatisfactory task. It is not unnatural that a court, in such a case, would wish that the parties had agreed upon a formula which would permit the damages to be measured by arithmetic, rather than by speculation and prophecy. When the parties have in fact agreed upon a formula readily applicable to the situation at hand, though they did not agree to its application to that exact situation, we think a court has the right to make use of the formula, if to do so seems fair to the court. In short, we do not think that one of the parties has a right to require a court to measure damages by a hard and unsatisfactory method, when that party has agreed to an easier and more satisfactory method for a closely comparable situation.

The language of the second paragraph of section 7.07 of the contract, quoted above, is our guide as to what items should be included in the plaintiff's recovery. It was at all times during the negotiation contemplated that the sponsors were to form a new corporation which would sign and perform the contract. The expenses which the sponsors paid or became obligated to pay were proper charges against the new corporation, the plaintiff, and are therefore proper subjects of recovery by the plaintiff. The expenditures made and obligations incurred by the plaintiff after its incorporation, in connection with the negotiation of the contract, its performance, and the mitigation of damages after its cancellation are recoverable. The counsel fees and expenses incurred by the sponsors are not vulnerable on the ground of duplication of services. It was natural that each sponsor should have the advice of its own counsel with regard to this important venture. The costs of administrative and court proceeding engaged in for the purpose of obtaining the necessary regulatory approvals is includible. Interest at the legal rate on the money invested by the sponsors in the stock of the plaintiff, computed to the date of termination of the contract, is a recoverable item, according to the language of section 7.07 of the power contract and of section 4.02 of the "interpretative memorandum."

Counsel fees and other expenses incurred in preparing for and prosecuting the instant litigation may not be recovered.

In paragraphs 19 and 22 of its petition, the plaintiff says:

"The plaintiff will also incur additional expenses prior to the satisfaction of the judgment herein, the amount of which will be supplied by amendment hereto."

The parties stipulated at the trial that, with regard to post-petition claims, only the question of liability would be presently decided, and the amount of the recovery, if any, would be determined in further proceedings. Expenditures made and obligations incurred after the filing of the petition, incident to the termination and settlement of commitments made in connection with the making and performance and termination of the contract, are recoverable.

The claims asserted on behalf of plaintiff and several of the use-plaintiffs for "compensation for the loss of the use of their money represented by their respective claims" are not recoverable. These claims amount to a request for an allowance of interest on the judgment

awarded, and since neither the Power Contract nor any applicable statute provides for such an award of interest, none is recoverable in this action. 28 U.S.C. § 2516. United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521.

We conclude that the plaintiff is entitled to recover on the following claims in the amounts indicated:

| Claim | Finding | Amount claimed | Amount allowed |
|---|---|---|---|
| Dickmann-Pickens-Bond Construction Co. | 210 | $14,553.03 | $14,553.03 |
| J. A. Jones Construction Company | 212 | 143,160.33 | [1] 143,160.33 |
| Pandick Press, Inc. | 213 | 38,338.76 | 38,338.76 |
| Reid & Priest | 214 | 7,097.12 | 7,097.12 |
| House, Moses & Holmes | 215 | 7,500.00 | 7,500.00 |
| Arthur Andersen & Co. | 216 | 16,469.66 | 16,469.66 |
| Middle South Utilities, Inc. | 217 | 4,651.86 | [2] 3,032.11 |
| The Southern Company | 218 | 29,391.29 | [3] 21,147.45 |
| Arkansas Power & Light Co. | 219 | 7,484.09 | 7,484.09 |
| First National City Bank of N.Y. | 220 | 500.00 | 500.00 |
| White & Case | 220 | 500.00 | 500.00 |
| Mississippi Valley Generating Co. | 221–230 | 618,658.07 | [4] 616,158.76 |
| Ebasco Services, Inc. | 231 | 570,727.59 | [5] 565,028.02 |
| Cahill, Gordon, Reindel & Ohl | 233–235 | 235,198.76 | [6] 232,491.75 |
| Winthrop, Stimson, Putnam & Roberts | 236–238 | 104,128.67 | [7] 103,296.63 |
| Willkie, Owen, Farr, Gallagher & Walton | 239–240 | 75,787.85 | 75,787.85 |
| Milbank, Tweed, Hope & Hadley | 241–242 | 15,000.00 | 15,000.00 |
| Total amount allowed | | | 1,867,545.56 |

[1] This amount includes $11,027.79 for the benefit of Oman Construction Company.

[2] There is disallowed $1,619.75 representing an unnecessary expenditure for transcripts.

[3] Payments to Southern Services for salaries, overhead and travel expenses of its personnel in the sum of $2,446.55 in connection with the April 10, 1954, proposal to AEC and also in the amount of $2,999.28 in connection with negotiating the Power Contract, are disallowed as coming within the categories of unreimbursable expense defined in the interpretative memorandum set forth at the end of finding 218. There is also disallowed $2,798.01 as an unnecessary expenditure for transcripts.

[4] There is disallowed $2,500.00 representing the value of the sand deed acquired by plaintiff.

[5] There are deducted and disallowed $3,239.15 and $1,500.42 because of plaintiff's failure to show that Ebasco was not required to absorb these expenses. There is also disallowed $960.00 because of plaintiff's failure to show that this item was a true liability.

[6] There is disallowed $2,707.01 representing 63½ hours spent in preparing the petition in this lawsuit.

[7] There are disallowed: $264.74 representing 7 hours at an average hourly rate of $37.82, which time was spent in preparing the petition in this lawsuit; $567.30 representing 15 hours spent on the proposal to TVA.

---

Judgment will be entered for the plaintiff in the above total sum, said sum representing the amounts found to be due the plaintiff on a portion of its claim. The amount due the plaintiff on the remaining portion of its claim will be determined in further proceedings pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

ALBERT V. BRYAN, District Judge, sitting by designation, and LARAMORE, Judge, concur.

ALBERT V. BRYAN, District Judge (concurring).

The very law points now mooted to defeat the contract as unauthorized were originally vouched by the Government to conclude it. These remain unbowed. Besides, admittedly every act now pleaded to impugn the contract, as the opinion of the court also well recounts, was "begun, continued and ended" in good faith and in the full knowledge of the Government. In truth there was no imposture.

To vitiate the contract as a potential imposture, the Government would invoke the biblical precept, embedded in public policy and statute, denouncing duplicity in agency. With this doctrine it would first condemn its own agent for pursuing aboveboard the honest directions of his Government. Then the principle would be interposed against the plaintiff notwithstanding that the Government's agent was never the agent of the plaintiff or ever "interested" in the plaintiff's "pecuniary profits or contracts"—notwithstanding, too, that the Government gave the plaintiff no choice but to deal through this agent. All this the court's opinion patly demonstrates. Certainly

the principle is not so salutary it .must be vindicated by visitation upon an unoffending contractor.

A covenant of a contract is a pledge— something "more than a promise, and lesse than a Oath"—to perform or respond in damages. The bargain good or bad, the United States faithfully keeps her covenants.

REED, Justice (Retired), sitting by designation (dissenting).

The court finds in Muschany v. United States, 324 U.S. 49, 66–67, 65 S.Ct. 442, 89 L.Ed. 744, a precedent for upholding the validity of the present contract. Corruption as a basis for the invalidation of a government contract is considered neither in the Muschany case nor in this case. Both cases turn on whether the conduct was in violation of public policy and therefore void.

. The court cites, in support of its position, the conclusion reached in the Muschany case .that a contract to be invalid as a violation of public policy must be "so menacing as to prohibit such contracts regardless of the effect in a particular case." The Muschany case calls for maintenance of contractual obligations of the United States unless a dominant public policy or a statutory enactment declares its invalidity.[3]

In the Muschany case, the Government purchased land through its own agent by a contract that allowed the agent cost plus a fixed fee, a method specifically approved by a statute, The National Defense Act of 1940.[4] In this present case now under consideration, there is a domi-

nant public policy ,against a negotiator with a conflict of interest which is embodied in a statutory enactment punishing such conduct as criminal.[5]

In such situations a contract made in violation of the criminal statute is unenforceable. Accepting the argument of the majority that no improper motive influenced any action of Mr. Wenzell does not in our opinion make the Mississippi Valley contract valid. If contracts are made in violation of positive law, they are unenforceable.[6]

The Supreme Court of the United States approved that rule many years ago in the Bank of United States v. Owens, 2 Pet. 527, 7 L.Ed. 508. There the charter of the bank provided a limitation of six percent upon its loans or discounts. It was held that more was taken. The charter, however, did not provide that a contract for a greater sum was void. The court declared the answer was obvious; an unlawful contract could not be. enforced, and decreed no recovery.

Again in Miller v. Ammon, 145 U.S. 421, 12 S.Ct. 884, 36 L.Ed. 759, recovery on a bill for a sale of liquor without a valid license was denied, the Supreme Court holding:

"The general rule of law is, that a contract made in violation of a statute is void; and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover. * * *. And in Harris v. Runnels, 12 How. 79, 13 L.Ed. 901, this court, after noticing some fluctuations in the course of decision, and observ-

---

3. Muschany v. United States, supra.

4. 54 Stat. 712; Muschany v. United States, supra, 324 U.S. at pages 66–67, 65 S.Ct. at page 451.

5. See note 9, infra.

6. 6 Williston on Contracts (Rev.Ed., 1938), § 1763:
"For the protection of the public, or for purposes of taxation, or for both reasons, many statutes are enacted forbidding certain bargains and sales either altogether or unless certain statutory regulations are complied with. There can be no doubt that if a statute directly pro-

hibits a contract or sale it cannot be enforced by the parties to it, and the same is true if the formation or performance of the bargain is declared to be a crime. .The imposition of a penalty is at least prima facie an implied prohibition of the transaction to which the penalty attaches. On the other hand, even though no penalty is imposed, the transaction ·may nevertheless be invalidated." The text is supported by numerous cases. .See .Berka v. Woodward, 125 Cal. 119, 57 P. 777, 45 L.R.A. 420; Marshall v. .Baltimore & Ohio R. Co., 16 How. 314, 334, 14 L.Ed. 953.

ing 'that we have concluded, before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so,' added: 'It is true that a statute, containing a prohibition and a penalty, makes the act which it punishes unlawful, and the same may be implied from a penalty without a prohibition; but it does not follow that the unlawfulness of the act was meant by the legislature to avoid a contract made in contravention of it. When the statute is silent, and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void.'" 145 U.S. at pages 426–427, 12 S.Ct. at page 886.[7]

This court has strongly supported the application of the rule against the validity of contracts where an officer or agent of the United States participates in their adoption. In Curved Electrotype Plate Co. of New York v. United States, 50 Ct.Cl. 258, a suit on an implied contract to pay for the Government's use of a patent was dismissed on the ground of an interest in the contract by the Public Printer responsible for its use. This court said, at page 271, referring to section 1783, Revised Statutes, the forerunner of 18 U.S.C. § 434, the section the Government relies on here:

"* * * section 1783, Revised Statutes, forbids any person directly or indirectly interested in the pecuniary profits or contracts of a commercial corporation acting as an officer or agent of the United States for the transaction of business with such corporation. It is not clear

that by the alleged transfer to his sister-in-law of his stocks in this and other concerns Mr. Benedict intended to deprive himself of all ownership therein. Certainly the statement that his purpose was to give the full benefit of the stock in plaintiff corporation to his brother in case the latter was able to repay him the advances he had made is inconsistent with an absolute transfer of his stock to his sister-in-law, because, if it was hers, he could not give his brother the benefit of it, even if the advances were repaid. Certain it is that Mr. Benedict regarded himself as equitably entitled to compensation out of the corporation's receipts, and he says as much."

See Rankin v. United States, 98 Ct.Cl. 357, which is in accord. Compare Architects Building Corp. v. United States, 98 Ct.Cl. 368, 380, where a ministerial act, signing a contract, was held permissible under Revised Statutes 1783. This court said, at page 380:

"We believe this is one of the exceptions to the general rule. It was not the intention of the statute to cover a case of the nature of the instant case where the action of the President of the Corporation, who happened to be an agent of the Government, was solely for the purpose of officially signing the lease or voting on its acceptance, and where he took no part in the negotiations and derived no benefit, his actions being purely ministerial and in no way detrimental to the interests of the United States and transcended no public policy."

It appears that the English courts apply the same rules as to contracts in violation of statutes. In Barton v. Piggott, L.R. 10 Q.B. (1874) 86, a surveyor of highways, forbidden by statute to have an interest in a contract for work or materials, unless a license in writing was

---

7. The Restatement of the Law of the American Law Institute is in accord. It recognizes, too, that where refusal to enforce or rescind a bargain would pro-

duce a harmful effect on parties for whose protection a statute was passed, the illegal contracts may be enforced. A.L.I. Contracts, §§ 580 and 601.

first obtained, had his accounts for such work subsequently approved by the appropriate justices who were authorized to approve beforehand. It was held unlawful to allow accounts declared illegal by another provision of the statute.

Pollock on Contracts (13th ed.), 275, phrases the present English rule in these words:

"(b) The imposition of a penalty by the legislature on any specific act or omission is *prima facie* equivalent to an express prohibition.

"These rules are established by the case of Bensley v. Bignold, which decided that a printer could not recover for his work or materials when he had omitted to print his name on the work printed, as then required by statute. It was argued that his right under the contract was untouched by the Act, which contained no specific prohibition, but only a direction sanctioned by a penalty. But the Court held unanimously that this was untenable, and a party could not be permitted to sue on a contract where the whole subject-matter was 'in direct violation of the provisions of an Act of Parliament.' And Best, J. said that the distinction between *mala prohibita* and *mala in se* was long since exploded. The same doctrine has repeatedly been enounced in later cases.

"Thus, for example, by the Court of Exchequer:

" 'Where the contract which the plaintiff seeks to enforce, be it express or implied, is expressly or by implication forbidden by the common or statute law, no Court will lend its assistance to give it effect. It is equally clear that a contract is void if prohibited by a statute, though the statute inflicts a penalty only, because such a penalty implies a prohibition.'

"It is needless to discuss the 'policy of the law' when it is distinctly enunciated by a statutory prohibition." [8]

Such unanimity of view as to the invalidity of contracts that violate specific statutory prohibitions brings us to an examination of the statute here in question. It appears below.[9] It was enacted to meet a specific menace to the fair negotiation of federal contracts and is akin to other statutory requirements to insure against corrupt influences, such as the requirement for statutory authority in the contracting officer or prior advertisement, or those that bar fiduciaries from profiting from dealings with their *cestui que* trust.[10] This section of the Code originated as Sec. 8 of An Act to prevent and punish Frauds upon the Government of the United States. It was enacted March 2, 1863, 12 Stat. 696, as a result of prolonged investigation and reports to Congress on the war contract frauds of that era.[11]

Government contracts are not only large in number and value but are negotiated by numerous contracting officers of varying ability and experience. The statutes for the protection of the Government are not because of frequent fraudulent influences but are to guard against the situations that may arise. They

---

3. Bensley v. Bignold (1882), 5 B. & Ald. 335; 24 R.R. 401.

9. 18 U.S.C. § 434:
   "Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or im-

prisoned not more than two years, or both."

10. In re Floyd Acceptances, 7 Wall. 666, 19 L.Ed. 449; United States v. Ellicott, 223 U.S. 524, 543, 32 S.Ct. 334, 56 L. Ed. 535; Securities & Exchange Comm. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. See Federal Conflict of Interest Statutes, 65 Harv.L.Rev. 955, 957.

11. H.R.Rep. No. 2, 37th Cong., 2d Sess., Government Contracts, and Supplement.

should be fairly interpreted so as to carry out their purpose to protect against a tendency to overreach the Government but are not to be extended to situations "not clearly within its terms." [12] In such cases as we have before us, it must be plain not only that, as we have shown above, the law makes illegal contracts that the statutes forbid, but that the questioned actions violate the statute.

Mr. Wenzell acted as an agent of the United States for the transaction of business with the business entity, which transactions immediately resulted in a contract with the Atomic Energy Commission for the construction of generating facilities. The entity became the Mississippi Valley Generating Company. The words, "such business entity," were inserted in § 434 to insure that all types of business arrangements were included.[13] The fact that Mr. Wenzell received no salary from the Government but only reimbursement of expenses does not affect our conclusion that he was employed and acted as an agent of the United States in analyzing the cost of TVA's production of electricity for the Budget Bureau. This was to be compared with the cost of generation by private operators. To accomplish this analysis, Mr. Wenzell was furnished detailed information as to TVA operations, including costs.[14] The knowledge thus acquired was passed on to First Boston, his employer and a prospective agent for the sale of the private securities of the sponsoring company, in the fall of 1953, by Mr. Wenzell, although the Bureau had forbidden such disclosure as it was a confidential Bureau document. Finding 35. With First Boston's previous experience in a similar transaction with Ohio Valley Electric Corporation, Mr. Wenzell's company was well equipped to handle the financial affairs for any builders of the needed generating plant. Mr. Wenzell submitted his report to the Bureau of the Budget September 20, 1953. Finding 29.

Shortly thereafter steps were taken by the responsible officials of AEC and the Budget to negotiate with private power companies for furnishing the needed electricity. The Government considered it desirable to recall Mr. Wenzell for assistance in the negotiation. He was recalled and came in the middle of January 1954, as a Budget Bureau consultant, and worked for it in and out of Washington until April 3, 1954. Finding 106. His expenses for this period were paid sometimes by the Government, sometimes by First Boston. Finding 99. Mr. Wenzell consulted frequently in this period with the private sponsors of the construction plan as a representative of the Budget Bureau to work out a plan for private construction of the facilities. He was the only representative of the Budget Bureau at an important meeting on January 20, 1954. Finding 50. Various meetings followed concerning the sponsors' proposals in which Messrs. Wenzell and Dixon, an active sponsor of Mississippi Valley, participated. Findings 50–67. The negotiators submitted a proposal to the AEC on February 25, 1954. This proposal was analyzed by the Budget Bureau, and Mr. Wenzell participated in the work. The conclusion was reached that the sponsors' proposed cost was too high.[15] The sponsors revised their cost estimates after various contacts with Mr. Wenzell. The Budget asked him to see Seal, a sponsor's representative, about new figures. He did so. Finding 84. He discussed the sponsors' offer with the sponsors' representatives, Messrs. Dixon and Yates, at a meeting with a senior officer of First Boston on March 10, 1954. Finding 86. During the period between the first and second proposals, there were several telephone calls and meetings between Wenzell and the sponsors' representatives concern-

12. United States v. Chemical Foundation, 272 U.S. 1, 18, 47 S.Ct. 1, 71 L.Ed. 131.

13. H.R.Rep. No. 304, 80th Cong., 1st Sess., Sec. 434, A32.

14. Findings of Fact 24 through 35, particularly 30.

15. Findings 60–100, particularly 89–90.

ing these proposals.[16] Later, at a general discussion at which Mr. Wenzell was present, the sponsors were told they were close "to submitting acceptable figures." Findings 97–98. Their formal proposal dated April 10, 1954, was made to the AEC on April 12 at Washington. This was done after a conference that morning with First Boston over the cost of the necessary construction money, some one hundred million dollars, at which Mr. Wenzell and other First Boston officials, including the Chairman of the Executive Committee, were present. Finding 107. On that date "Wenzell expected that First Boston would handle the financial arrangements for the sponsors if a contract resulted from the April 10 proposal." Finding 108. The April 10th proposal was accepted by AEC as a "Satisfactory basis" for the negotiation of the contract finally concluded on November 11, 1954. Findings 129–131.

These facts establish, we think, that Mr. Wenzell was an employee of the United States participating in the transactions that culminated in the contract in question within the terms of § 434 of Title 18 U.S.Code. But before the contract should be declared unenforceable under the section in question, it must also be established that the agent was "an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts" of the business entity with which he transacts business for the Government, that is, the sponsors who became the Mississippi Valley Generating Company. We think he was directly interested, within the meaning of the statute, in the contract of Mississippi Valley with AEC. His negotiations were with the sponsors of the business entity that made that contract.

The majority opinion, we think, misjudges the thrust of the statute. It argues that it is not shown that First Boston had an interest in the contract as financial agent or otherwise until after Wenzell's governmental employment had terminated. Assume that fact as true.

The defense to this suit is not that First Boston violated § 434, but that Wenzell did.

The statute covers a person, not an officer, agent, or member of the Mississippi Valley business entity who is indirectly interested in the contracts of that business entity and acts as an agent of the United States for the transaction of business with such business entity. This covers Mr. Wenzell's situation.

Mr. Wenzell was a Vice President of First Boston receiving a salary and a bonus based upon the amount of business he brought the firm. Finding 125. If solely or partially through his contacts with the officials of Mississippi that business entity was induced, persuaded, or found it convenient to employ First Boston as its agent to "place the debt" of Mississippi with bond buyers, Mr. Wenzell could confidently expect recognition from First Boston.

The exact date of the contract between the Mississippi Valley business entity and First Boston on financing does not appear in the record. It was apparently at the meeting in Boston on April 12, 1954, to consider the submission of the sponsors' new proposal that arrangements were made. Findings 116 and 124. The retainer facts appear in detail in Findings 107–128.

The action of First Boston in refusing a fee for its services in the loan was predicated on the advice of counsel as to the questionable legality of Mr. Wenzell's dual role as government negotiator and official of the financial agent of Mississippi Valley. First Boston, at an executive committee meeting, October 21, 1954, decided not to accept compensation for its services, except out-of-pocket expenses, because the company thought the financing had flowed directly from the offer of Mr. Wenzell's services to the Budget by First Boston's President, Mr. Woods. Finding 117. It had been determined in May preceding that the fees would be split 60% to First Boston and 40% to Lehman Brothers. Finding 115.

16. Findings 87, 89, 90, 92, 94.

First Boston's fee for the OVEC financing, a transaction akin to this one was $150,000, plus $20,000 expenses. Finding 27. Apparently the question of waiving a fee came up in First Boston's Executive Committee meeting of July 1, 1954. No action was then taken. Until November 17, 1954, after the contract between Mississippi Valley and AEC was signed, neither Lehman Brothers nor any representatives of the sponsors "had notice of First Boston's attitude regarding the charging of a fee." Finding 117. But whether the financing was to be without compensation or not, First Boston considered it a valuable feather in its cap to be in the "senior position" of such a large financial transaction. Finding 113.

The problem raised by Mr. Wenzell's activities in connection with his representation of the United States in its negotiations with Mississippi was not new on July 1, 1954. Both the First Boston and Mississippi Valley sponsors had had the matter brought to their attention. Prior to the time the first proposal of the sponsors was submitted to the Budget and AEC, February 25, 1954, the sponsors' counsel advised Mr. Dixon of the possible conflict of interest because of Mr. Wenzell's representation of the Government, if First Boston was asked to handle the financing. Mr. Dixon immediately spoke to Mr. Wenzell about the matter. Finding 68. A similar warning also came to Mr. Wenzell from members of the Budget Bureau staff during Wenzell's participation in the negotiations concerning the second offer of the sponsors. Finding 76. Mr. Wenzell spoke to Mr. Hughes of the Budget about the possible conflict question raised by the sponsors of Mississippi Valley. He advised him to talk to counsel and then to the Director of the Budget. Mr. Wenzell then talked with Mr. Coggeshall, the President of First Boston who told Wenzell to take it up with First Boston's counsel, Sullivan & Cromwell of New York. On February 26, 1954, the day after the sponsor's first proposal to the AEC, Mr. Wenzell was advised by Sullivan & Cromwell to resign "forthwith and in writing" from the Budget Bureau. He was "also advised that if the proposal was later accepted and First Boston was requested to handle the financing the board of directors of First Boston should consider whether they wanted to accept the business and, if so, whether they should charge a fee." Finding 72. Mr. Wenzell did not resign immediately, nor ever in writing, but continued to negotiate for the Government on the new contract with the sponsors and First Boston, as shown above. No explanation has been offered of the failure of Wenzell to resign promptly after his attorney advised him to do so on February 26, 1954, nor as to why, after being advised of the possible charge of conflict of interest, as set out in unchallenged findings 78 and 79, he continued to attend meetings in the Budget Bureau where the sponsors' offers to the Government were discussed and analyzed. For us these facts show a complete indifference to an obvious conflict of interest in violation of 18 U.S.C. § 434.

The steps taken by Mr. Wenzell between the first unsatisfactory proposal of the sponsors of the Mississippi Valley contract and the proposal that ripened into the contract, February 25 to April 12, 1954, appear to us to have been taken when his interest in securing the financial representation of the sponsors by First Boston was direct, positive, and looked useful to his financial advantage as helpful to his employer, First Boston. The acts were carried out with full advice as to their questionable character. They violated the words of the statute. Cf. Waskey v. Hammer, 223 U.S. 85, 32 S.Ct. 187, 56 L.Ed. 359.

That statute was intended to protect the public against participation in negotiations by civil servants with interests conflicting with those of the Government, to prevent abuses, and inspire confidence. The record shows that Mr. Wenzell's study of TVA operating costs and practices, and his subsequent association with and advice to the sponsors of the Mississippi Valley contract negotiations were with the knowledge and approval of the

*Budget Bureau.* This, we think, does not validate the contract. The Government has been fortunate in securing the services of many able Americans who serve without compensation but so long as they retain an interest in their respective companies, they cannot, under the statute, negotiate contracts with them for the Government. He may advise the Government as to business matters but he cannot act as an agent of the Government for the transaction of business with any business entity in which he has an interest. This is the public policy the criminal statute lays down.

We have here no problem of unjust enrichment of the Government without payment for the benefits furnished it by the Mississippi Valley Generating Company. To now say that the contract is invalid may seem harsh since the evidence does not disclose a payment or an express promise of direct financial benefit to Mr. Wenzell or the First Boston, but if the statute in question is to perform its intended function in the protection of the Government against prohibited actions that might influence contracts by public agents with private connections, courts must carry out the legislative purpose. The Government has vigorously defended this suit to recover damages for breach of contract on the ground of the invalidity of the agreement. We think the Government's position on that ground of public policy is well taken and the petition should be dismissed.

JONES, Chief Judge (dissenting).

I agree with the dissenting opinion of Justice REED, but would add the following:

I would further emphasize the fact that the invalidity of the Power Contract does not rest upon the showing that it was entered into in bad faith, or corruptly, or for the purpose of perpetrating a fraud upon the Government. Nor do we have a criminal prosecution in which it is incumbent upon the defendant to establish criminal intent.

Rather, the issue is based on a principle older than this country itself, that no man who works for the Government may at the same time transact business with an entity in which, directly or indirectly, he has a pecuniary interest. The maxim that a servant cannot faithfully serve two masters is an ancient one and is grounded on the frailties of human nature. The warning it carries is proven each day by experience. Where loyalty is divided, the devotion and singleness of purpose demanded of its fulfillment is missing. The maxim has special significance for the Government because of the high standards of ethical conduct which it exacts from its employees.

For many years Congress has been concerned with the possible evils resulting from a compromise of this fealty by Government employees. To guard against the damaging effects of fraud in its various forms—by striking at one of its prolific sources—Congress as early as 1862 enacted a "conflict of interest" statute. 12 Stat. 577. To make certain that it covered any agent of the Government, Congress amended the law on February 25, 1863. 12 Stat. 696. Since that time this law has undergone little modification. The policy it sanctions is one seeking to remove the temptation to violate the trust relationship of Government service. Michigan Steel Box Co. v. United States, 49 Ct.Cl. 421; Rankin v. United States, 98 Ct.Cl. 357. The legislation is thus directed at a temptation to commit wrong. Not the *fait accompli.*

The application of the statute is not defeated by a failure to establish deliberate fraud or corruption on the part of the servant who feels, or might feel, the nudge of interests adverse to those of the Government. Indeed, the contract may be disaffirmed without a showing that the Government suffered actual damages as a result of the activities of the employee concerned. The purpose of the statute, broadly phrased to curb evasion, is to prohibit the transaction of Government business by its employee with a business

entity in whose profits or contracts he has a pecuniary interest whether it be direct or indirect.[17]

Did the activities of Adolphe H. Wenzell fall within the terms of 18 U.S.C. § 434? I think so. To me it is inescapable in the light of the undisputed facts in this case that Wenzell was employed to act and did act as an agent of the United States for the transaction of business with the Dixon-Yates group, the business being the prospective contract between the Government and the entity to be organized by the sponsors for that purpose.

The assertion that the numerous activities conducted by Wenzell to facilitate the contract sought by the sponsors were not the acts of an "agent of the United States for the transaction of business" does not comport with the facts. The record discloses what occurred in some but not in all the meetings and telephone calls between Wenzell and the Dixon-Yates group. At least we know that he procured and furnished to the Budget Bureau and to the sponsors information on the probable cost of interest on money to be borrowed by the plaintiff. Early in the inception of the project and before the sponsors' first proposal was submitted, it was well recognized by the officers of the Government, by the sponsors, and by Wenzell as well, that the interest rate on money borrowed by the utility company with whom the Government would contract would be an important element in the total cost to be paid by the Government. Findings 47 and 57. Therefore, the very matter to which much of Wenzell's effort was devoted was not only a part of the business being transacted with the Government but a vital element in it.

The majority seems to believe that the "interest" of Wenzell in the contract of the sponsoring group was so remote that it would not justify the invalidation of the Power Contract, but I view the facts differently. It must be remembered that Wenzell was not drafted by the Government. On the contrary, his employment as a consultant for the Budget Bureau was a direct outgrowth of the telephone calls made by the chairman of the board of directors of First Boston to Dodge and the resulting conference between the two men on May 11, 1953. Finding 24.

There is not the slightest doubt that the Dixon-Yates group was fully cognizant of the dual position of Wenzell. In fact, they were disturbed about it to the extent that they suggested that he resign in writing, but he did not do so, and they also knew that he continued to have an interest in the program. Could they have been more interested in avoiding the appearance of evil rather than the evil itself?

When large projects are involved there is always a tremendous drive for the privilege of handling and financing. It is highly competitive as it should be in a free economy. But this very fact makes it all the more important that the Government permit no unfair advantage as between competitors. They should all be on the same dead level of equality. This is an added reason for not permitting any interested party's serving in a dual capacity.

It is argued that Wenzell had no connection with the performance contract, but only with the financing. But they are as closely linked as the law of supply and demand. Very few one-hundred-million-dollar contracts can be performed without financing, and the financing of a large contract is an immensely profitable undertaking. Does anyone doubt that First Boston and Wenzell expected to finance the contract, and that Dixon-Yates expected them to do so?

Because of First Boston's experience in arranging for the financing of the project for the Ohio Valley Electric Corporation, the sponsors were well aware that if a contract resulted from their proposals, there was a strong probability that First Boston would be employed to

17. 18 U.S.C. § 434.

handle the financing, and we may infer from the facts and circumstances in the record that this probability was equally well known to First Boston and Wenzell.

As a vice president of First Boston, he was entitled to a bonus on the business he brought to the firm and was greatly interested in a successful and expeditious closing of the Dixon-Yates contract, not only because of the fee First Boston would earn as financial agent but also because of the prestige it would gain in handling a transaction of such magnitude. While the record does not show that he served as a consultant in the Budget Bureau after April 3, 1954, he stayed long enough to learn that the sponsors' revised cost estimates were being favorably viewed by the Government and that a new proposal based on the revised figures would receive serious consideration. In addition, he did not regard his services with the Government as terminated until April 10, 1954, by which time the sponsors had drafted the second proposal and permitted him to review the provision in which he was most interested—the provision relating to interest rates on money to be borrowed by plaintiff.

The representatives of the sponsors were not novices in the handling of the proposed project with the Government. They were experienced businessmen who dealt in big figures and knew their way around. Clearly they were aware of the tremendous advantages of having a "friend on the inside." Otherwise, it is difficult to understand why they consulted Wenzell so frequently.

Finally, the argument that Wenzell's services with the Budget Bureau had no influence whatever in the retainer of First Boston as financial agent is, it seems to me, completely refuted by the statement of the chairman of the board of First Boston. He declared that the firm's decision not to charge the sponsors a fee was dictated by the fact that the retainer of First Boston by the sponsors had resulted directly from his conversation with Dodge in May 1953, when Wenzell's services were offered to the Budget Bureau. Finding 117.

In the conclusion reached by the majority, considerable reliance is placed on the Administration's unflinching and hurried insistence upon a contract with a private utility company; the diligence with which Wenzell pursued his duties in the Budget Bureau; the sponsors' awareness of Wenzell's duality and the disclosure of this situation to the Budget Bureau; Wenzell's departure before the actual drafting of the contract began, and the fairness of the resulting Power Contract.

This conclusion of the majority seems to stem from an understandable desire to avoid a harsh result in this case, but the difficulty I find with the majority decision is that the policy so clearly expressed in 18 U.S.C. § 434 leaves no room for equitable considerations. To my mind, the policy means that in a situation such as that revealed in this case, the tendency or likelihood of a disadvantage to the Government invalidates the Power Contract. I cannot join in chipping out exceptions to a policy so forceably laid down by Congress nor agree that the conflict of interest statute means little when it says much. If that policy is to be narrowed or limited by exceptions, it is the function of Congress and not of this court to spell out such limitations and exceptions.

### FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:

CONTENTS

*Findings*

I. The Contract
   A. General ........................................ 1–9
   B. Performance by Plaintiff ...................... 10–17
   C. Termination of the Contract ................... 18–21

II. The Conflict of Interest Defense
    A. Eisenhower Administration's Power Policy in 1953 and 1954 .............................. 22–23
    B. Wenzell's Work in Budget Bureau in 1953 ....... 24–35
    C. Development of Plan to Secure Power From Private Sources in Lieu of TVA Fulton Plant .......... 36–44
    D. Preparation, Submission, and Review of Sponsors' Proposals, and Wenzell's Activities in Connection Therewith .................................. 45–106
    E. Retainer of First Boston and the Decision as to its Fee ...................................... 107–128
    F. The Decision to Negotiate a Contract on the Basis of the April 10 Proposal ..................... 129–132
    G. The Negotiation of the Power Contract ......... 133–136
III. The Replacement Defense ........................... 137–164
IV. The Waiver Defense ................................ 165–173
V. The Public Utility Holding Company Act Defense ........ 174–189
VI. Lack of Regulatory Approvals Defense ................. 190–203
VII. Lack of Mutuality Defense ........................... 204
VIII. Damages
    A. General ...................................... 205–207
    B. Mitigation of Damages ....................... 208–209
    C. The Claim of Dickmann-Pickens-Bond Construction Co. ........................................ 210
    D. The Claim of Jackson Life Insurance Company .... 211
    E. The Claim of J. A. Jones Construction Company .. 212
    F. The Claim of Pandick Press, Inc. ................ 213
    G. The Claim of Reid & Priest .................... 214
    H. The Claim of House, Moses & Holmes ............ 215
    I. The Claim of Arthur Andersen & Co. ............ 216
    J. The Claim of Middle South Utilities, Inc. ........ 217
    K. The Claim of The Southern Company ............ 218
    L. The Claim of the Arkansas Power & Light Company 219
    M. The Claims of The First National City Bank of New York and of White & Case ............... 220
    N. The Claim of Mississippi Valley Generating Company ...................................... 221
        (a) Payment to Ebasco on 1954 Billing ...... 222–228
        (b) Ebasco, as Agent for MVG ............ 229
        (c) MVG Charges ....................... 230
    O. The Claim of Ebasco Services Incorporated ...... 231
    P. The Claims of Cahill-Gordon, Winthrop-Stimson, Willkie-Owen, and Milbank-Tweed ............ 232
        (a) The Claim of Cahill, Gordon, Reindel & Ohl ................................. 233–235
        (b) The Claim of Winthrop, Stimson, Putnam & Roberts ........................ 236–238
        (c) The Claim of Willkie, Owen, Farr, Gallagher & Walton ..................... 239–240
        (d) The Claim of Milbank, Tweed, Hope & Hadley ............................. 241–242
        (e) Reasonableness of the Attorneys' Fees ... 243–245
    Q. Post-Petition Claims ......................... 246

## I. THE CONTRACT

### A. *General*

1. Plaintiff herein is Mississippi Valley Generating Company (hereinafter called MVG), a corporation organized under the laws of the State of Arkansas. Seventy-nine percent of the issued and outstanding stock of MVG is owned by Middle South Utilities, Inc. (hereinafter called Middle South), and the remaining 21 percent is owned by The Southern Company (hereinafter called Southern). Middle South and Southern are sometimes hereinafter referred to as the sponsors.

2. This suit was brought by MVG on behalf of itself and for the use of and benefit of 24 parties referred to as use-plaintiffs. The suit is based upon a contract, hereinafter called the Power Contract, entered into between MVG and defendant, acting through the Atomic Energy Commission (hereinafter called AEC), under which MVG agreed to construct and operate a steam electric generating station and related facilities at West Memphis, Arkansas. The Power Contract and certain supplemental agreements were duly executed and delivered on November 11, 1954. The contract and annexed interpretative and explanatory document were received in evidence as plaintiff's exhibits 2–8, 11, and 15. These exhibits and all other exhibits referred to herein are by such references incorporated in these findings.

3. The Power Contract resulted from the following:

(a) On April 10, 1954, Middle South and Southern submitted to the AEC a proposal wherein the sponsors agreed to organize a new corporation (MVG), which would construct and operate the plant and other facilities in accordance with the terms of the proposal. For Middle South the proposal was signed by its president, Edgar H. Dixon, and for Southern by J. M. Barry, chairman of Southern's executive committee;

(b) on June 30, 1954, AEC wrote the sponsors that the proposal constituted a satisfactory basis for the negotiation of a definitive contract and that AEC was ready to begin negotiations; and

(c) on July 7, 1954, the parties began negotiations which terminated with the signing of the Power Contract on November 11, 1954.

4. Middle South is a public utility holding company which owned 100 percent of the stock of the Arkansas Power & Light Company, Louisiana Power & Light Company, and Mississippi Power & Light Company, and approximately 96 percent of the common stock of New Orleans Public Service Company. Dixon was a director of each of these four subsidiaries of Middle South, and he also became president of MVG when it was organized.

Southern is a public utility holding company which owned 100 percent of the stock of Alabama Power Company, Georgia Power Company, Mississippi Power Company, and Gulf Power Company. Eugene A. Yates, at all times material to this action, was chairman of the board of directors of Southern.

5. Section 8.22 of the Power Contract provided in part as follows:

"*Effective Date:* The effective date of this contract shall be the latest of the following: (a) the date when this contract is executed and delivered by the parties hereto; (b) the date when item (3) of Section 8.15 shall be delivered to the Company; (c) the date when item (4) of Section 8.15 shall be delivered to the Company; or (d) the date on which the time shall have elapsed during which the contract must remain on file with the Joint Committee on Atomic Energy pursuant to Section 164 of the Atomic Energy Act of 1954 or the date when said Joint Committee shall have waived such requirement as provided in said Section."

6. Items (3) and (4) of Section 8.15 of the Power Contract, referred to in section 8.22, provided as follows:

"The obligations of the parties hereunder shall be subject to the following:

\*  \*  \*  \*  \*  \*

"(3) the receipt by the Company of an opinion of the General Counsel to the AEC to the effect that the AEC has power and authority to execute this contract and the undertakings herein described and to obligate the United States of America for all payments which may be required to be made by the AEC to the Company pursuant to any of the provisions hereof, and that the persons executing and delivering this contract on behalf of the AEC have full power and authority to do so; and

"(4) the receipt by the Company of an opinion of the Comptroller General of the United States to the effect that the AEC has power and authority to enter into this contract and to obligate the United States of America for all payments which may be required to be made by the AEC to the Company pursuant to any of the provisions hereof, and that the AEC has authority to pay cancellation costs under this contract out of any funds now or hereafter appropriated to it by Congress."

7. (a) The opinion of the General Counsel to the AEC dated November 11, 1954, was rendered and delivered to plaintiff.

(b) On November 13, 1954, the Joint Committee on Atomic Energy adopted a resolution waiving the 30-day period specified in Section 164 of the Atomic Energy Act of 1954. However, as is more fully set forth in findings under the heading of "The Waiver Defense", the Joint Committee on Atomic Energy adopted a resolution on January 28, 1955, revoking the waiver.

(c) The opinion of the Comptroller General of the United States was embodied in two opinion letters dated October 5, 1954 and December 13, 1954, respectively, and copies of these were delivered to plaintiff. The second letter was delivered on December 17, 1954.

8. Since December 17, 1954, the date of the delivery of the second opinion of the Comptroller General, was the last of the dates specified in section 8.22, the Power Contract became effective on December 17, 1954.

9. Because of the time which had elapsed prior to the execution of the Power Contract, a letter agreement was entered into between MVG and defendant on November 11, 1954, stating that if by February 15, 1955, the effective date of the contract had not occurred as provided in section 8.22 and valid regulatory approvals necessary in connection with the issuance of MVG's capital stock had not then been obtained, either MVG or the United States might terminate the Power Contract by written notice without liability of either party to the other. By an exchange of correspondence during the period from February 11 to February 28, 1955, it was agreed that those provisions of section 8.22 of the Power Contract that were covered by the letter agreement had been satisfied and that the Power Contract was effective. As a result, the letter agreement was no longer operative.

B. *Performance by Plaintiff*

10. Subsection 1 of section 8.15 of the Power Contract provided that the obligations of the parties would be subject to the receipt by plaintiff of regulatory approvals in form and substance satisfactory to it and necessary to enable it to perform its obligations under the contract or necessary to enable plaintiff to issue its equity and debt capital. On November 17, 1954, six days after the execution of the Power Contract, plaintiff filed with the Securities and Exchange Commission (hereinafter called SEC) an application for approval of MVG's equity financing. On February 9, 1955, after extended hearings in which there was vigorous opposition to plaintiff's application, the SEC entered an order authorizing plaintiff to issue and sell to the sponsors capital stock in the amount of $5,-500,000. On March 14, 1955, this order of the SEC was appealed to the Court of Appeals for the District of Columbia, as

more fully described herein under the heading of "Lack of Regulatory Approvals Defense."

On April 22, 1955, plaintiff filed an application with SEC for permission to issue and sell bonds and to make bank loans. As of July 11, 1955, when defendant notified plaintiff that the Government proposed to terminate the contract, testimony had been closed in this proceeding before the SEC, plaintiff's proposed findings having been filed on June 20, 1955. In the hearing, plaintiff encountered strong opposition from the same parties who had opposed its application in the equity proceedings and had taken the appeal to the Court of Appeals. The issues raised by the opposition were substantially the same in both proceedings, and in view of the SEC order in the equity proceeding, plaintiff could reasonably expect favorable action from SEC on its application to sell bonds and make bank loans. However, because of the opposition encountered and the appeal referred to, it was also apparent that there would be some delay, to an extent not ascertainable, before authority would be finally granted to plaintiff to issue and sell its debt obligations.

11. The condition of subsection 2 of section 8.15 of the Power Contract was the execution and performance by institutional investors and banks of contracts and commitments providing for the sale to such investors of plaintiff's debt capital in a form satisfactory to plaintiff. Bond purchase and bank loan agreements in a form satisfactory to plaintiff had been entered into with insurance companies and banks before the Power Contract was terminated. Plaintiff advised AEC of this action and sent it copies of the bond purchase and loan agreements.

12. Both the bond purchase agreement and the bank credit agreement required that, at the time of each borrowing thereunder, an opinion of counsel be furnished to the effect that plaintiff had "obtained all orders, certificates, approvals, authorizations or consents of the Securities and Exchange Commission" to enable it to issue and sell bonds, or to borrow money and issue notes, as the case might be, and that "such orders, certificates, approvals, authorizations and consents are valid and are in full force and effect, the times (if any) prescribed by statutes or regulations for appeals therefrom or rehearings thereon have elapsed and none of them are the subject of any pending attack on appeal or by direct proceedings or otherwise * * *".

13. Under date of June 14, 1955, Ebasco Services Incorporated (hereinafter called Ebasco), the architect-engineer employed by plaintiff to design the power plant and act as construction manager, estimated that plaintiff's cash requirements would be $6,175,000 by December 31, 1955. It was also estimated that these cash requirements would increase rapidly each month thereafter and that by the end of June 1956, plaintiff's total cash requirements would amount to $27,575,000.

14. If plaintiff had exhausted the equity capital of $5,500,000 before the debt proceedings had been favorably concluded, it would have been necessary for plaintiff to discontinue work on the project unless (a) it could have persuaded the banks and insurance companies to waive the requirements of valid SEC approval of the debt financing, or (b) obtained temporary bank loans until approval was secured. However, both the appeal on the equity financing and the SEC debt proceedings became moot when defendant terminated the contract. The record affords no basis for making an accurate determination as to when the debt proceedings would have been favorably concluded. A finding that plaintiff would have had or that it would not have had funds available for the construction of the plant after the date of termination, would be speculative. Plaintiff did not encounter any problem of lack of funds before the contract was terminated. Of the $5,500,000 of capital stock which the SEC had authorized plaintiff to issue and sell, plaintiff had actually issued and sold to the sponsors stock in the amount of $1,100,000. By the date the contract was terminated, plaintiff had

large outstanding commitments, but it had actually spent less than one-half of the $1,100,000.

15. Although all of the regulatory approvals required under the terms of the Power Contract had not been obtained by plaintiff as of the date of termination, the evidence shows that from the date the Power Contract was signed and until it was terminated, plaintiff was diligent in its efforts to obtain all of the required regulatory approvals.

16. Before the negotiations on the contract began, the defendant had made it clear to plaintiff that the proposed power to be generated at the new plant would be needed by the fall of 1957, and during the negotiations, plaintiff was told that the first of the three units of the power plant was to be in operation within 32 months after the effective date of the contract.

In section 2.01 of the Power Contract, plaintiff agreed to use its best efforts to have the three generating units of the power plant ready for commercial operation not later than 32, 34, and 36 months, respectively, after the effective date of the contract. In view of the defendant's express need for the power by the fall of 1957, and in order to meet the target dates which were known long before the Power Contract was signed, the sponsors and plaintiff began activities looking toward performance of plaintiff's obligation under what eventually became section 2.01 of the Power Contract months before that document was executed. These early activities included taking options on land which was to be the site of the plant, primary engineering work, the preparation of a schedule of construction activities, and some exploratory work on the site.

By the end of 1954, plaintiff, through Ebasco, had made limited commitments for many of the items of equipment needed and for a construction office and warehouse.

In the early part of 1955, a construction office was opened at the site and major construction was started on June 1, 1955. By the time the contract was terminated, three of the basic construction contracts had been let and many of the purchase orders had been issued.

The record as a whole shows that at the time the Power Contract was terminated plaintiff had used its best efforts to comply with the obligation set forth in section 2.01 of the Power Contract.

17. Aside from sections 2.01 and 8.15 (covered by preceding findings), there were a number of provisions in the Power Contract and in the interpretative memorandum annexed thereto which imposed affirmative obligations upon plaintiff. The defendant offered no evidence that plaintiff had failed to perform any of the obligations set forth in these provisions. The undisputed evidence establishes that at the time the defendant terminated the contract, plaintiff had performed such obligations imposed upon it by the contract in all instances where performance was timely, or that it was proceeding diligently toward performance.

C. *Termination of the Contract*

18. Near the end of June 1955, plaintiff learned that the President of the United States had requested the Director of the Bureau of the Budget to confer with AEC and the Tennessee Valley Authority (hereinafter called the TVA) to determine whether to cancel the Power Contract because of the decision of the city of Memphis to construct its own electric generating facility, thereby relieving TVA of the obligation to furnish Memphis with power.

19. On July 11, 1955, at about 5 p. m., plaintiff was advised by telephone by the Chairman of AEC that the President of the United States had decided to order termination of the contract. On August 1, 1955, the oral notice was confirmed in a letter from AEC to plaintiff. The letter expressed the hope that it would be possible for the parties to agree on a mutually acceptable basis for bringing the contract to an end.

20. On July 12, 1955, representatives of plaintiff met with the President of the United States, and thereafter there was

a series of meetings with representatives of AEC. In compliance with a request from AEC, plaintiff supplied estimates of termination costs as of June 30, September 30, and December 31, 1955. During these meetings there were discussions about plaintiff's commitments to third parties and as to steps that could be taken to minimize the outstanding claims. Plaintiff also worked with AEC in attempting to settle some of the smaller claims. However, the representatives of AEC were unable to give plaintiff any specific instructions on actions that should be taken in connection with the termination of the contract. The AEC representatives stated that they had not received any directive regarding the matter. The post-termination discussions were broken off by AEC in October 1955, and on November 23, 1955, AEC wrote plaintiff that upon the advice of its counsel, it had concluded that the contract was not an obligation which could be recognized by the Government.

21. From the date the Power Contract was executed until the letter of November 23, 1955, no representative of the defendant had indicated to plaintiff that it had failed in any way to discharge its obligations under the contract. However, at the meetings between plaintiff and the AEC after the contract had been terminated, AEC reserved the question of whether the contract was invalid because of a conflict of interest. This is the basis of one of defendant's affirmative defenses, the facts regarding which are set forth under the heading "Conflict of Interest Defense."

## II. THE CONFLICT OF INTEREST DEFENSE.[1]

### A. *Eisenhower Administration's Power Policy in 1953 and 1954*

22. It was the basic Eisenhower Administration policy on power during 1953 and 1954 that the Government would seek to have either private enterprise or local communities provide power generating sources in partnership with the Government. This policy was first announced in the President's State of the Union Message of February 2, 1953.

23. In accordance with the Administration policy and in furtherance of its objective to reduce the budget, Joseph M. Dodge, Director of the Bureau of the Budget, eliminated from the TVA budget for the fiscal year 1955 a request for funds for the construction by TVA at Fulton, Tennessee, of a steam generating plant which was to serve the commercial, industrial, and domestic power needs of the city of Memphis and its environs. TVA's request for a similar appropriation in the budget for the fiscal year 1953 had been disallowed by the Truman Administration, but it had been included in the budget for the 1954 fiscal year, which President Truman left with Congress when the Eisenhower Administration took office. In March 1953 during his review of the then pending budget, Dodge disallowed the request for the fiscal year 1954. In the spring of 1953 and again in 1954, efforts to add an appropriation for the TVA Fulton plant were defeated in Congress.

### B. *Wenzell's Work in Budget Bureau in 1953*

24. Through three telephone calls he made early in May 1953, George D. Woods, chairman of the board of directors of First Boston Corporation, obtained an appointment with Dodge on May 11, 1953. First Boston is and was one of the leading investment banking concerns in the country. It underwrites security issues for both private and governmental entities. When the two men met in Washington, D. C., on the afternoon of May 11, Woods stated that he had read the published announcements of the Administration's policy of reducing the Government's participation in business activities, that he was wholeheartedly in accord with the policy, and that if there was anything which he or his firm could do to further the policy, they were ready and willing to be of service and assistance. Dodge, who had

---

1. Paragraph 24(A) of defendant's answer.

not been in office very long, was interested in having some power studies made, particularly for the purpose of ascertaining the subsidy the Government was providing to TVA. He had not been able to find the individual he thought appropriate to make the study and asked Woods for a suggestion, stating that the Bureau needed the services of a man who had worked on utility financing transactions and was experienced in accounting and money costs. Woods replied that First Boston had such a man, Adolphe H. Wenzell, an engineer who had worked on many utility financing transactions and was qualified for the undertaking. Woods agreed to ascertain if Wenzell could be made available.

25. Upon his return to New York Woods discussed the matter with Wenzell and found that he was willing to undertake the assignment. Woods also talked with his principal associates, James Coggeshall, Jr., president of First Boston, and Duncan Linsley, chairman of the corporation's executive committee, and learned that they had no objection to Wenzell's services being made available to the Bureau. Thereupon, Woods telephoned Dodge and made arrangements for Wenzell to meet Dodge on May 15, 1953.

At the time, Wenzell was one of 40 vice presidents of First Boston and one of its numerous directors. He had been employed by First Boston since its inception in 1934 and had been with its predecessor since 1923. Wenzell was an engineer, specializing in utility matters and serving in the buying department of the corporation. This department was concerned with investigations and negotiations leading up to an undertaking by First Boston to underwrite securities. His entire business life and experience had been devoted to this type of work. At times, he supervised and personally conducted investigations of utility properties and the soundness of the management for the purpose of obtaining information that would enable First Boston to determine whether it should be identified with any financing for the company under investigation. He was regarded as an expert in this field.

26. Pursuant to the arrangements made, Wenzell met Dodge in the latter's office in Washington on May 15, 1953. Dodge talked with Wenzell about his experience, background, and the nature of the work to be done. From this and from a preliminary investigation he had made, Dodge was satisfied that Wenzell could perform the desired service. Accordingly, it was agreed that Wenzell would act as a consultant to the Bureau of the Budget on a part-time basis, spending one or two days a week in Washington at the Bureau, and then returning to First Boston's office in New York City to resume his work there. Wenzell was to serve without compensation, but it was agreed that he would be paid $10 per day in lieu of subsistence and that his necessary transportation expenses would be paid by the Government through the use of transportation requests which were furnished to him for that purpose. It was understood that he would not sever his connection with First Boston and that he would continue to receive his regular salary from it.

Dodge instructed Wenzell to make a commercial, financial analysis of TVA, including a summary of its development and a comparison of its accounting and financial practices with those of privately owned utility companies—all with the ultimate objective of estimating the amount and showing the sources of the Government's subsidy to TVA. Dodge emphasized that he did not want an audit, an engineering examination, or a survey of TVA properties.

27. TVA is a very large supplier of electrical energy to the AEC. However, the AEC also purchases huge amounts of energy from private suppliers. One of these suppliers is the Ohio Valley Electric Corporation (hereinafter designated as OVEC), composed of a group of private utilities which, in 1952, contracted with AEC to supply it with 1,800,000 kw. at Portsmouth, Ohio. This is one of the largest generating plants in the world, and a large amount of financing was re-

quired by the utilities that banded together to carry out this undertaking.

First Boston was employed by OVEC to arrange for this financing, consisting of directly placing the securities of OV EC with large institutional investors. It did so, and received a fee of $150,000 for its services, plus $20,000 for expenses.

The OVEC transaction was substantially completed in 1952, but in 1953, when Wenzell was first employed by the Budget Bureau, First Boston was performing some services in connection with the OVEC project.

28. Wenzell began work in the Bureau on May 20, 1953, and was introduced to the staff of the Resources and Civil Works Division, which handles the budget and legislative work relating to the Departments of Agriculture and Interior, the Federal Power Commission, TVA, and other agencies. Dodge had told Wenzell that he was to use TVA reports as the basic documents for the study, but the staff of the Resources and Civil Works Division was instructed to provide him with any additional information he needed for that purpose.

29. Wenzell completed his assignment and submitted his report to Dodge about September 20, 1953. Between May 20, 1953, and the date the report was delivered, he made 11 trips to Washington and spent 29 days in the Bureau. On his first trip from New York on May 20, 1953, First Boston paid his transportation expenses, but the Government paid such expenses thereafter. During this period, he received $10 per diem from the Government for subsistence. He also submitted supplemental vouchers to First Boston for his subsistence expenses, and these were duly paid.

30. In the course of Wenzell's study, a considerable volume of written and printed data was made available to him by the Bureau staff. The material included TVA annual reports, General Accounting Office reports of TVA audits, TVA financial statements, material presented to the Bureau by TVA in justification of its budgets, a report on TVA's proposed electric generating plant at Fulton, a statement of tax equivalents paid by TVA, and the like. He also had discussions with one or more members of the staff on the financial status of TVA.

31. On August 31, 1953, Wenzell met with members of the Bureau staff and discussed generally his conclusions on his study of TVA operations. His comments regarding TVA operations were favorable but he stated that, in his opinion, not enough of TVA's hydroelectric power costs were charged to power. He also expressed concern about any further expansion of TVA's service area.

While he worked at the Bureau during this period, Wenzell was assigned an office next to that of Rowland R. Hughes, the Assistant Director of the Bureau of the Budget. Before Wenzell's report was completed, he showed it to Hughes, who made several suggestions regarding it.

32. Wenzell's report consisted of a concise summary of TVA operations, a comparison of its power system operations with those of private power companies, and a statement of the fiscal problems to be faced if future power requirements in the area were to be supplied by TVA. His report, in evidence as defendant's exhibit 10, was accompanied by his conclusions and recommendations, including the following:

(a) the electric generating capacity and annual power output of TVA is the largest in the country;

(b) the original purpose and program of the TVA, i. e., the hydro development of the Tennessee River Basin, was nearing its end;

(c) since 1951, TVA had been changing from a predominantly hydroelectric operation to a steam electric operation, because of the completion of the unified steam development program and a tremendous increase in the demands for power caused by TVA's efforts to supply a large portion of AEC's requirements;

(d) in addition to costs that properly belong to navigation and flood control, TVA had allocated an additional substantial portion of the cost of multiple-use

facilities to navigation and flood control, whereas these costs should have been allocated to power operations;

(e) a comparison of the assets and revenues used by TVA for calculating payments made by it in lieu of general or local taxes with similar assets and revenues of 14 adjacent private power companies showed that TVA paid only 50 percent as much general and local taxes as the private companies;

(f) on the basis of the true costs to the Government of long-term money, the deficiency in the earnings of the power division of TVA for the year ended April 30, 1953, was a substantial sum; this sum was a Government subsidy.

Among the alternative suggestions for future power supply to the TVA service areas were the following:

(a) the municipalities or cooperatives by themselves, or as a group, should have the right to construct steam plants to supply their expected load growth;

(b) the need for additional power in the area could be supplied by wholesale steam generating companies, which would sell the power to TVA under long-term contracts, and TVA would then distribute the power through its transmission network in the area;

(c) municipalities and cooperatives around the periphery of the service area could be served by adjacent power companies, but this idea was contrary to public utility practice and policy.

He also wrote that in order for TVA to escape the dilemma of being primarily interested in navigation and flood control on one hand and being forced into the steam power business on the other, TVA should retain ownership and control of all of the multiple-use dams and other navigation and flood-control facilities but the balance of its power system assets should be transferred to a fully tax-paying corporation, the entire capitalization of which, in the first instance, would be owned by the Government. The new corporation would purchase the entire output of power at the dams at a price which would include equivalent local taxes, interest at a rate equal to the cost of long-term Government money, and amortization of cost over a long period of time. All future capital requirements for expansion would be obtained through the sale to the public of regular corporate security issues without any kind of Government guarantee, and a definite program would be established to liquidate all of the Government-owned securities by sale to the public. In his report, Wenzell concluded that the adoption of this plan would accomplish the objective of getting the Government out of the subsidized power business without surrendering any measure of control over navigation and flood control in the Tennessee River Basin.

33. When Wenzell's report was delivered to him, Dodge went over it briefly but did not read it carefully until later. Dodge never adopted or used any of the recommendations made in the report, nor did he consult Wenzell on any policy matters connected with the budget. Since he had not requested Wenzell to include recommendations in his report, Dodge was surprised to see them and they did not impress him. Wenzell's recommendations were not a factor in the policy decision, later communicated by Dodge to Strauss, that the AEC should enter into a contract with the utility companies.

On October 19, 1953, Dodge wrote Wenzell, expressing appreciation for the work Wenzell had done and stating that the report "was an extremely valuable contribution, not only for the material contained in it but its use as a foundation for further studies in consideration of the same subject." The letter also stated that the report "has been examined by two important individuals whose reaction to your work equal my own." The individuals referred to were President Eisenhower and Ex-President Hoover, who were given copies of Wenzell's report.

34. Neither the Chairman of AEC, its General Manager, nor its Deputy General Manager, who was responsible in AEC for the discussion and development of data that led to the decision to

negotiate the Power Contract and who headed the AEC group in negotiating the contract, had seen or were aware of Wenzell's report until four months or more after the date of the execution of the Power Contract.

35. When he handed his report to Dodge, Wenzell asked permission to retain a copy. Dodge agreed that since Wenzell was the author, he could have a copy on the condition that it would not be shown to anyone else since it was a confidential Bureau document. However, in the fall of 1953, after Wenzell had completed his assignment and had resumed his regular work in First Boston, Woods asked Wenzell for a copy of the report made to Dodge. Wenzell gave his copy to Woods, who read it over the weekend and returned it with the comment that Wenzell had done a good job. Neither Wenzell nor Woods received permission from anyone in the Bureau for Woods to read the report.

## C. *Development of Plan to Secure Power From Private Sources in Lieu of TVA Fulton Plant*

36. As previously stated, the Budget Bureau had decided in the fall of 1953 not to include any provision in the budget for the fiscal year 1955 for the TVA projected steam plant at Fulton Tennessee. The reasons for this decision, as subsequently stated by Hughes (defendant's exhibit 88), were:

(a) It was imprudent to embark upon a construction program requiring expenditures of one hundred million tax dollars in fiscal years 1955, 1956 and 1957 at a time when government borrowing was verging on the debt limit;

(b) both the Senate and House of Representatives, in considering TVA appropriation bills in the previous session of the Congress, had rejected amendments to provide funds for starting construction of the Fulton steam plant, and

(c) there was pressing need to explore the far-reaching implications of a Federal policy of spending Federal tax dollars for Federal steam plants to meet the power needs of this particular region and, if decided upon, to explore the impact of such a policy throughout other regions of America.

In a discussion with congressional leaders, Dodge had been told that if a request for funds for construction of the TVA plant in Fulton should be included in the budget, the request would not be approved by Congress.

When Gordon Clapp, the General Manager of TVA, learned of the decision during the fall of 1953, he informed representatives of the Bureau of the Budget that if provision for the Fulton plant was eliminated from TVA's budget, TVA would take the position that the power then being furnished by TVA to AEC should be reduced so that a like amount of power would be available to TVA to meet the growing needs of its other customers. TVA was then under a firm contract with AEC to supply its Paducah, Kentucky, installation substantially the entire output of TVA's generating plant at Sha.,mee, Kentucky, near Paducah. TVA was also supplying a large block of power to the AEC installation at Oak Ridge, about 360 miles east of West Memphis, Arkansas. As a result, the Bureau of the Budget began drafting a statement for the President's budget message to the effect that an attempt would be made to relieve TVA of some of its power load to AEC and that if this did not prove to be practicable or successful, the matter of the construction by TVA of a plant at Fulton would be reconsidered.

37. On December 2, 1953, Dodge met in his office with Lewis I. Strauss, Chairman of the AEC, and Walter J. Williams, then AEC's General Manager. Dodge stated that it was desirable to avoid capital expenditures for new TVA steam generating capacity and that the Budget Bureau had considered that this objective could be accomplished by having AEC contract with private industry to construct a plant that would supply 450,-000 kw. of additional power for AEC at its Paducah, Kentucky, installation by 1957, and by having AEC release a like amount of power which TVA was then

supplying to it so that the released power would be available for TVA's other requirements. Dodge referred to Electric Energy, Inc. (hereinafter called EEI) and OVEC, two different groups of private utility companies which had previously entered into long-term power contracts with AEC to build steam generating stations and to supply power to AEC at its installations in Paducah, Kentucky, and Portsmouth, Ohio. Dodge inquired whether the plan outlined by him would be feasible, whereupon Williams stated that the answer to the question would require discussions with J. W. McAfee, president of Union Electric Company and also president of EEI.

After the meeting, Williams arranged to meet McAfee, who had been helpful in arranging for the construction by EEI of a plant at Joppa, which was then being completed to furnish AEC power at its Paducah installation. When McAfee met with Williams on December 8, 1953, Williams asked whether EEI or some similar corporation would be interested in building a plant to supply AEC with as much as 450,000 kw. of generating capacity by the middle of 1957. McAfee stated that it would be difficult for EEI to add generating capacity at Joppa and suggested either a plant upstream from Cairo but downstream from the Joppa plant, or a plant near the town of Shawnee. He agreed to make some inquiries about the matter. Later, on December 14, 1953, Williams telephoned McAfee, requesting that the latter write the AEC and indicate his interest in furnishing the generating capacity mentioned on December 8. On December 14, 1953, McAfee wrote the requested letter, stating that he thought a group of private investors could be formed to supply AEC the amount of power requested at its Paducah project upon substantially the same rates and terms as provided for in the contract between AEC and EEI. Williams had earlier cautioned McAfee to make only general inquiries and not to disclose the particular project under discussion. Accordingly, in his letter, McAfee stated that when he received more specific information he would be in a position to discuss the project with financial institutions and prospective members of a managing group so that more definite information could be supplied.

A copy of McAfee's letter was sent to William F. McCandless, Assistant Director for Budget Review in the Budget Bureau, who had been told of the meeting with McAfee and had requested a copy of the letter in order that he might show it to Dodge. The Budget Bureau's interest in any proposal which might be submitted by McAfee's group was twofold: first, the Bureau was concerned with relieving the burden on the budget of the large capital outlay required for building additional facilities for TVA; second, in such a transaction, the Budget Bureau acts as the Administration's mechanism to make certain that the project is defensible. Dodge realized that the Budget Bureau would later be called upon by both the White Hhouse and a congressional committee to give an opinion about the project.

38. On December 17, 1953, Hughes met with Gordon R. Clapp, Chairman of the Board of TVA, and with members of the staffs of the Budget Bureau and TVA. At this meeting, Clapp was informed that no money would be included in the 1955 budget to provide new steam plants for TVA but that arrangements were being made to reduce by the fall of 1957 existing TVA commitments to AEC by some 450,000 kw., thus providing TVA with power for reasonable growth in industrial, municipal, and cooperative loads through 1957. At Clapp's request, it was agreed that an attempt would be made to relieve TVA of a minimum of 500,000 kw. and that this amount would be increased to 600,000 kw. if possible. Clapp was told that if negotiations for furnishing the AEC load requirements from other sources were not consummated, the question of starting additional generating units in the TVA area would be reconsidered. On the following day, December 18, 1953, the statements made to Clapp were confirmed in a letter sent to him by Dodge.

· After December 17, 1953, Dodge delegated responsibility for carrying on the project to Hughes, and thereafter Dodge's connection with the matter became less and less frequent. He resigned on April 15, 1954, and was succeeded by Hughes.

39. Sometime prior to December 14, 1953, Dixon learned from McAfee that AEC might be seeking an additional source of power in the Paducah area. Dixon was interested in the information for two reasons: (1) the potential sale of electric power, and (2) his feeling that his company should make a contribution to the effort of supplying the electric power needs of the Government through investor-owned power companies rather than through publicly-owned power companies.

On December 23, 1953, Dixon met in Strauss' office with Williams, Strauss, and Kenneth D. Nichols, who had been selected to succeed Williams as General Manager of AEC when the latter resigned on January 31, 1954. The purpose of the meeting was a discussion about having private utility companies build additional generating capacity near Paducah for the purpose of relieving TVA of its commitments to AEC there. There was also a discussion about the power situation in the Tennessee area, and there were maps indicating the power loads and utility plants in that area. Dixon referred to and produced a copy of a letter which Mississippi Power & Light Company, one of the subsidiaries of Middle South, had written to TVA under date of October 15, 1953, proposing to supply to TVA for a term of 20 years a block of 450,000 kw. of power in lieu of the construction by TVA of its proposed Fulton plant, and for that purpose to construct near Memphis a plant which would deliver the power to TVA at the Tennessee State line.

On the same day, Williams telephoned McCandless at the Budget Bureau to inform the latter about the meeting. On the next day, Williams sent McCandless a copy of the letter which had been left by Dixon.

40. On December 24, 1953, Hughes, as Acting Director of the Budget Bureau, wrote to Strauss, stating that the Bureau understood that as a result of preliminary conversations between AEC and private interests, arrangements could probably be worked out to supply AEC at Paducah with 500,000 (and possibly up to 600,000) kw. more of electric power from non-Federal sources than AEC was then scheduled to receive by 1957 and that these arrangements would relieve TVA of its previous commitments to AEC in like amounts, freeing such power for normal load growths in the TVA area. He also stated that the TVA budget would be based on that expectation, but that if satisfactory arrangements could not be developed to provide such power for AEC installations from private sources, reconsideration would be given to TVA's request for appropriations to build additional power facilities. Hughes' letter expressed the understanding that the arrangements he referred to related solely to existing firm commitments for permanent power between TVA and AEC. The letter stated that it would be helpful if AEC would proceed with the negotiations with a view to reaching a firm agreement with private interests to supply the amount of power stated above by not later than the fall of 1957. Hughes requested that the Bureau be kept currently informed regarding the negotiations, because of the necessity of submitting supplemental appropriations to Congress during the following spring in the event the arrangements mentioned were not consummated.

41. On the basis of the opinion expressed in McAfee's letter of December 14, 1953, the section of the President's budget message relating to TVA was formulated and later released. In the message, which was delivered to Congress on January 21, 1954, the President stated as follows with respect to additional power plants for TVA:

"Although no appropriations are included in the 1955 budget for new power generation units by the Tennessee Valley Authority, expendi-

tures will increase for continuation of construction of power plants presently underway, and for operation of power plants after they are completed. Expenses for operation of flood control, navigation, and fertilizer facilities will continue at about the 1954 level. Expenditures for power and fertilizer operations are more than offset by the income from sales. In order to provide, with appropriate operating reserves, for reasonable growth in industrial, municipal, and cooperative power loads in the area through the calendar year 1957, arrangements are being made to reduce, by the fall of 1957, existing commitments of the Tennessee Valley Authority to the Atomic Energy Commission by 500,000 to 600,000 kilowatts. This would release the equivalent amount of Tennessee Valley Authority generating capacity to meet increased load requirements of other consumers in the power system and at the same time eliminate the need for appropriating funds from the Treasury to finance additional generating units. In the event, however, that negotiations for furnishing these load requirements for the Atomic Energy Commission from other sources are not consummated as contemplated or new defense loads develop, the question of starting additional generating units by the Tennessee Valley Authority will be reconsidered."

42. On January 4, 1954, McAfee wrote Williams, stating that since their discussion in Washington, McAfee was impressed with the necessity of considering other alternatives. He suggested the following, in order of priority, as a means of relieving the Federal budget of avoidable capital expenditures in the TVA area: (1) that TVA no longer assume full responsibility for supplying the needs of municipalities, and as existing contracts expire, that the municipalities which needed a greater supply of power than was available from TVA, be obliged to purchase power from others or construct municipal power plants; (2) that TVA arrange with neighboring power companies to buy power from them, and (3) the plan under discussion, i. e., a contract between AEC and private industry to supply power to AEC at Paducah.

Strauss was notified of the receipt of the letter, copies of it were distributed in AEC, and it was discussed in that agency.

43. On January 14, 1954, Hughes and McCandless attended a meeting in Strauss' office with Strauss, Williams, and Nichols. Reference was made to the two letters from McAfee and to the proposal which Mississippi Power & Light Company had submitted to TVA on October 15, 1953. Nichols pointed out to Hughes and McCandless that if AEC purchased more power from private utilities in lieu of the power being furnished by TVA under firm contracts with AEC, the cost to AEC would be greater and the supply less certain because of possible delays in the construction of the plant and the location of reserve power. He stated that McAfee was not eager to enter into such contract and that from an engineering point of view, Paducah was not the proper location for the new power plant, because if the AEC's needs there were reduced, it would be difficult and expensive to use the surplus power elsewhere. Finally, he suggested that if the power was needed in the Memphis area, it would be better for the city of Memphis or for TVA to enter into a power contract with private utilities to construct a plant in that area along the lines that had been suggested by Dixon and McAfee.

McCandless requested that the AEC pursue the matter further with McAfee.

After the meeting in Strauss' office, Williams arranged for McAfee and Dixon to attend a meeting in Strauss' office on Wednesday, January 20, 1954.

44. There is no evidence that Dixon, McAfee, or any representative of defendant had any contact with Wenzell during the period from November 1, 1953 to January 14, 1954. Neither Mc-

Afee nor Dixon knew of the report Wenzell made in September 1953.

D. *Preparation, Submission, and Review of Sponsors' Proposals, and Wenzell's Activities in Connection Therewith*

45. About the middle of January 1954, Hughes suggested to Dodge the advisability of requesting Wenzell to again assist the Bureau, because of Wenzell's study of TVA and his knowledge of commercial transactions. By that time, the Administration had decided that AEC should proceed to make a contract with private utility companies and that the TVA plant at Fulton would not be built. Dodge authorized Wenzell's return and thereafter, when Wenzell was working at the Bureau, Dodge saw little of him until March 1954.

The Bureau was concerned that any proposal which it considered met its fiscal standards, namely (1) that the cost of the power to be contracted for by AEC would be reasonable in relation to the cost of other power used by AEC, and (2) that the cost of power under any proposal could be reconciled with the estimated cost of power from the proposed TVA Fulton plant, taking into account the cost of interest and taxes paid by the private companies. Wenzell was to assist the Bureau again as a part-time consultant during the exploratory discussions on the project, particularly with respect to the probable interest cost of any financing plans that might be discussed. His work was to be in the technical area of comparative costs.

46. In response to a telephone call made by Hughes on January 14, Wenzell met Hughes in Washington on January 18, 1954. Hughes told Wenzell that the Government had decided to have a private power company construct a large steam generating plant near Paducah, Kentucky, to supply approximately 600,000 kw. of power to the AEC in substitution for a like amount of power then being supplied to AEC by TVA in the same location. Hughes showed him a paragraph in the President's budget message reflecting the decision that had been made (finding 41); stated that meetings had already been held with the utility executives during the month of December, and said that another meeting at the AEC had been arranged for January 20 with Dixon and McAfee. Hughes emphasized the need for great speed on the project, and after learning that Wenzell knew both Dixon and McAfee, Hughes asked Wenzell to attend the meeting and to use such influence as he had with the private utility people to impress upon them the need for prompt action on the matter.

Wenzell had met Dixon about 1943. In 1948 or 1949, he had talked to Dixon in connection with services that First Boston proposed to render to Arkansas-Missouri Utilities Company, a customer of Arkansas Power & Light Company, one of Middle South's subsidiaries.

On the same day (January 18, 1954), Hughes made an appointment by telephone for Wenzell to see Strauss in order that Wenzell could learn further particulars about the meeting to be held on January 20. No mention was made at the time about the cost of interest rates involved in financing the project.

47. During the afternoon of January 18, 1954, Wenzell went to the AEC building and had a very brief meeting with Strauss. All visitors at AEC were required to sign a "Visitor's Registration" card which contained a space for the name and address of the visitor and his "Organization". On that occasion and on each occasion thereafter when Wenzell visited the AEC, he specified his address as "100 Broadway, N. Y. City", which was the address of the offices of First Boston, and inserted "First Boston Corp." in the space specified for the organization. Wenzell did this to provide information as to where he could usually be found by anyone looking for him.

Wenzell told Strauss that he was there at the request of Hughes and was trying to get some background of the program and plan. Strauss had never met Wenzell before, and there is a conflict in the testimony of Wenzell and Strauss as to

whether Wenzell stated he was connected with the Bureau of the Budget. The greater weight of the evidence shows that Hughes told Strauss that Wenzell was a banker connected with the First Boston Corporation as an officer or a partner, and that Strauss was to acquaint Wenzell with the background and purpose of the meeting to be held on January 20, 1954. Strauss assumed that Wenzell was to attend the meeting to advise all concerned on matters within his competence. Strauss was aware that the cost of money, i. e., the interest rate on the securities which might be issued by the private utility companies, was an important element in the total cost to the Government of any facilities that might be constructed. Strauss stated that the AEC was trying to move forward rapidly with the program that Hughes had outlined to Wenzell. Strauss also emphasized that it was important that the private utility companies give serious consideration to the matter to be discussed and that it be handled without delay. Wenzell told Strauss that he was a vice president of First Boston, and Strauss stated that he was familiar with that firm. It was then arranged that Wenzell would discuss the matter the following day with Williams. Wenzell returned to New York City that evening.

48. On January 19, 1954, Dixon received a telephone call at his New York office from Wenzell who stated that he would be present at the meeting on January 20 as a representative of the Bureau of the Budget and that Dixon should not be surprised to see him there.

49. Pursuant to the arrangements previously made, Wenzell returned to Washington from New York on January 19 to see Williams at AEC. On his own volition and without consulting any representative of the defendant or of First Boston, Wenzell took with him Paul Miller, an assistant in First Boston's buying department. Miller had participated actively in the financing of the OVEC project in which First Boston had acted as financial agent for OVEC. Wenzell thought that it was inevitable that various questions relating to financing an enterprise such as the OVEC project would arise at the January 20 meeting and that it would be desirable to have an expert available to answer such questions.

At the AEC building, Miller registered as representing First Boston, as did Wenzell. Wenzell and Miller met with Williams and Cook of the AEC, and were advised by Williams of the discussions that had previously been held with Dixon and McAfee. Cook was present, because he had been designated as the official who was to be responsible for looking after the project for AEC after Williams' resignation, which occurred on January 31, 1954. There was no discussion about financing, and there is no evidence of any statements made by either Wenzell or Miller. Cook and Williams were told that Wenzell was a consultant to the Bureau of the Budget, but Cook did not know until later that Wenzell was also an officer of First Boston. Wenzell and Miller remained overnight in Washington.

50. On the morning of January 20, Wenzell and Miller first met with Hughes and then went to the AEC to attend the scheduled meeting, which was delayed until afternoon because of McAfee's late arrival. At AEC Wenzell and Miller had a general discussion about the proposed project with Williams. At 3 p. m. the meeting convened. In addition to Wenzell and Miller, it was attended by McAfee and Dixon, and by Williams, Cook, MacKenzie, and Sapirie of AEC. Strauss was present for a few minutes. Wenzell was the only representative of the Budget Bureau at the meeting. Miller was not a representative of any Government agency but, as earlier stated, had come to Washington at Wenzell's request.

51. The proposal that had been discussed before the meeting was the construction of additional facilities in the Paducah area to supply power to AEC as a substitute for power then being furnished by TVA to AEC at Paducah, so that AEC could release a like amount of power to TVA for use by its other con-

sumers. McAfee and Dixon stated that they were ready and willing to do anything possible, without regard to profit, to help with the problem of furnishing power. Thereupon, there was much discussion about the wisdom of constructing a new plant near Paducah where so much power generation was already concentrated. It was pointed out that if the AEC cancelled its existing contracts at Paducah or reduced its power consumption there, there would be great difficulty in marketing the tremendous oversupply of power in that area.

It was made plain that the purpose of the power plant to be constructed was not to satisfy any increased need of the AEC but to relieve TVA's need in the Memphis area, and this led to a discussion of the possibility of building the plant near Memphis to produce power for delivery to TVA. Since the AEC had no projects in the Memphis area and required no power there, a question arose as to whether AEC should act as the contracting agency with the private utility companies, as had originally been proposed by the Government. It was stated that AEC would contract and pay for the power but that it would be physically delivered to TVA, and that the effect of this would be to release an equivalent amount of power which TVA was supplying to AEC at Paducah. Dixon stated that he thought it would be a much better plan to have TVA contract directly for the proposed new plant instead of having AEC act as contracting party. No questions were raised regarding the details of financing the proposed plant, and there is no evidence that Miller made any statements or suggestions at the meeting.

After the meeting at the AEC had adjourned, there was a conference shortly thereafter in Hughes' office in the Budget Bureau in accordance with arrangements that Williams had made. The conference was essentially a continuation of the meeting at the AEC. In attendance were MacKenzie, Cook, Williams, McAfee, Dixon, Wenzell, Miller, McCandless, and Hughes. McAfee and Dixon reiterated their desire to be of assistance but again expressed their concern about the location of another plant at the Paducah area, pointing out that such a plant would require additional transmission lines for both TVA and the private utilities at considerable additional costs and that the area was geographically unsuitable for future distribution and use of the power in the event AEC's needs were reduced.

Dixon stated that Middle South's utility system had previously made proposals to furnish TVA 450,000 kw. in the Memphis area and was ready to do so at any time at whatever cost the Federal Power Commission deemed fair. It was finally decided that Dixon would prepare a study of the cost factors pertaining to the construction by his company of a power plant that could generate 450,000 to 600,-000 kw. of power across the river from Memphis in the territory of Middle South.

Hughes indicated that probably the AEC could contract for the construction of a plant in the Memphis area, but both Dixon and McAfee thought this was an awkward way of handling the matter. After the utility company executives had argued this point somewhat, Hughes informed them that the decision as to which agency would be the contracting party would be made by the Government.

The evidence shows that from December 2, 1953 (the date on which Dodge first discussed the proposed project with Strauss), until the Power Contract was signed, the defendant never changed its decision that the AEC was to be the contracting agency for the generating plant. However, the meeting in Hughes' office on January 20, 1954, was the first occasion when the Government requested the utility company executives to consider the construction of the proposed power plant in the Memphis area rather than at Paducah.

52. There is no evidence of any statements by Wenzell at either of the January 20 meetings. Miller said nothing at the first meeting, but at the meeting in Hughes' office, he pointed out that a heavy concentration of power in the Paducah area and the possibility of a de-

crease in AEC's need there might affect the prospects of obtaining money for the construction of the proposed plant.

53. On the morning of January 20, 1954, Wenzell told Dixon that during the previous summer he had made a confidential study for the Budget Bureau in Washington and had been recalled by the Bureau. He also told Dixon that he was attending the January 20 meeting as a representative of the Budget Bureau rather than as a First Boston man. At that time, Dixon did not understand what Wenzell's assignment in the Bureau of the Budget was nor was he told the precise nature of Wenzell's work.

At the close of the meeting in Hughes' office, Dixon stated that he would begin some investigations of the kind mentioned at the meeting. Since Dixon expected to be absent from New York for a few days, it was agreed that Wenzell would meet with Tony Seal of Ebasco, which performed engineering services for Dixon's companies. Wenzell was to inform Seal about what was contemplated in order to expedite the matter.

On the evening of January 20, 1954, Wenzell and Miller returned to New York. Their transportation and other expenses of the trip from New York to Washington and return were defrayed by First Boston.

54. Wenzell did not return to Washington until February 4, 1954, but on January 21, 1954, he met with Seal pursuant to the arrangements made on January 20. Wenzell related to Seal the substance of the discussions that had been held in Washington and advised him to get busy on an exhaustive study of the proposed project. There was no discussion of finances at the time.

The meeting with Seal and subsequent meetings which Wenzell had in New York until about March 15, 1954, with representatives of the utility companies were held either at the request or with the knowledge of Hughes, to whom Wenzell frequently telephoned from New York.

55. On January 27, 1954, Seal and Paul Canaday, who was a vice president and director of Middle South, came to Wenzell's office at First Boston. Canaday and Seal were attempting to formulate a plan for the project. Wenzell stated that he was at their service as a representative of the Bureau of the Budget on the all-important matter of the cost of interest on money that would be borrowed to finance the construction of the plant. It was well known that the cost of money played an important part in the cost of the entire project and in the price at which the energy could be produced and sold.

During the period of Wenzell's services with the Budget Bureau, which began in January 1954 and ended April 3, 1954, Wenzell was advising Hughes as well as Dixon and his associates on the cost of money. Hughes had requested Wenzell to stay in touch with Dixon and his associates on the development of a proposal and particularly to help point up the real cost of money to be used in financing the project. The object was to obtain the best rate possible and to get a figure which would not only be used by Dixon but would be known to the Bureau so that both would be talking about one and the same factor.

On January 29, 1954, Hughes telephoned to Wenzell in New York City to find out what had occurred in the meetings that Wenzell had had with Canaday and Seal.

56. On February 3, 1954, Wenzell met again with Canaday and Seal who were working on a proposal. The evidence does not show what the parties said or did. At that time, it was too early to discuss the details involved in financing the project.

57. On February 4, 1954, Wenzell returned to Washington to see Hughes in order to bring Hughes up to date on what had occurred during Wenzell's New York meetings with Dixon's associates. Although the evidence on the matter is not clear, it appears that Dixon was in Hughes' office on the same day and engaged Hughes and Wenzell in a conversation about the cost of money for the project. Dixon and Wenzell returned to

New York on the same day by plane. Wenzell inquired about the status of the work of Dixon's organization in the preparation of a proposal, and there was some discussion about the cost of money and about Wenzell's responsibility in furnishing information about this phase of the matter. Dixon then asked Wenzell to do him a personal favor and ascertain the opinion of First Boston on what the interest rates in the then current money market would be for financing a project similar to the OVEC project.

58. On February 5, 1954, a meeting arranged by Wenzell was held in his office. Besides Wenzell, Harter and Cannon, vice presidents of First Boston's sales department, and Miller were present. Since Harter and Cannon were in touch with the securities markets, Wenzell asked for their best judgment on the interest rates that would have to be paid for funds borrowed to finance the construction of a plant similar to OVEC, taking into account three hypothetical bases of corporate capitalization, i. e., (1) a high debt ratio of from 90 to 95 percent of debt to total capital, (2) an intermediate ratio of from 75 percent debt to total capital, and (3) a ratio of 50 percent debt and 50 percent equity. It was assumed that the total cost of the plant would be about 90 million dollars. After careful consideration of the problem, Wenzell was told that money could be obtained on the three hypothetical bases at the following respective interest rates: (1) 3½ percent, (2) 3½ percent, and (3) 3¼ percent. Wenzell could have obtained this information from other sources, but he was acquainted with the First Boston executives and considered that First Boston was one of the best and most reliable sources, if not the best source, of such information.

Wenzell did not indicate why he wanted the information from Harter or Cannon, nor what was to be done with the figures supplied by them.

Later, during the same day, Wenzell had a telephone conversation with Dixon and advised him about the results of the meeting.

59. On February 8, 1954, Wenzell went to Washington to report to Hughes the results of the meeting held on February 5 at First Boston on the cost of money. Hughes requested that further studies be made on other forms of capitalization and on different periods for repayment of the debt. Hughes stated that the Government could not contract for power for a longer period than 25 years, but he wanted information on amortization of the debt for a longer period of time so that a portion of the debt would be outstanding after the expiration of the contract with the Government.

During the day, Dixon and Canaday met with Wenzell and also with E. J. Donnelly of the Bureau of the Budget in Wenzell's office in the Bureau. Donnelly was the principal budget examiner for the TVA, the Canal Zone, and other agencies. In 1953, when Wenzell was engaged in his study of the TVA, he had obtained most of the data used in preparing his report from Donnelly. Also, Donnelly mailed Wenzell additional information regarding TVA on January 22, 1954. In the room at the time, there were a number of documents relating to TVA, of which some were published and some were not available to the public. At the meeting, those present particularly looked at and used the monthly financial statements which were prepared by TVA for its own purposes. The Budget Bureau was furnished a copy each month, but the documents were not available to the public. There was a general discussion on the various costs incurred by TVA, such as generation, transmission, and other costs set forth in the financial statements. Wenzell asked Donnelly to supply certain additional information relating to the cost of power to TVA, the quantity and cost of power TVA purchased from private industry, and TVA's cost of distribution.

At Hughes' suggestion, Wenzell went to a meeting on the same day in Nichols' office at the AEC, where Dixon, Canaday, and Seal were also present. Dixon reiterated his previous statement that the project was being approached in an

awkward manner, but that he would do his best to prepare a proposal in accordance with instructions given by the Bureau of the Budget.

60. On Wednesday, February 10, 1954, Wenzell had another meeting at First Boston with Cannon, Harter, and Miller to obtain some further information on interest costs in relation to the longer period of amortization which Hughes had mentioned to Wenzell on February 8. The discussion was concerned with a capitalization based upon a ratio of 80 percent debt and 20 percent equity. On the assumption that the total amount borrowed would be 120 million dollars, that it would be amortized over a 40-year period, that the AEC contract would run for 25 years, and that 75 percent of the debt would be paid off at the expiration of the contract, the conclusion was reached that the loan could be made on the basis of an interest rate of 3½ percent.

During the same afternoon, Hughes phoned Wenzell, and later Wenzell and Seal had a telephone conversation. It was Wenzell's recollection that he probably gave both Hughes and Seal a report of the results of the meeting at First Boston.

61. On or about February 14, 1954, Wenzell attended a meeting in Dixon's office where Dixon, Canaday, and Seal were present. Canaday and Dixon had been working on figures and had reached the point where they tried out the application of interest rates. Wenzell gave them the information on interest rates that he had previously obtained from First Boston, and they made some tentative calculations on the basis of those rates. Hughes had impressed upon Wenzell the necessity for speed on the project, and Wenzell was interested in seeing that work on the proposal was proceeding.

On February 15, Hughes again telephoned to Wenzell in New York to discuss the project. Hughes was aware that Wenzell had attended the meeting in Dixon's office as a consultant of the Budget Bureau. On the same day, there was a telephone conversation between Wenzell in New York and Dixon in Pittsburgh, but there is no evidence as to what was discussed.

62. About the middle of February 1954, Dixon asked Paul Hallingby, then assistant to Dixon as president of Middle South, to give his opinion as to whether a proposed power plant could be financed through the issuance of securities based upon a debt ratio of 95 percent debt to 5 percent equity as in the OVEC project and, if so, what the cost of the debt money would be. Hallingby made inquiries of several investment bankers and officers of institutional investors (other than First Boston), who were well apprised of the state of the bond market, and then informed Dixon that debt financing could be obtained at an interest rate of about 3½ percent on an assumed debt structure like that of OVEC.

63. When McAfee learned at the meeting of January 20, 1954, that the defendant was considering the erection of the proposed power plant in the Memphis area, he lost interest in the matter because the location was far removed from the pool area of the companies in which he was interested. On January 22, 1954, he left for the Orient and was out of the country for nearly two months.

About February 16, 1954, Dixon met Ralph Moody, an officer of Union Electric Company, in Pittsburgh to discuss the question of whether Union Electric would join with Middle South in making a proposal to the AEC for the proposed plant in the Memphis area. Dixon then learned that Union Electric had no interest in the matter because the location was outside its pool area. However, Moody wrote McAfee, who replied that he had not changed his mind and that his company would not participate in the construction of a plant in the Memphis area. Moody advised Nichols of McAfee's decision on February 19, 1954.

Sometime prior to February 18, Dixon informed Wenzell that Union Electric was no longer interested in the project, and Wenzell promptly relayed this information to Hughes.

64. About February 18, 1954, Wenzell learned from Dixon that he was to attend a meeting the following day in the offices of Southern in New York City in an effort to persuade that company to join in the venture.

In a telephone conversation prior to the meeting, Hughes requested Wenzell to attend as representative of the Budget Bureau. When Hughes learned that McAfee's company had decided not to participate in the venture, Hughes was disturbed because he felt that if only one company had to carry the entire responsibility, there was a chance that no proposal would be made to AEC.

65. At the meeting held on February 19, 1954, in the offices of Southern, Dixon, Canaday, and Seal were present as representatives of Middle South. Southern officers who attended included Yates, James M. Barry, chairman of the executive committee, the company's senior engineer, its senior accountant, and its senior counsel.

First Boston had done a considerable amount of financing for the subsidiaries of Southern, and Wenzell had known Yates for many years. However, the meeting of February 19 was the first occasion at which Wenzell had ever met with or talked to Yates concerning the project. Wenzell was told by Yates that he had been to see Hughes a few days prior to the meeting and that the Georgia Power Company, one of Southern's operating subsidiaries, had previously written TVA offering to sell a substantial block of power. At the close of the meeting, Yates gave Wenzell copies of the correspondence relating to the offer made to TVA.

During the meeting, Dixon made an earnest plea for Southern to join Middle South in the proposed venture and stated that Middle South had done sufficient preparatory work to determine that a proposal could be submitted to the Government. There was little or no discussion about financing the project. Except for Wenzell's conversation with Yates regarding the latter's earlier meeting with Hughes, there is no evidence of what Wenzell said or did at the meeting. On the same day, Wenzell advised Hughes by telephone of what had occurred at the meeting. Hughes stated that he was pleased to hear that Dixon was trying to get another partner. About February 20, 1954, Southern decided to join in the venture, and Yates notified Hughes and Nichols of this decision the same day.

66. On February 19, 1954, Wenzell left on a trip for Denver and did not again engage in any activities relating to the project until February 23, 1954, when he met Hughes and Dixon at the Budget Bureau.

Beginning on February 1, 1954, Canaday and Seal had been making a number of calculations which were used in the preparation of the proposal submitted by Middle South and Southern to AEC on February 25, 1954. The actual drafting of the proposal did not begin until February 20 after Southern had agreed to join the venture. Wenzell did not participate in the drafting of the proposal.

At the February 23 meeting Dixon showed Hughes a copy of an early draft of the proposal. About noon on the same day, Dixon and Yates met in the AEC with Nichols. McCandless and Wenzell were also present as representatives of the Bureau of the Budget. The purpose of the meeting was to review the tentative draft of the proposal with Nichols to ascertain whether it contained sufficient information for AEC's consideration.

67. While he was in Washington on February 23, 1954, Wenzell drafted an opinion letter which he showed to both Dixon and Hughes. The letter read as follows:

"Draft—2/24/54

"LETTERHEAD OF THE FIRST BOSTON CORPORATION

"Mr. E. H. Dixon,
    "*President, Middle South Utilities, Inc.
        2 Rector Street, New York 6, N. Y.*

"Dear Mr. Dixon: You have furnished us with a copy of the proposal of Middle South Utilities, Inc, and

The Southern Company addressed to the Atomic Energy Commission dated ——— for the sale to the AEC of 600,000 kw of electric power through the creation of a new generating company which would undertake the construction of the necessary facilities. You have advised us that you estimate the capital requirements of the new company for facilities and working capital at around $120,000,000, which you propose to finance on the basis of approximately 95% debt and 5% common stock equity. The equity, to be paid in, is to be $6,000,000 and is to be owned by Middle South Utilities, Inc. and The Southern Company, either directly or by their operating subsidiaries and, possibly, by other utility companies. You have also advised that you want to arrange for up to $130,000,000 of debt capital in order that you may have some cushion for contingencies.

"You have asked us to advise you as to the cost of such debt securities on the basis of the 25 year power contract with the AEC outlined in said proposal supplemented by a (30 year) power contract between the proposed generating company and the utility companies owning the common stock equity under which these companies will agree to take or pay for sufficient power to service the debt securities to the extent that sales to the AEC or to others may not be sufficient to do so, first mortgage bonds not exceeding $130,000,-000, having a maturity of 30 years (beyond the completion date of the new plant, estimated to be approximately 36 months) and amortized through a level debt service type of sinking fund (which will retire 75% of the bonds by the end of 25 years after the facilities are completed and 100% by maturity).

"It is our opinion that under the foregoing circumstances, and under existing market conditions, such debt securities can be sold by the corporation to institutions at an interest cost not to exceed 3½% per annum.

"It is understood that bond proceeds will be taken down over the period of construction of the facilities estimated to be approximately three years and that a standby charge of —% per annum for the unused portion of the $130,000,000 total will accrue starting ———.

"Very truly yours,

"THE FIRST BOSTON CORPORATION,

"By ————— —————"

Although Wenzell prepared the draft in Washington on the 23rd, his recollection was that it was typed and dated when he returned to his New York office on the following day.

The draft of the proposal which Dixon and Yates had available for the meetings of February 23 contained, in the following paragraph, the only reference to the cost of money:

"We have received assurances from responsible financial specialists expressing the belief that financial arrangements can be consummated on the basis which we have used in making this proposal and under existing market conditions, and our offer is conditioned upon such consummation."

The above-quoted statement was inserted in the proposal in reliance on the oral information previously given by Wenzell to Dixon as the opinion of First Boston that the project could be financed on the basis described in finding 60. Dixon had suggested to Wenzell that it would be desirable to have First Boston's oral opinion set forth in a letter, and this suggestion led Wenzell to prepare the draft. On February 23, when the sponsors' tentative proposal was shown to Hughes, he was told that the above-quoted statement was based on First Boston's oral opinion on interest costs, and that a draft of a letter from First Boston, confirming the oral opinion, was being prepared.

As previously stated, the cost of money was an important factor in the total cost of the project, and Hughes had requested Wenzell to make sure that the interest rate to be used by the sponsors in their proposal would be the best figure obtainable, under a capitalization based on a high ratio of debt to equity and with the debt payable over a long period of time. The draft prepared by Wenzell on February 23 was not formally executed by First Boston, but if it had been signed and sent by First Boston, it would have substantiated the oral opinion previously obtained by Wenzell from First Boston and conveyed to Hughes and Dixon.

68. Sometime in the week prior to February 27, 1954, Dixon and his counsel, Daniel James, had a discussion about Wenzell's activities. James felt that if it became necessary to finance the project, First Boston would receive first consideration as financial agent because of its experience on the OVEC project. Therefore, James told Dixon that since Wenzell was an officer of First Boston and was also employed by the Budget Bureau, a difficult situation might be created if Dixon should subsequently ask First Boston to handle the financing of the project. James said it was apparent that the project was developing into a public versus private power fight and that it would be unwise to give the opposition anything which could be used as the basis for an attack. James did not consider that a conflict of interest was involved but thought the sponsors could not afford a situation where the opposition might make it appear that there was a taint of illegality. James advised that Dixon mention the matter to Wenzell with the suggestion that Wenzell might want to speak to his own counsel and to the Budget Bureau about it.

In accordance with the advice received from his attorney, Dixon spoke to Wenzell about the matter in Washington on February 23, 1954. The record does not clearly show what he said to Wenzell, but in substance he asked whether Wenzell had considered the possibility that criticism and embarrassment might result from the fact that Wenzell, as an officer of First Boston, had been doing special work on a project for the Bureau of the Budget, if it later developed that First Boston should be employed to handle the financing of the same project. He suggested that Wenzell discuss the situation with the Bureau of the Budget and with his counsel.

69. On the same day (February 23), Wenzell told Hughes that there were certain implications that might flow from Wenzell's interest opinion draft; that the sponsors were submitting to the Government a proposal which was based upon an interest rate that was accurately described in Wenzell's draft; that the interest rate mentioned in Wenzell's draft was "a very tight figure", which Wenzell had given to the sponsors because it was desirable to get an accurate figure with the expectation that the financing could be obtained at the rate mentioned. He further stated that First Boston was the source of the information in this draft and that if market conditions changed for the worse, the sponsors could use the draft as a moral commitment by First Boston, obligating it to arrange for the financing at the interest rates stated. He then pointed out to Hughes that if it later developed that First Boston should be asked to handle the financing for the sponsors and should give them a letter similar to Wenzell's draft, the facts that he had been the instrumentality for obtaining the interest figure from First Boston, had given the figure to the sponsors, and had used the same figure in his draft could cause criticism against and embarrassment to the Administration, in that it could be charged that he, as a First Boston officer and while employed as a special consultant to the Bureau of the Budget, had improperly used his position in the Bureau to obtain business for First Boston. Although Wenzell spoke to Hughes about embarrassment to the Administration, the record as a whole shows that he was concerned that he might be getting into a position of duality which could be embarrassing to him and to First Boston as well. In the conversa-

tion, Wenzell suggested that Hughes discuss the subject with his political advisers. Hughes replied that Wenzell was exaggerating the importance of the matter, but advised Wenzell to report the situation to his principals in First Boston, to explore the question with counsel, and then to talk with Dodge about the matter.

70. Wenzell returned to New York on February 23 and, after he arrived at his office in the evening, he discussed the problem referred to in the preceding finding with Coggeshall, president of First Boston. In a general way, Coggeshall knew that Wenzell had been doing some work with the Budget Bureau, but he had no direct responsibility for Wenzell's activities. However, since Woods was abroad, Wenzell briefly related his conversation with Hughes to Coggeshall, who felt that the situation was of such importance that Wenzell should obtain advice from First Boston's counsel, Sullivan & Cromwell. Coggeshall thereupon called Arthur Dean, the partner in the firm who generally handled First Boston's business, stating that Wenzell had been working as a consultant to the Bureau of the Budget; that certain problems had arisen, and that Wenzell wanted to talk with Dean or one of the partners in the firm. Since Dean was leaving the city, it was arranged that Wenzell would see Raben, another partner in the firm, on February 26, 1954.

71. On February 25, 1954, Middle South and Southern submitted to the AEC a proposal which was signed respectively by Dixon and Yates, whereby they agreed to form a new corporation which would finance and construct generating facilities from which 600,000 kw. of electric power would be delivered to TVA at the Tennessee line for the account of AEC. The sponsors proposed that the new corporation enter into a contract with AEC for a term of 25 years under which the power would be furnished upon payment of a base capacity charge of $9,626,000 per annum, plus an energy charge which was to be subject to adjustment, plus reimbursement of State, Federal, and local taxes to be paid by the

new corporation. The proposal stated that the contract would provide that AEC would make arrangements with TVA for the receipt by it and the delivery to AEC in kind of the power and energy to be supplied by the new company. The proposal is in evidence as defendant's exhibit 23 and is made a part hereof.

72. On February 26, 1954, Wenzell conferred with Raben of Sullivan & Cromwell. Wenzell related that his work as a consultant with the Bureau of the Budget had been finished in the fall of 1953, but that he was called back to the Bureau again the following January for a brief period to do what he could to expedite the submission of a proposal by some private utility companies, and that his current role with the Bureau was substantially finished. Wenzell then showed Raben a copy of the sponsors' proposal and the draft of his February 24 interest opinion letter. He explained that, in his capacity as consultant to the Bureau of the Budget, he had obtained information from First Boston as to the interest rates on the financing of the project and had passed the same information on to Dixon and to the Bureau of the Budget. He then asked whether Raben saw any objection to First Boston's signing a formal opinion letter along the lines of Wenzell's February 24 draft. Raben replied that the question was purely academic since, in point of fact, Wenzell had already supplied the information to the Bureau and to Dixon, and the letter would amount to no more than confirmation of the oral information.

Wenzell stated that the sponsors' proposal had not been accepted by the Government and that if a proposal should be accepted, many months might elapse before that occurred. He also informed Raben that First Boston had not been employed to handle the financing by any of the parties interested in the proposal. He then inquired whether any problems would arise if it developed in the future that a proposal was accepted by the Government and First Boston was requested to arrange for the sale of the debt se-

curities. Thereupon, Raben advised Wenzell that he should terminate his relationship as consultant with the Budget Bureau forthwith and in writing. He also advised that if the proposal was later accepted and First Boston was requested to handle the financing, the board of directors of First Boston should consider whether they wanted to accept the business and, if so, whether they should charge a fee. Finally, he told Wenzell that he should keep Dodge and Hughes informed about any developments in the matter, including any decision which First Boston might later make as to handling the financing of the project.

On the same day Raben telephoned to Dean, who was in Washington, D. C., at the time, to get a confirmation of the advice given to Wenzell. Dean confirmed the advice Raben had given Wenzell in all respects and further stated that he did not see any problem of a conflict of interest, but that there was a question of policy for First Boston to consider. He felt that since Wenzell had served as a consultant to the Budget Bureau, First Boston might well handle the financing as a matter of public service and not accept any fee. He also stated that First Boston should keep Hughes and Dodge informed on whatever decision was made.

As will hereinafter appear, Wenzell did not resign immediately, nor did he ever submit a written resignation to the Bureau of the Budget. He continued to act as a consultant to the Bureau until April 3, 1954.

73. After the AEC received the sponsors' proposal of February 25, AEC asked the Budget Bureau for its views. On February 26, Hughes introduced Canaday, Seal, and Barry, representing the sponsors, to Carl H. Schwartz, Chief of the Resources and Civil Works Division of the Budget Bureau. Hughes stated that the sponsors' representatives would be available to answer questions, and told Schwartz that he wanted a memorandum containing an analysis of the proposal made and delivered by March 2, 1954.

During the discussion which followed, the Bureau staff submitted several questions, including an inquiry as to how the power, which was to be delivered to the AEC at Memphis, would serve AEC's needs at Paducah. In reply, Seal drew a sketch, indicating that the power would move into the Memphis area where it would be used by TVA and would release power supplied from other parts of the TVA system, so that the power thus released could flow into the Paducah area for use by AEC.

After the meeting with the sponsors' representatives, the Bureau staff continued its analysis of the proposal throughout the weekend, when it was apparent that sufficient information was not available to submit the financial comparison that was desired. Accordingly, on Monday, March 1, Schwartz telephoned Hughes, who was in New York. Hughes said that Wenzell would be in Washington that day and would see Schwartz.

The members of the AEC staff also began a review of the sponsors' proposal of February 25. On February 27, 1954, Cook telephoned Dixon, learned that the base capacity charge in the proposal had been computed on the basis of an interest cost of $3\frac{1}{2}$ percent on funds to be borrowed, and obtained some information regarding the proposed energy charge. During the conversation, it was arranged that Dixon would send Seal to Washington on the following Monday (March 1) to go over the figures with AEC.

74. Wenzell had not participated in the initial reviews of the proposal by either the AEC or the Budget Bureau staffs, but on March 1, he arrived at the Budget Bureau and was present at a meeting of the staff, which was engaged in completing the review of the proposal and in the preparation of the memorandum to be sent to Hughes. Wenzell brought with him Powell Robinson, an assistant vice president of First Boston's sales department, who attended the meeting. Robinson did not attend as an official or consultant of any Government

agency. He made no statement or suggestion during the time he was present.

By the time this meeting was held, Wenzell had completed his assignment in the Bureau as to the cost of money for financing the project. Therefore, his function as a consultant to the Bureau during the period from March 1 until April 3, 1954, when he ceased to serve as a consultant, related principally to the total cost of the project. He took the position that the estimates of costs in the February 25 proposal were too high.

Cook either attended the March 1 meeting at the Bureau or furnished the Bureau staff with the results of his analysis, showing that the project would cost the Government about four million dollars per year more than the AEC was then paying TVA for power furnished by it at Shawnee and that the additional costs were due to increases in construction costs and to taxes. Although Wenzell had participated in the discussion relating to the financial aspects of the proposal, certain questions arose about power engineering, and he stated that he was not qualified to answer such questions. He therefore telephoned Seal and arranged for the latter to meet with the group on the following day. As stated, Cook had previously made arrangements with Dixon for Seal to come to Washington on March 1 to discuss the proposal further with representatives of AEC.

75. On Tuesday, March 2, a meeting in the Budget Bureau was attended by three members of the staff, by Wenzell, and by Seal. McCandless and Schwartz were present from time to time. Seal was shown a copy of the preliminary draft of the analysis prepared by the Bureau staff and was asked a number of questions regarding the basis on which certain estimated costs in the proposal had been computed and about engineering details involved in the transmission and delivery of power from the proposed new plant. In general, the questions propounded by the Bureau staff indicated the staff's opinion that the sponsors' costs were high as compared with costs of power supplied by TVA for AEC at the Shawnee plant. Seal supplied as much information as he could but stated that the proposal had been hastily put together. Seal left about noon and conferred with Cook and Meyer of AEC, pursuant to arrangements Cook had made.

After a further discussion by the Bureau staff, a new memorandum was prepared and delivered by McCandless to Hughes at his home that evening. The memorandum stated that in its review, the Bureau staff had conferred with representatives of the sponsors, had briefly discussed the proposal with Cook, and had had the benefit of discussing it at considerable length with Wenzell. It was stated, however, that sufficient information had not been obtained for a refined comparative cost analysis and that active participation by TVA would be required for such an analysis. The memorandum concluded with the statement:

"We believe that the rates involved are sufficiently close that negotiations should be entered into by the parties concerned."

After the meeting ended, Wenzell went to Seal's office in Washington, stated that the Bureau memorandum had been finished, and that Clapp of TVA and Nichols of AEC were to meet with Hughes again on March 3 for further intra-Government discussions.

76. On or about the period of the March 1–2 meetings held in the Bureau, Wenzell had conversations with several members of the staff and expressed concern regarding his situation. On one occasion, Donnelly, who had worked with and supplied Wenzell much of the data used for Wenzell's September 1953 report, told Wenzell that he was "working both sides of the street" and was likely to get in serious trouble. He suggested that Wenzell's actions were attributable to his lack of familiarity with the restrictions applicable to Government employees as compared with practices in private business. Donnelly also mentioned the matter to Schwartz, his division chief, but never talked to either Dodge or Hughes about it.

While at luncheon with Pilcher and Grahl of the Bureau staff on March 2, Wenzell remarked that he felt that he was in an awkward position in connection with his work on the sponsor's proposal. There was no further mention of the matter at the time, but Grahl learned that Wenzell was an employee of First Boston, a concern which might be interested in financing the project. Grahl repeated Wenzell's statement to Schuldt, his section chief, and asked whether there was a possibility of a conflict of interest in the situation. Grahl stated that so far as he knew, no conflict of interest existed.

At about the same time, Wenzell also talked to McCandless who knew that Wenzell was an officer of First Boston. Wenzell mentioned that he was somewhat concerned about his situation and intended to speak to Dodge about it. There was no further discussion, but Wenzell later told McCandless that Wenzell had held a very satisfactory conversation with Dodge on the subject of Wenzell's concern.

77. On March 2, 1954, Yates wrote the directors of Southern a confidential memorandum, summarizing the proposal of February 25 and stating that he had made several trips to Washington to talk with representatives of AEC and the Budget Bureau. In the memorandum, Yates further pointed out that after the meetings in Washington and after discussions with representatives of Middle South, Southern had decided to join in the venture. There was also a statement in the memorandum to the effect that First Boston had advised Middle South and Southern that the sponsors' bonds in the amount of $114,000,000 and bearing interest at 3½ percent could be sold to insurance companies under the current market conditions. This statement was based on the information Dixon had obtained from Wenzell and passed on to Yates before the proposal of February 25 was submitted.

78. Sometime after James and Dixon had discussed the problems that might arise by reason of Wenzell's activities in the Budget Bureau and the possibility that First Boston might participate in the financing of the project, Dixon had told James that someone in First Boston had stated that the question of Wenzell's activities would be presented to Dean of Sullivan & Cromwell. On February 27, 1954, James spoke briefly to Dean and learned that he was functioning on the problem. During the next week, Dixon informed James that First Boston's counsel had advised Wenzell to resign his position with the Budget Bureau at once.

Sometime later in March 1954, when Dixon and James called on Hughes in Washington on another matter relating to the project, James raised the question of Wenzell's duality with Hughes. Although James had understood that Wenzell was going to resign, he had learned that Wenzell was occasionally taking part in meetings of the Budget Bureau and James wanted to know why Wenzell was continuing to act as a consultant to the Bureau. Therefore, James pointed out the problem to Hughes in about the same language James had used in his conversation with Dixon during the week prior to February 27, 1954 (finding 68). Hughes made no comment on the matter.

79. Sometime after February 26, 1954, when Raben, with Dean's concurrence, had advised Wenzell to resign promptly as a consultant to the Budget Bureau, Dean told Coggeshall that this advice had been given to Wenzell. Coggeshall did not inquire whether Wenzell had resigned but simply assumed that Wenzell had accepted the advice and submitted his resignation.

On March 3, 1954, Dean inquired of Raben whether Wenzell had resigned. On the same day, Raben telephoned Wenzell and learned that Wenzell had not resigned but was in the process of doing so. Also, on March 3, 1954, Dean talked by telephone with Wenzell, advising him to resign promptly and in writing. At Dean's suggestion, Raben again telephoned Wenzell on March 10, 1954, and found that Wenzell had not then resigned. However, from the statement Wenzell made, Raben decided that Wen-

zell's decision to resign was an accomplished fact and that the resignation would be submitted momentarily. Consequently, Raben took no further action on the matter.

80. On March 3, 1954, Hughes held a meeting which was attended by Nichols and Clapp and by various members. of the TVA, AEC, and Budget Bureau staffs. After a discussion of the general outline of the sponsors' proposal of February 25, it was agreed that AEC and TVA would make a joint analysis of the proposal. Since the Budget Bureau wished to be kept advised of the progress made on this analysis, Pilcher and Grahl of the Bureau were designated to represent it at the TVA-AEC meetings.

Also on March 3, 1954, Strauss wrote Dodge in response to a letter sent by Hughes on September 24, 1953. Strauss' reply contained AEC's analysis of the sponsors' proposal of February 25 and stated that AEC had conducted negotiations with the sponsors with the understanding that the purpose of the project would be to relieve TVA of its previous commitments to AEC for the amount of power to be supplied by the private companies and to free that amount of power for normal load growth in the TVA power area. Strauss pointed out that AEC had a firm contract with TVA for the supply of power and that if higher costs to AEC resulted from a cancellation of the contract between AEC and TVA, such higher costs would have to be justified on the basis of advantages to AEC or overall advantages to the United States and that higher executive authority or Congress should make that determination. He concluded the letter with statements that the AEC was divided upon the advisability of using its contractual authority in the manner that had been proposed and that higher authority would presumably determine what course of action would be in the best interests of the Government.

81. On March 4, Cook sent a teletype to Dixon and Seal requesting information needed by AEC for a further analysis of the February 25 proposal. Since Dixon was out of town, Seal prepared the answers to a portion of the questions, obtained information for answering the remainder from a telephone conversation with Dixon, and then prepared a memorandum which he delivered to Cook at the AEC on March 5, 1954.

82. About March 5, 1954, Schwartz and McCandless decided that the Budget Bureau needed the services of a power engineer to assist in the analysis of the proposal. In the afternoon of that day, they spoke to Hughes and suggested that an engineer from either the Bonneville Power Administration or the Federal Power Commission be obtained for that purpose. At the same time, they told Hughes that Wenzell was becoming a little uneasy about his relationship with the Budget Bureau in connection with the proposal. Hughes indicated that he was familiar with Wenzell's feelings.

83. From the evening of March 2 until the morning of March 9, 1954, Wenzell was in New York. During this period he had the following telephone conversations in addition to the calls he received from Dean and Raben:

March 3—with Hughes and Schwartz in Washington;

March 3—with Canaday in Florida;

March 4—two telephone conversations with Seal;

March 5—three conversations with Hughes, Yates, and Seal, each of whom was in Washington;

March 8—with Yates;

March 9—in the morning with Dixon.

Except for the fact that these telephone conversations related in some way to the project, there is no evidence as to what was said in any of them.

84. On March 9, 1954, Pilcher and Grahl of the Budget Bureau met with Meyer and Sapirie of AEC and Kampmeier of TVA to review the draft of the AEC-TVA analysis of the sponsors' proposal of February 25. Wenzell was not present.

After the meeting at AEC, Grahl and Pilcher returned to the Budget Bureau,

where they attended a meeting at which Belcher, McCandless, Donnelly, and Wenzell were present. Wenzell had arrived in Washington in the early afternoon. Grahl supplied copies of the draft of the AEC-TVA analysis and orally summarized it. The analysis showed that the proposal would cost seven or eight million dollars more per year than the estimated cost of the proposed TVA plant at Fulton. It was the opinion of all present that the estimates of costs in the proposal were too high and that an attempt should be made to persuade the sponsors to submit a proposal more favorable to the Government. Wenzell was asked to talk to Seal to determine whether the sponsors would submit a better proposal. Sometime later, Wenzell told Seal that the cost estimates in the February 25 proposal were too high.

85. While he was at the Bureau on March 9, Wenzell called on Dodge and stated that he was concerned that if the sponsors submitted a satisfactory proposal and if there was a financing problem connected with the proposal, whether First Boston would be barred from participating in the financing because Wenzell had been employed as a consultant to the Bureau. Dodge had had little or no contact with Wenzell during the preceding two months. Dodge thought that Wenzell was referring to the possibility of First Boston's participating in an underwriting syndicate with a number of other companies. At that time, there was no proposal that could be used for a basis of negotiation, and Dodge felt that there would be a long period of negotiations and that many preliminary approvals would have to be obtained before the question of financing would arise. However, Dodge told Wenzell that if there was any likelihood that First Boston might participate in any financing which developed in the future, Wenzell should finish his work with the Bureau as quickly as possible. Wenzell replied that he would terminate his work in the Bureau soon. He also said that if anything later developed that would involve First Boston in the financing and if there

should be a question of a fee or compensation in connection therewith, he would see that the matter was referred to the Bureau for its prior approval. He added that this promise would also apply to the release of any publicity regarding the handling of the financing.

During the same conversation Wenzell briefly referred to and discussed the overall costs on which the sponsors' proposal was based. Wenzell stated that he was not qualified to advise the Bureau on the matter of overall costs and suggested that Dodge make arrangements to obtain the services of Francis L. Adams, Chief of the Bureau of Power, Federal Power Commission. Dodge agreed to talk to the Chairman of the Federal Power Commission to see if Adams was available for such an assignment. Wenzell returned to New York on the evening of March 9.

86. On March 10, 1954, Dixon and Yates, along with several representatives of Middle South and Southern, met in Dixon's office to begin preliminary work on a memorandum of understanding between the two companies in connection with their joint proposal. Dixon and Yates had to leave the meeting to attend a conference that day with Linsley, chairman of First Boston's executive committee, in the latter's office, and the memorandum of understanding was completed in their absence.

Wenzell was present in Linsley's office with Dixon and Yates during the discussion. Dixon was well acquainted with Linsley and had frequently asked for Linsley's opinion on security issues and the condition of the money market. Wenzell arranged the meeting, because Dixon wanted to make certain that the information given to him by Wenzell represented the opinion of some First Boston official like Linsley. Although interest rates may have been mentioned in the discussion, it was concerned chiefly with the current condition of the financial market as related to the financing of an OVEC type of project. No specific financing plan was discussed.

Prior to the meeting Linsley had never talked about any matters relating to the project with Wenzell, nor had Linsley known that Middle South and Southern had submitted a proposal to the AEC. It was not until April 12, 1954, that Linsley learned of Wenzell's interest opinion draft of February 24, 1954.

87. On March 10, 1954, McCandless telephoned Wenzell, and on the following day Wenzell had a telephone conversation with Seal.

In the afternoon of March 11, 1954, Wenzell returned to Washington to attend another meeting of the Budget Bureau staff. Those present talked about the joint AEC-TVA analysis of the sponsors' proposal, the high costs included in the proposal, and the desirability of lowering the costs. Prior to the meeting, Pilcher and Grahl had attended a session at the AEC for the review of another analysis prepared by the staffs of AEC and TVA.

At the Bureau meeting, it was decided that the AEC should ask the sponsors to review the draft of the TVA-AEC analysis of the proposal and that someone from AEC should arrange for Seal to submit more information on the sponsors' cost figures.

As a result of the meeting in the Bureau, Cook telephoned Dixon on March 12, stating that the Government's analysis of the proposal showed that there was quite a disparity in the costs set forth in the proposal as compared with an estimate of what it would cost TVA to provide an equivalent capacity at the Fulton site. Cook stated that the principal elements of the cost difference were the capital costs used in the demand charge and the sponsors' use of the TVA formula for computing the energy charge. Dixon replied that the sponsors would be happy to discuss the matter further and that he would have Seal and Canaday, who were then in Washington, call at Cook's office and go over the points mentioned with Cook. After receiving a telephone call from Dixon, Seal and Canaday met with Cook, who gave them a copy of the draft of the AEC-TVA analy-

sis of the proposal, with the understanding that it would be returned on March 15 or 16, along with the sponsors' statements as to any inaccuracies found in the Government's analysis. Cook also requested that the sponsors' representatives be prepared to furnish their minimum cost proposal at the same time.

88. Wenzell remained in Washington overnight on March 11 and returned to New York the following day. He remained there until Tuesday, March 16, 1954.

On Monday, March 15, 1954, Wenzell had a long-distance telephone conversation with McCandless in Washington. The record also indicates that on the same day Dixon placed a call in Washington for Wenzell, who was in his New York office at the time, and that Wenzell later attempted to return the call. The evidence does not show whether the call was completed.

89. On March 15, 1954, the final draft of the joint AEC-TVA analysis of the sponsors' proposal was prepared and sent to the Bureau the next day in the form of a memorandum from Meyer of AEC to Grahl of the Budget Bureau. On March 16, 1954, representatives of the sponsors, including Dixon, Yates, Canaday, Barry, Smith, and James, met with Dodge in the conference room of the Bureau. Wenzell, who had returned to Washington that morning, was also present at the meeting. The group met to discuss the results of the joint TVA-AEC analysis, a copy of which had been previously given to Seal and Canaday by Cook.

While the meeting was in progress, Grahl called Dodge into the hall to show him a copy of the final draft of the AEC-TVA analysis received that day from AEC. At Dodge's instruction, Grahl handed one copy of the draft to Wenzell.

In the meeting, the sponsors' representatives urged Dodge to have an independent analysis made of the February 25 proposal, whereupon Wenzell suggested that Adams of the Federal Power Commission be requested to make the analysis.

90. On March 16, 1954, several representatives of the sponsors met in Dixon's hotel room in Washington and prepared a draft of a letter to Nichols of AEC in reply to the joint TVA-AEC analysis of the sponsors' proposal. A copy of the draft found in Yates' files has in his handwriting at the top of the letter the word "tentative" followed by his initials and the words "Wash.—March 16". Also in his handwriting below this statement is a series of initials and names listing Hayden Smith, Barry, Yates, Dixon, James, Canaday, and Wenzell.

The testimony with respect to the persons who were present and who participated in the drafting of the letter is vague.

Dixon recalled that a meeting was held in his hotel room to draft the letter and that the draft was taken to the Bureau of the Budget, where the meeting described in the preceding finding was held with Dodge; Dixon said he doubted whether Wenzell was present when the letter was drafted.

James could not remember how the draft was prepared, where, or by whom, but his time account shows that on the preceding day, March 15, he worked on an answer to the AEC-TVA analysis of the sponsors' proposal. His notation indicates that the preparation of the draft may have been started the preceding day.

Canaday was sure that he had seen the letter but had no other recollection regarding it.

Neither Seal nor Barry could recall that he saw the letter or participated in its preparation.

Wenzell's recollection was that he did not meet with the sponsors' representatives in Dixon's hotel room.

Although it has not been shown by a preponderance of the evidence that Wenzell was present at the meeting in the hotel room, he was handed a copy of the draft on March 16, 1954, and he made several changes in the letter in his own handwriting. His copy of the draft with his handwritten changes thereon is in evidence as defendant's exhibit 265.

The letter was never prepared in final form, signed by the sponsors, or sent to the AEC.

91. Pursuant to arrangements made between the Bureau and the Federal Power Commission, Adams began acting as a technical consultant to the Bureau on March 19, 1954, and on the following day was engaged in the study of the several analyses that had been made.

92. Wenzell was in New York from March 17 to March 23, 1954. On March 22, Hughes telephoned him "to make sure that he (Wenzell) had turned everything over to Adams." There is some evidence that Wenzell had a telephone conversation with Seal on the following day, March 23.

On March 23, Wenzell went to Washington and saw Hughes, who made an appointment for Wenzell to talk to Adams the same day. McCandless also telephoned Adams, stating that Wenzell would call on Adams and discuss with him the cost of money for financing the type of plant that was then being considered. During the meeting between Adams and Wenzell, the subject of the discussion generally was the cost of money for the bonds involved in financing the proposed plant. Wenzell also talked with Roberts, an assistant to Adams. Wenzell returned to New York the same evening.

93. After Adams had made an independent analysis of the February 25 proposal on the basis of the material furnished him, Adams, McCandless, and other staff members of the Bureau met with Seal on March 24, 1954, at which time Adams stated that the figures in the proposal were considerably higher than a reasonable estimate of costs to the sponsors. Adams then asked Seal to develop basic estimates for the cost of constructing a plant and other facilities to provide the services contemplated in the proposal, and Seal agreed to confer with the sponsors regarding this request.

94. The desk pad kept by Wenzell's secretary shows that on March 24, he had telephone conversations with McCandless, Seal, and Canaday, but there is

no evidence regarding the nature of the conversations. The record also shows that there was another telephone conversation between Seal and Wenzell on March 26.

Since Adams had been called in by the Bureau to advise it on the costs of the project, there was very little work for Wenzell to do for the Bureau after March 23, 1954.

On March 30, Wenzell had telephone conversations with Yates and Canaday. Also on March 30, Wenzell talked by telephone with McCandless, who asked Wenzell to be present at a meeting to be held at the Budget Bureau on April 3, 1954.

95. By the time the meeting of March 24 between Adams and Seal was held, it was clear to the sponsors that their proposal of February 25 would not form an acceptable basis for the negotiation of a contract. Following Adams' suggestion to Seal, a group of executives from Middle South and Southern, together with engineers from Ebasco and Southern, worked from March 26 to about April 1, 1954, on the preparation of detailed cost estimates covering the construction of a power plant at West Memphis, Arkansas. These cost estimates were used as a basis for the sponsors' proposal of April 10, 1954. There is no evidence that Wenzell was present at or participated in any of these meetings where the basic cost estimates for the second proposal were prepared.

96. On April 1, Seal and engineers representing the sponsors met with Roberts and Adams in the latter's office and presented the detailed basic cost estimates that had been prepared by the sponsors. These estimates were discussed and reviewed.

On April 2, Hughes met with Adams, Roberts, and McCandless, and it was agreed that Adams would continue his study and be prepared to give a rough outline of his conclusions at a meeting to be held with Messrs. Dixon and Yates on April 3, 1954.

97. On April 2, 1954, McCandless made a telephone call to Wenzell in New York, and on Saturday April 3, Wenzell returned to Washington. On that date, he attended a meeting held at the Bureau, where Hughes, McCandless, Adams, Dixon, Yates, Seal, and Canaday were also present. The meeting had been called by Hughes for the purpose of discussing the sponsors' new cost estimates. As a result of Adams' analysis, it was agreed that the revised cost estimates were better than those contained in the proposal of February 25 but that further refinement of the figures was required. Dixon and Yates were told that if they could submit a new firm proposal close to the revised cost estimates, the Budget Bureau would feel that the new proposal would deserve serious consideration. Thereupon, Dixon and Yates agreed to outline a proposal for further discussion. Although the record is not entirely clear on the point, it appears that during the meeting, Wenzell confirmed to Dixon and Yates, as well as to Hughes, the information which he had previously given them on the cost of money.

98. During the afternoon of April 3, Wenzell saw Nichols and Cook at the AEC. Nichols told Wenzell that the sponsors had by that time come close to submitting acceptable figures. He suggested that Wenzell encourage the sponsors to refine their figures and to submit a proposal based on a fixed price for the construction of new facilities, with details as to the basis upon which both the demand and energy charges were calculated. Nichols also mentioned cancellation provisions and said that the AEC could not consider a proposal that was not firm as to capital costs nor one which did not contain cancellation provisions acceptable to the AEC. Nichols told Wenzell that he would be glad to meet with Adams and the sponsors when they were prepared for further discussions.

The meeting was arranged by a telephone call from Hughes to Nichols. Cook understood Wenzell was present as a representative of the Budget Bureau.

· Wenzell returned to New York that evening. It was his last trip to Washington in connection with the project.

99. During the second period of his service as a consultant with the Budget Bureau, i. e., the period from January 18, 1954 to April 3, 1954, Wenzell made 11 trips from New York to Washington and return. He did not follow any regular or consistent practice in the manner in which he submitted bills for his travel and subsistence expenses. Although the Government had agreed to pay his transportation expenses and a per diem for subsistence, most of the bills were submitted to First Boston and paid by it. The following is a summary of the dates on which each trip began and ended and the manner in which his travel and subsistence expenses were billed and paid:

(1) January 18, 1954—all expenses paid by First Boston.

(2) January 19–January 20, 1954—all expenses paid by First Boston.

(3) February 4, 1954—the Government paid Wenzell's transportation both ways, but First Boston defrayed his other expenses.

(4) February 7–February 8, 1954— First Boston paid Wenzell's transportation to Washington and all subsistence expenses of the trip. The Government paid his transportation from Washington to New York.

(5) February 22–February 23, 1954— First Boston paid Wenzell's transportation fare from New York to Washington and all subsistence expenses of the trip. The Government paid his fare for travel from Washington to New York.

(6) March 1–March 2, 1954—the Government paid his · transportation both ways, but First Boston defrayed all other expenses of the trip.

(7) March 9, 1954—all expenses were defrayed by First Boston.

(8) March 11–March 12, 1954—First Boston paid all expenses of the trip.

(9) March 15–March 16, 1954—First Boston defrayed all expenses of the trip.

(10) March 23, 1954—First Boston defrayed all expenses of the trip.

(11) April 3, 1954—First Boston paid all expenses of the trip.

100. After the meeting of April 3 with Adams and Roberts, the sponsors' representatives reviewed their basic estimates and had new cost figures available by April 6, 1954.

On April 5 and 6, Adams and Roberts discussed the technical aspects of the revised cost estimates with representatives of the sponsors.

On April 6, Hughes, McCandless, and Roberts met with Dixon and Yates, at which time the sponsors gave a general outline of a second proposal which they were preparing to submit. The sponsors began the actual drafting of this proposal in Washington, D. C., on April 6.

Also, on April 6 there was a meeting at AEC attended by Nichols, Cook, Dixon, Yates, Adams, and Roberts. The sponsors had a preliminary summary which indicated that in the second proposal, the annual charges to AEC, including estimated taxes, would exceed the AEC annual cost under the AEC-TVA contract at Paducah by $1,669,000. The annual charge was based upon a facilities cost of $107,250,000. It was agreed that the sponsors would start the preparation of a definitive proposal to be reviewed at another meeting on April 8, 1954. It was further agreed that, after such review, Nichols would present an analysis of the new proposal to the members of the Atomic Energy Commission and that there would be a further discussion with Hughes, so that the Bureau could then make a policy determination as to the course of action to be followed.

On April 7 and 8, Adams and Roberts conferred with AEC staff members and representatives of the sponsors on certain technical aspects of the sponsors' cost estimates and proposed contract provisions.

On April 8, Adams and Roberts, along with Cook and Meyer, met with a group of the sponsors' representatives, including Seal, Canaday, and Barry. The sponsors presented a draft of their second

proposal and after the draft had been reviewed paragraph by paragraph, it appeared that all the questions raised by the Government's representatives could be resolved with two exceptions which related to (1) the provision that AEC could not resell the power, and (2) the termination of the contract 11½ years after operations commenced.

101. About April 8, 1954, Dixon asked Hallingby to again check on the availability and cost of debt money for the proposed project. As he had done in February (finding 62), Hallingby talked to various investment bankers and institutional investors and advised Dixon that the debt financing could be obtained .at an interest cost of approximately 3½ percent.

102. On April 10 there was an all-day meeting at the AEC. Nichols, Cook, and Meyer represented the AEC, while Adams and Roberts attended as consultants for the Bureau of the Budget. For the sponsors, Dixon, Yates, James, Canaday and Seal were present. The sponsors withdrew the proposal of February 25 and presented the draft of a second proposal based on their revised cost estimates. During the meeting, all aspects of the second proposal were reviewed. The sponsors agreed to several modifications which were to be set forth in a formal proposal to be submitted by them under the date of April 10, 1954.

During the meeting, Dixon said that the best informed judgment which the sponsors had been able to obtain indicated that the interest charges on the debt money would be 3½ percent, but he further stated that if it developed that the sponsors had to pay a higher rate, he would expect the Government to reimburse the sponsors for the additional interest costs. On the other hand, Nichols took the position that if the actual cost of money to the sponsors was less than 3½ percent, he would expect to reopen the question of costs so that the Government would obtain the benefit of the lower rate.

The cost of money, to which both Dixon and Nichols referred, is not a static figure, but varies from day to day, and sometimes from hour to hour in accordance with the ups and downs of the market. As will hereinafter appear, the actual cost of the money borrowed was 3⅝ percent for MVG's bonds and 3¼ percent for its notes.

103. After the meeting of April 10, the sponsors made a few changes in the proposal and then submitted it to the AEC on Monday afternoon, April 12, 1954, although it was dated April 10, 1954.

The second proposal, like the first proposal, was an offer, whereby the sponsors, in response to the President's budget message, agreed to contract with the AEC for the construction of an electrical generating plant and other facilities near Memphis, Tennessee. The capacity of the plant in both proposals was the same. However, the second proposal differed from the first in several respects.

In the first proposal, the capital cost figures were based on a study which had originally been made for the Mississippi Power & Light Company in connection with an offer it made to TVA. Since that offer related to a plant having 450,-000 kw. capacity, the cost figures in the February 25 proposal were adjusted upward to provide for a plant of 600,000 kw. On the other hand, the capital cost figures in the April 10 proposal were based upon estimates prepared by Ebasco for the actual cost of constructing a plant of the desired capacity at West Memphis, Arkansas.

The proposal of February 25 referred to and compared the sponsors' capital cost with TVA's estimated costs for the construction of the proposed plant at Fulton, Tennessee, whereas the April 10 proposal did not mention a comparison of costs with the TVA Fulton plant.

In the first proposal, the base capacity charge was stated as $9,626,000, whereas the base capacity charge in the second proposal was $8,775,000.

The proposal of February 25 stated that the energy charge and other terms and conditions of the contract, including

adjustments, were to be similar to those contained in AEC's contract with TVA for such service, but in the April 10 proposal, the energy charge was stated in specific figures and the terms for the adjustment thereof were set out in some detail.

104. The sponsors' proposal of April 10, 1954, was prepared in Washington, D. C., by Dixon, Canaday, Barry, James, Smith, and Seal. Wenzell was not present in Washington at any of the sponsors' meetings during which the proposal was drafted. As already stated, he returned to New York on April 3 and his activities in connection with the April 10 proposal thereafter consisted of the following:

(a) Several days before April 12, 1954, when the sponsors delivered the proposal to the AEC, a representative of the sponsors either gave Wenzell a copy of the proposal for his examination or called him by telephone and read to him the following paragraph contained in the April 10 proposal:

"We have received assurances from responsible financial specialists expressing the belief that financing can be arranged on the basis which we have used in making this proposal and under existing market conditions, and our offer is conditioned upon the arranging of such financing."

The above-quoted sentence was the portion of the second proposal in which Wenzell had a real interest. Whether the sponsors gave him a copy of the proposal or whether the sentence referred to was merely read to him, he compared the statement on financing in the second proposal with that in the first proposal, ascertained that the second proposal contained substantially the same provision on the subject, and knew that it was based upon the interest rate of 3½ percent that he had obtained from First Boston.

(b) It was always contemplated that the cost of money would be reflected in the capacity charge to the Government, and appendix C to the Power Contract shows that the cost of money is the largest component of cost included in the capacity charge. In view of that fact and Dixon's knowledge that the conditions in the money market change from time to time, he felt that it was necessary to get current information at the time the sponsors were working on the final details of the April 10 proposal. Therefore, on April 9, 1954, he telephoned Wenzell, asking him to get the informed judgment of First Boston on the current cost of money. On the next day, April 10, Dixon again talked with Wenzell by telephone and was told by Wenzell that it was the judgment of First Boston that the interest rate would be 3½ percent. This information was relied upon by the sponsors in the drafting of the second proposal.

105. On Saturday, April 10, 1954, there was a long distance telephone conversation between McCandless and Wenzell, but the record does not show what was said by either of them.

Wenzell felt that his relationship with the Budget Bureau terminated on April 10, 1954, the date of the sponsors' second proposal.

106. Wenzell performed no services for the Budget Bureau after April 3, 1954. During the period of his services which began on January 18 and ended on April 3, 1954, he did not consider that he was advising parties whose interests were in conflict. He did not feel that by his meetings and telephone conversations with representatives of the sponsors, by obtaining and giving to them First Boston's opinion on the cost of interest, by preparing and showing them the February 24 draft of an opinion on interest rates (finding 67), and by engaging in the other activities which have been detailed in the foregoing findings, he was giving advice and assistance to parties whose interests were different from those of the Budget Bureau, because he felt that the sponsors' interests and the Government's interests in all of these matters were common.

E. *Retainer of First Boston and the Decision as to its Fee*

107. On the morning of Monday, April 12, 1954, there was a meeting in Linsley's office at First Boston, at which Linsley, Wenzell, Dixon, Hallingby, Yates, Miller, and Smith were present. At the meeting, the sponsors' representatives stated that they were preparing to submit their proposal to the AEC and that they wanted First Boston to give them a letter confirming the oral opinion of the interest rates given by Wenzell to Dixon on April 10. It was agreed that First Boston would give an appropriate written opinion. Dixon also asked First Boston to furnish him a statement of First Boston's views on the procedure for securing a commitment for debt financing of the type and in the amount contemplated by the sponsors.

At the meeting, Linsley learned for the first time from Wenzell about the interest opinion letter which the latter had drafted on February 23.

After the meeting, the sponsors' representatives went to Washington and submitted the proposal to the AEC on the afternoon of April 12, 1954. At the meeting of April 12, Wenzell considered that since his services with the Bureau had ended on April 10, he was acting as a representative of First Boston.

108. On January 14, 1954, when Hughes had requested Wenzell to perform some additional work for the Bureau of the Budget, Woods was told by Wenzell that he had been requested to return to Washington and perform services for the Bureau for a few days. At the time, Woods thought that the work was simply a completion of Wenzell's previous assignment. Therefore, Woods indicated no objection and made no further inquiry. Woods was out of the United States from the end of January 1954 until about March 16, 1954. During Woods' absence from the country, Wenzell discussed the project with Miller from time to time. Aside from Wenzell's conversations with Miller and the discussion Wenzell had with Coggeshall on February 23, 1954 (finding 70), there is no evidence that Wenzell discussed his activities on the project with any officer of First Boston until April 12, 1954, when Woods had lunch with Wenzell. During the luncheon, Wenzell related generally what he had been doing in Woods' absence. Wenzell also told Woods that he was then back with the buying department of First Boston.

By the date the luncheon was held, Wenzell expected that First Boston would handle the financial arrangements for the sponsors if a contract resulted from the April 10 proposal.

109. On April 13, 1954, Hallingby requested Miller to arrange for First Boston to sign the formal opinion letter regarding interest, as discussed the previous day. Using the Wenzell draft of February 24, James prepared a draft of a letter to be signed by First Boston. His draft was erroneously dated March 14, 1954, instead of April 14, 1954, and he erroneously gave the date of the sponsors' proposal as April 14, rather than April 10, 1954. The latter error was carried into the letter signed by First Boston.

With minor changes, the letter was typed at First Boston, signed by Linsley as chairman of the executive committee, and delivered to James at a meeting held in Linsley's office on April 14, 1954, at which Linsley, Miller, Wenzell, and James were present.

The letter read as follows:

"April 14, 1954.
"MR. E. H. DIXON,
"*President, Middle South Utilities, Inc.,*
"*2 Rector Street, New York 6, N. Y.*
"DEAR MR. DIXON: You have furnished us with a copy of the proposal dated April 14, 1954, addressed to the Atomic Energy Commission by Middle South Utilities, Inc. and The Southern Company regarding the sale to the AEC of 600,000 kw of electric power through the creation of a new generating company which would undertake the construc-

tion of the necessary facilities. You have advised us that you estimate the capital requirements of the new company for facilities and working capital at around $107,250,000, and that you propose to finance the new company on the basis of approximately 95% debt and 5% common stock equity. The equity to be paid in is to be $5,500,000 and is to be owned by Middle South Utilities, Inc. and The Southern Company, either directly or by their operating subsidiaries and, possibly, by other utility companies. You have also advised that you want to arrange for up to $120,000,000 of debt capital in order that you may have some cushion for contingencies.

"You have asked us to advise you as to the cost of such debt securities on the basis that the power contract with the AEC outlined in said proposal will be for a term of 25 years and will be supplemented by a contract between the proposed generating company and the sponsoring companies under which the latter will agree to take and pay for sufficient power to service the debt securities to the extent that sales to AEC or to others may not be sufficient to do so, and on the basis that the first mortgage bonds will mature 30 years after completion of the new plant (estimated at approximately 36 months after commencement of construction) and will be amortized through a level debt service type of sinking fund, which will have retired about 75% of the bonds 25 years after completion of the facilities and 100% by maturity.

"It is our opinion that under the foregoing circumstances and under existing market conditions, such debt securities can be sold by the Corporation to institutions at an interest cost of not to exceed 3½% per annum.

"It is understood that bond proceeds will be taken down over the period of construction of the facili-

ties, which is estimated to be approximately three years.

"Very truly yours,

"————— —————,

"*Chairman Executive Committee.*

"DRL/g."

On one copy of the letter in evidence the figure "14" in the date "April 14, 1954" is circled, and there is a handwritten notation "10" above, followed by the initials "AHW" and the date "5/12/54". These corrections were made by Wenzell on an office copy on May 12, 1954, to show that the date of the proposal was April 10 rather than April 14, 1954.

110. Dixon left New York on April 13 and did not return until about April 22, 1954. On April 14 Miller began preparation of the material Dixon had requested on April 12. Miller asked Hallingby for information on the prospective load growths of Middle South and Southern. Hallingby obtained the information in piecemeal form, and before all of it was assembled, Miller left for Puerto Rico and did not return until April 22, 1954. In Miller's absence, Hallingby had several telephone conversations with Wenzell between April 15 and April 22, 1954, in which Hallingby gave the remainder of the information sought by Miller to Wenzell. There were additional telephone conversations between Hallingby and Wenzell on April 27, April 29, May 5, and May 7.

On April 23, 1954, Wenzell conferred with Miller regarding the project, but the record does not show the nature of the discussion.

111. About the middle of April 1954, James E. Whittemore, head of the public utilities department of Lehman Brothers, an investment banking firm in New York, learned that Middle South was contemplating supplying power to AEC, and he thought there might be an opportunity for Lehman Brothers to participate in the financial arrangements. Accordingly, he made a solicitation by telephone conversation to Hallingby on or about April 15. Whittemore obtained some in-

formation about the probable extent of the financing but he was later called back and told that Middle South was not in a position to discuss financial arrangements at that time. On April 22, 1954, Whittemore and another member of his firm, met Hallingby in an effort to have Lehman Brothers' services considered in connection with the financing of the project.

On April 28, Whittemore and his associate met with Dixon, Yates, and Hallingby in the offices of The Southern Company, at which time the ability and the desire of Lehman Brothers to take part in the financing of the proposed new company were discussed. No decision was made regarding the employment of Lehman Brothers as financial agent at that time. A short time later, Dixon discussed the matter with several of his directors, and they decided that Lehman Brothers had some talents that would be helpful in connection with the financing of the project.

112. When Miller returned to his office on April 22, 1954, he learned that Dixon was trying to get in touch with him or Linsley, who had also been out of his office during the latter part of April.

On Friday, May 7, 1954, there was a meeting at First Boston between Dixon, Yates, Hallingby, Woods, Linsley, Coggeshall, Miller, and Wenzel. Dixon stated that he was disturbed that First Boston had not presented its views to the sponsors regarding a proper financial plan for the project and that First Boston had done little toward setting forth its views in a memorandum. There followed a discussion regarding the preparation by First Boston of a memorandum as to the types of securities to be issued and the nature of the financing. Woods planned to use several of First Boston's officers as a small task force to prepare the memorandum and to approach the banks and insurance companies in the event First Boston was retained to perform the service.

Dixon introduced the idea at the meeting that if First Boston was to arrange for the financing, he would like to have Lehman Brothers associated with First Boston in the undertaking. First Boston was not pleased with this suggestion. Woods stated that he would have to consider the idea and discuss it with his associates.

113. On May 11, 1954, Dixon met Woods and Coggeshall at a luncheon, where Woods stated that First Boston was not particularly anxious to act as financial agent if Lehman Brothers was to be associated in the work and that First Boston did not need the assistance of any other concern. He suggested that it might be just as well if First Boston withdrew from the undertaking. Woods further stated, however, that if Dixon felt that it would be undesirable for Lehman Brothers to handle the matter alone, First Boston was willing to be associated with Lehman Brothers on the conditions that First Boston would have the dominant position so far as authority was concerned and would also to have the senior position with respect to advertising and the division of fees. He left it for Dixon to decide how the arrangement and the conditions stated were to be effected. In the financial community, the senior position in advertising is a matter of importance. Woods considered at the time that if the handling of the financing was successfully consummated by First Boston, the accomplishment would be valuable from an advertising standpoint and would add to First Boston's store of experience. Woods also felt that the advertising might result in First Boston's obtaining other business of the same kind.

The next day, Dixon advised First Boston (which had had no direct dealings with Lehman Brothers) that the sponsors desired to have First Boston and Lehman Brothers act as financial agents on the conditions that had been specified by Woods.

114. Shortly after the meeting of May 7, Miller began drafting a plan for the debt financing. Although Miller had the responsibility of preparing the memorandum, he discussed it with Wenzell

who participated to some extent in the work assigned to Miller. After Miller had discussed a preliminary draft with Dixon and Hallingby, First Boston proceeded to complete a memorandum outlining a financing plan that was satisfactory to the sponsors.

On May 18, 1954, the final draft of the plan was discussed at a meeting at the offices of Middle South, where Woods, Miller, and Wenzell of First Boston, representatives of Lehman Brothers, and various representatives of Middle South and Southern were present.

It was decided that the fee for the financial agents would be divided on the basis of 60 percent to First Boston and 40 percent to Lehman Brothers and that First Boston would have the preferred position on any advertising.

About May 20, 1954, First Boston and Lehman Brothers first approached the institutional investors. These negotiations continued until the middle of August 1954, when the finance committee of the Metropolitan Life Insurance Company authorized the purchase of bonds, and the terms of the loan had been agreed upon to the extent of providing a basis for negotiation of the bond purchase agreement and related documents. Miller and Linsley acted for First Boston in these negotiations. Ultimately, the financing was arranged at an interest rate of 3.58 percent instead of at 3½ percent, the rate which had been previously used in the opinions given by First Boston as to the cost of the debt money.

115. On May 19, 1954, Woods issued to certain First Boston personnel a memorandum setting forth the agreement he had concluded with Dixon on or about May 12, 1954, regarding First Boston's association with Lehman Brothers in the financing arrangements. The memorandum read as follows:

"Black Book Memorandum

"Mississippi Valley Generating Company
"It is planned to organize this Company for the purpose of building a power plant on the Mississippi River opposite Memphis. Its sponsors will be Middle South Utilities, Inc. and The Southern Company. These Companies will own its entire stock, 80% by Middle South and 20% by Southern Company. The entire output of the plant will be sold under contract to the Atomic Energy Commission.

"First Boston and Lehman Brothers have been requested by the managements of the sponsoring Companies to act in a general advisory capacity with respect to all financial aspects, and specifically to act as agents in placing the debt of the new Company with insurance companies and banks.

"Any fee which may be paid is to be divided 60% FBC and 40% Lehman, and it is understood that FBC is the leader in the business and will have senior position in all advertising and publicity.

"Responsibility for this matter will be in the hands of Mr. Linsley and Mr. Paul Miller.
                "(S)   George D. Woods."

116. The testimony is conflicting as to the date when First Boston was first retained by the sponsors to handle the financing for the project. The greater weight of the evidence shows that Dixon understood and believed that First Boston had been retained as of April 12, 1954, when First Boston was requested to issue the letter quoted in finding 109 and to advise Dixon on the procedure for obtaining a commitment of funds. On the same day Miller began to assemble information obtained from Hallingby. Dixon had tried to get in touch with both Miller and Linsley about April 22, 1954, and when the meeting of May 7 was held, Dixon expressed disappointment because First Boston had not proceeded with the preparation of the memorandum of a financial plan. However, the consummation of an agreement between the sponsors and First Boston was delayed when Dixon stated on May 7 that he would like to have Lehman Brothers associated

with First Boston on the task of raising the money.

There never was any written agreement of retainer, but the evidence shows that all questions were resolved by May 12, 1954, when Dixon and Woods agreed that First Boston and Lehman Brothers would act as financial agents for the sponsors.

117. During the period between May 25 and the middle of June 1954, Woods, in several conversations with Linsley, took the position that it would be the better policy for First Boston not to charge a fee for its services as financial agent for the sponsors. Linsley agreed with Woods. About June 15, 1954, Woods telephoned Dean, stating that First Boston had decided as a matter of policy not to charge any fee. There was some resistance to Wood's decision by the other members of First Boston's executive committee, and the matter was discussed by the committee on July 1 and again on September 22, 1954. At a regular meeting held on October 21, 1954, the executive committee took the following action:

"* * * In line with the discussions which took place in the Executive Committee meeting on July 1, 1954, and after due consideration, the Executive Committee confirmed our earlier decision not to accept compensation for our services (except remuneration for out-of-pocket expenses) in connection with the Direct Placement of up to $93,000,000 principal amount of bonds and up to $27,000,000 of unsecured notes for Mississippi Valley Generating Company. * * *"

The decision not to charge a fee was based on Woods' conclusions that the financing, which First Boston had been retained to handle, had flowed directly from the conversation which Woods had had with Dodge in May 1953, when Woods had offered Wenzell's services to the Budget Bureau to assist the Administration in connection with its power policy, and that First Boston should not charge a fee for assistance in obtaining funds that were designed to obviate the necessity of Federal expenditures for the expansion of TVA.

Until November 17, 1954, neither Lehman Brothers nor any representatives of the sponsors had notice of First Boston's attitude regarding the charging of a fee.

118. On November 17, 1954, there was a meeting at the offices of Middle South where Hallingby, Linsley, and Miller were present, along with Whittemore and Gutman of Lehman Brothers. During a discussion about the financial agents' fees Linsley indicated that First Boston would not charge a fee. It was the position of Lehman Brothers that only a very modest fee should be charged, but Lehman Brothers did not agree that there should be no fee paid to the agents. The matter was left open for further discussion.

119. On November 19, 1954, Miller and Hallingby had a conversation in which Miller disagreed with Hallingby's proposal that a small fee would be better than none. Miller also tried to make it clear to Hallingby that First Boston would expect no fee regardless of what arrangements the sponsors made with Lehman Brothers.

120. On February 18, 1955, Senator Lister Hill of Alabama, made a speech, criticizing the activities of Wenzell and First Boston. On the following day, Dean was asked to go to Woods' apartment where he met Woods, Coggeshall, and Wenzell. Coggeshall and Woods drafted a statement which First Boston released to the press and which was carried in the news on the next day, Sunday. With respect to fees, the release stated:

"Neither The First Boston Corporation nor Mr. Wenzell received a fee from the Bureau of the Budget nor are we to be paid for services in connection with the generating company financing. * * *"

On March 16, 1956, Hallingby expressed dissatisfaction to Miller that Middle South had not been notified before the story was released. Lehman Brothers were also displeased with the

news story and felt that they should not have been apprised of First Boston's decision through a news story.

121. Although Hallingby advised Dixon as to what transpired at the meeting of November 17, 1954, Dixon did not understand that First Boston had made a final decision not to charge a fee. On May 5, 1955, he informed Linsley and Miller that he was preparing for his appearance before the SEC regarding the debt financing of MVG, that he anticipated questions relating to fees would be asked, and that he desired a clear statement of First Boston's position on the matter.

On the same day, Dean met with Miller, Woods, and Linsley, at which time Dean suggested that if there was any doubt about the decision which First Boston had made, the doubt should be removed by a clear and explicit letter to Dixon. Dean drafted a letter which, with slight revisions, was signed and sent to Dixon on May 6, 1955. The letter, signed by Woods, read as follows:

"You have again raised the question with us whether we wish to accept a fee for our services in connection with the senior financing of Mississippi Valley Generating Company, which has taken the form of the direct placement of a maximum of $92,914,000 principal amount of $3\frac{5}{8}\%$ First Mortgage Bonds, and a maximum of $27,086,000 principal amount of $3\frac{1}{4}\%$ Notes under a Bank Credit Agreement.

"From its inception we have regarded our services in this matter as falling within the category of the public interest. We therefore confirm that we wish no fee for our services.

"If you wish to reimburse us for our out-of-pocket expenses, they have amounted to date to $244.-84. There may be certain further out-of-pocket expenses in connection with public advertisement of the financing which would only be incurred with your approval."

122. On May 10, Dixon showed a copy of the letter to Lehman Brothers and requested a statement of their position on the matter. The attitude of Lehman Brothers was that the fee should be very modest but that it was a mistake not to charge any fee. However, on May 11, 1955, Lehman Brothers decided that in view of First Boston's decision, Lehman Brothers would not charge a fee.

123. Dixon was surprised by First Boston's decision not to accept a fee for its services as financial agent. The decision was unusual and without precedent in the history of First Boston.

124. On May 11, Canaday appeared before the Arkansas Public Service Commission to testify in support of MVG's application for State approval of its proposed debt financing. He testified in part that the sponsors were using the services of First Boston and Lehman Brothers in working out the terms of the loan and that the financial agents might be paid a fee subject to SEC approval. It was stated that any fees paid would be quite modest.

At the time he testified, Canaday had not been informed of First Boston's letter to Dixon dated May 6, 1955, disclaiming a fee. It was not until later that Canaday learned that neither First Boston nor Lehman Brothers would charge a fee.

125. On June 1, 1955, Wenzell resigned from his position in First Boston. First Boston's method of compensating its officers and employees includes a salary plus a bonus, the bonus being based upon the amount of business which the employee brought to the firm. In 1954, Wenzell received a salary and a bonus from First Boston, but the evidence does not show the amount of his bonus or the basis on which it was computed. In 1953 and 1954, Wenzell owned 200 shares of stock in First Boston, but the stock was in his wife's name.

126. As shown by preceding findings, Strauss knew on January 18, 1954, that Wenzell was an officer of First Boston. At the conference with Wenzell at AEC

on January 19, 1954, Cook and Williams knew that Wenzell was employed as a consultant to the Budget Bureau, but Cook did not know until later (a date not established by the record) that Wenzell was an officer of First Boston. At that time, Williams had been given responsibility for handling the project in AEC, and when he resigned on January 31, 1954, Cook assumed that responsibility and continued to discharge it thereafter. Subsequent to January 19, 1954, Wenzell attended five meetings at AEC where it was known that he appeared as a consultant to the Budget Bureau.

On July 7, 1954, during the negotiation of the contract, the AEC representatives were informed that First Boston and Lehman Brothers were acting as financial agents for the sponsors.

In December 1954, the AEC had a representative present at the SEC equity hearings, where it was stated that First Boston had been retained as financial agent for MVG. However, there is no evidence that any representative of AEC had knowledge up to that time that Wenzell, while serving as a consultant to the Budget Bureau, had been meeting with and supplying information to the sponsors regarding the project, nor that any AEC representatives knew the extent to which the sponsors were aware of Wenzell's activities in that regard.

127. Despite the advice which had been given by First Boston's counsel to Wenzell on February 26, 1954 (finding 72), and the promise which Wenzell made to Dodge on March 9, 1954 (finding 85), neither Wenzell nor any other representative of First Boston ever gave notice to the Budget Bureau that First Boston had been retained as a financial agent by the sponsors or of the terms and conditions upon which the retainer was made.

There is no evidence that the Bureau of the Budget had notice of the fact that First Boston had been retained as a financial agent of the sponsors until February 18, 1955. From that date until March 10, 1955, the legal adviser to the Bureau had possession of a copy of the transcript of the SEC equity hearings. The transcript showed that First Boston and Lehman Brothers had been employed as financial agents by the sponsors.

128. As stated in a preceding finding, the letter of November 23, 1955, by which the AEC advised plaintiff that AEC refused to recognize the Power Contract as an obligation of the United States, was based upon an opinion which Mitchell, General Counsel of AEC, rendered to the Commission on November 15, 1955. After reviewing the activities of Wenzell, as disclosed in the SEC hearings and in the hearings held by the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, the opinion (defendant's exhibit 40) concluded with the following:

"My conclusion is that there is a substantial question as to the validity of the contract which can only be settled in the courts."

F. *The Decision to Negotiate a Contract on the Basis of the April 10 Proposal*

129. Following the submission of the April 10 proposal, Hughes held a conference with Clapp and Nichols, together with staff members from TVA, AEC, and the Budget Bureau, at which time it was agreed that TVA and AEC would make a joint analysis of the proposal and that Adams would participate for the Budget Bureau. An intensive review and analysis of the proposal was made, and in connection therewith, representatives of the sponsors met with the Government's representatives to discuss aspects of the proposal and furnish additional information when requested.

On April 24, 1954, Hughes sent the President a memorandum, reporting the results of the analysis and recommending that the Budget Bureau be authorized to instruct AEC to proceed to complete arrangements for a contract with the sponsors and that the Bureau be further authorized to instruct TVA and AEC to work out related interagency arrangements.

On April 28, 1954, Hughes and the AEC received a telegram from a group

headed by Von Tresckow, stating that they proposed to submit a proposal to AEC and that it would be more favorable than any other of which the group had knowledge. The Von Tresckow proposal was received by AEC on May 27, 1954, and was subjected to a review and analysis during the period June 3 to June 5. As a result, no decision was then made by the Government to negotiate a contract with the sponsors on the basis of the April 10 proposal.

130. On June 14, 1954, a comparative summary analysis of the sponsors' proposal, the Von Tresckow proposal, and estimated TVA costs for the Fulton plant was presented by Hughes and Strauss to congressional leaders in conference with the President. At that time, the President stated that AEC would be instructed to proceed with negotiations under the sponsors' proposal for the purpose of entering into a definitive contract within the terms of the proposal. Until these instructions were received, no decision had been made by AEC to enter into negotiations with the sponsors.

On June 16, 1954, letters approved by the President were sent by Hughes to AEC and TVA, directing AEC to proceed with negotiations with the sponsors, with a view to signing a definitive contract on a basis generally within the terms of the proposal, and instructing TVA and AEC to work out the necessary contractual, operational, and administrative arrangements between the two agencies so that operations under the contract would be carried out in the most economical and efficient manner.

131. On June 30, 1954, AEC wrote the sponsors in part as follows:

"As Mr. Cook informally advised Mr. Dixon this date, your proposal dated April 10, 1954, offering to furnish 600,000 kw of firm power in the Memphis area constitutes a satisfactory basis for negotiation of a definitive contract.

"We are ready to begin negotiations."

The sponsors did not know of the defendant's decision until June 30, 1954. The sponsors' proposal was a firm offer but, as indicated by the quotation above, the AEC letter was not an acceptance; it was simply a statement that AEC was ready to begin contract negotiations.

132. On April 15, 1954, three days after the submission of the proposal, the law firm of Cahill, Gordon, Reindel & Ohl, with the assistance of the law firm of Winthrop, Stimson, Putnam & Roberts, commenced the drafting of a proposed contract. Shortly after June 30, AEC was advised that the sponsors had prepared a draft of the proposed contract and were ready to begin the negotiations. In order to have the draft printed and allow the AEC an opportunity to consider it, it was agreed that the negotiations would begin on July 7, 1954.

### G. The Negotiation of the Power Contract

133. The negotiation of the contract began on July 7, 1954, and was concluded with the signing of the contract on November 11, 1954.

The AEC's team of negotiators was headed by Cook and the number of people on the team varied in different sessions of from 6 to 9, with a total of 14 different people taking part. They were a competent and aggressive staff of negotiators.

The sponsors' team was headed by James, and besides representatives from the two sponsoring companies, included engineers from Ebasco and Southern Services. The sponsors' team varied from 5 to 8 persons with a total of 11 people taking part.

From July 7 through September 17, there were 15 formal sessions for which minutes were kept. In addition, there were informal sessions for which no minutes were made. Nine successive proofs of the proposed contract were printed to incorporate revisions tentatively agreed upon by the negotiators. The negotiating sessions were lengthy, arduous, and hotly contested. As late as Novem-

ber 10, 1954, the Government insisted on two new contract provisions, and it was doubtful whether there would be a contract unless the sponsors' representatives agreed to these requests. One of the provisions placed a limitation on MVG's earnings under the contract and the other gave the AEC the right to purchase the facilities at any time after three years from the effective date of the contract.

134. On August 18 Nichols and Hughes wrote the Chairman of the Joint Committee on Atomic Energy, transmitting the sixth proof of the proposed contract dated August 11, 1954, with letters stating that the contract was within the terms of the proposal made by the sponsors on April 10, 1954. In a general way, the contract was within the terms of the proposal, but during the negotiating sessions, there were numerous changes in and additions to the terms set forth in the proposal. During the sessions, the representatives of the sponsors frequently referred to the terms of the proposal but were not successful in limiting the consideration of the Government negotiators to the provisions of that instrument.

The specific terms contained in the proposal were set forth in an appendix consisting of nine typewritten pages, whereas the Power Contract as finally executed by the parties was a printed document of 49 pages with 10 printed pages of appendices, and an interpretative agreement comprising about 10 printed pages.

Early in October, AEC submitted the proposed contract as then drafted to the Joint Committee on Atomic Energy for consideration. At the same time, AEC furnished the committee a detailed report dated October 7, 1954. This document was prepared by Nichols, the General Chairman of AEC, and gave his understanding of many of the provisions of the contract. In appendix 8 of the report, which is in evidence as defendant's exhibit 223, Nichols listed 25 provisions of

the contract which he designated as improvements over the terms and conditions of the proposal and as advantageous to the AEC. In appendix 9, he also set forth a number of items which he characterized as "major concessions from the company" which were obtained by AEC in the negotiations. His report also pointed out, however, that AEC had requested four changes in or additions to the proposal and that these were either only partially accepted by the sponsors or were rejected in their entirety.

135. During the period of negotiations, AEC furnished proofs of the proposed contract from time to time to the Bureau of the Budget, the Federal Power Commission, the TVA, and to other agencies of the Government. Many of the agency suggestions were incorporated in the contract. The suggestions and recommendations of the Budget Bureau were made available informally to Cook. In addition, the Budget Bureau furnished a formal review. Joint meetings were held between AEC and representatives of the Federal Power Commission, which furnished a large amount of basic data. At times, Federal Power Commission's staff met with the AEC to suggest changes in the proposed contract. Three proofs of the contract were made available to TVA, and after the AEC representatives had met with those of TVA, a number of the TVA suggestions were incorporated verbatim in the contract.

136. Wenzell did not participate in any of the negotiating sessions, and there is no evidence that he consulted with or advised any of the sponsors' representatives or any Government representatives during the period of negotiation.

III. THE REPLACEMENT DEFENSE [2]

137. By a letter agreement entered into August 23, 1951, and a contract effective as of July 1, 1954, TVA agreed to supply substantially the entire output of 1,205,000 kw. from its generating plant at Shawnee, Kentucky, to the AEC installation at Paducah, Kentucky. The contract was for an initial term expiring

2. Paragraph 24(B) of defendant's answer.

on January 1, 1966, and there was a provision for annual renewals thereafter through January 1, 1977. EEI had also built a plant at Joppa, Illinois, in the vicinity of Paducah for the purpose of supplying AEC's Paducah installation with 735,000 kw. of electricity. Paducah is approximately 180 miles north of West Memphis, Arkansas. TVA was also supplying a block of 1,730,000 kw. to AEC at its installation at Oak Ridge, about 360 miles east of West Memphis. In 1953, the AEC also had an installation at Portsmouth, Ohio, which was wholly outside the TVA service area. Power for the Portsmouth installation was supplied by a plant constructed by OVEC. As previously stated, AEC had no installations at or near Memphis, Tennessee, and it had no plans in 1953 for further expansion of its existing facilities or for the construction of new facilities.

138. By written contract entered into on November 23, 1935, between TVA and the city of Memphis, TVA agreed to supply all of the electrical needs of the city for a period of 20 years, beginning June 1, 1938, and ending June 1, 1958. Under the contract, Memphis could not buy electricity from sources other than TVA. In 1953 TVA was supplying Memphis with about 350,000 kw., the peak load, but it was estimated that these requirements would reach 520,000 kw. by 1960. As long as there was a possibility of securing power in adequate quantities from TVA, Memphis desired to continue the relationship. It was for the purpose of serving the commercial, industrial, and domestic needs of Memphis and its environs that TVA had sought an appropriation to construct a plant of 450,000 kw. at Fulton, Tennessee, some 20 to 30 miles northwest of Memphis on the east bank of the Mississippi River. As already stated, TVA's request for funds for the Fulton plant had been eliminated from the budget for the fiscal year 1953 by the Truman Administration; efforts to obtain appropriations for the same purpose had been defeated in Congress in 1953 and 1954, and the Eisenhower Administration eliminated TVA's request for funds for the Fulton plant from the budget for the fiscal year 1955.

139. Findings 22, 23, 36, 37, 38, 39, 40, 41, 42, 43, 51, 71, 75, 80, 84, 87, 95, 96, 103, 129, 130, 131, 132, 133, 134, and 135 are pertinent to defendant's replacement defense and are incorporated in Part III hereof. In summary, these findings relate to the Eisenhower Administration's policy on power during 1953 and 1954; the elimination of TVA's request for funds to construct the Fulton plant from the budget for the fiscal year 1955 and TVA's position thereon; defendant's decision to have AEC contract with private utility companies for the construction of new electric generating capacity for AEC at Paducah, so that AEC could in turn release a like amount of power to TVA; the defendant's meetings with Dixon and McAfee; the President's budget message of January 21, 1954; the determination that the need for the proposed new power plant was to relieve TVA in the Memphis area rather than to satisfy any increased needs of AEC; Hughes' suggestion to Dixon that he make a study of the costs required for the construction of a plant near Memphis under contract with the AEC; the sponsors' proposal of February 25, 1954, and the analysis thereof by the Budget Bureau, AEC and TVA; the withdrawal of the proposal of February 25 and the submission of the sponsors' proposal of April 10, 1954; defendant's review and analysis of the second proposal and of the Von Tresckow proposal; the President's decision that AEC should begin negotiations for the purpose of entering into a contract within the terms of the second proposal; Hughes' direction to AEC to proceed with the negotiation of the contract; Hughes' instructions to TVA and AEC to work out the necessary arrangements for operations under the contract, and the negotiation of the contract.

140. As stated in finding 39, Mississippi Power & Light Company, one of the subsidiaries of Middle South, made a written proposal to TVA on October 15, 1953, by which it offered to erect a plant near Memphis to supply TVA with a

block of 450,000 kw. of power for a term of 20 years in lieu of TVA's construction of the Fulton plant. This offer was never acted upon by TVA.

On February 3, 1954, Nichols suggested to Yates that Southern make a similar offer to TVA. Accordingly, on February 9, 1954, Yates wrote Clapp an offer in which Southern agreed to build a plant at Guntersville, Alabama, for the purpose of supplying TVA with 200,000 kw. of power at that location. Yates' letter stated that the President's budget message contemplated that some 500,000 to 600,000 kw. of the load in the TVA service area was to be supplied from other sources by the fall of 1957. Copies of the letter were sent to Hughes and Nichols. Clapp replied on March 1, 1954, stating that Yates had misinterpreted the President's budget message relating to TVA in that the message contemplated that AEC would relieve TVA of 500,000 to 600,000 kw. of power that TVA was obligated to supply AEC, in order that the power thus released could be used to meet the normal load growth in the TVA service area. Yates sent copies of the reply to both Hughes and Nichols.

On February 19, 1954, the Resources and Civil Works Division of the Budget Bureau sent Hughes a memorandum setting forth that division's analysis of both offers. The memorandum stated in pertinent part as follows:

"Following is a brief analysis of proposals made to the Tennessee Valley Authority by the Southern Co. for the Georgia Power Co. and by the Mississippi Power and Light Company. Both utilities propose to sell large blocks of firm power to the TVA at transmission voltage at points on the southern border of the Federal system. Although neither offer involves direct sale to the Atomic Energy Commission or other wholesale customers of TVA, both offers could be considered as a means of achieving the objectives of the President's budget message statements to the effect that arrange-

ments are being made to reduce, by the Fall of 1957, existing commitments of TVA to AEC by 500,000 to 600,000 kilowatts. Power brought in at the southern edges of the TVA system could be used to meet loads there with equal amounts of power from the Shawnee plant in turn being allotted to AEC service at Paducah, Kentucky, under appropriate agreements between TVA, AEC and the utilities involved."

On the following day, January 20, 1954, in a meeting at which Hughes, Dixon, McAfee, and others were present, it was decided that Dixon would prepare a study showing the cost of constructing a power plant across the river from Memphis for the purpose of generating 450,000 to 600,000 kw. of power. At that time, Hughes indicated that AEC would be the Government's contracting agency for the project.

141. As stated in finding 80, when Strauss wrote Dodge on March 3, 1954, regarding the sponsors' proposal of February 25, Strauss stated that the AEC was divided upon the advisability of using its contractual authority in the manner that had been proposed.

On April 16, 1954, after the sponsors' proposal of April 10 had been submitted, Commissioners Smyth and Zuckert of AEC sent Hughes a joint letter reading as follows:

"DEAR MR. HUGHES: On April 15, 1954, the Chairman of the Atomic Energy Commission, Mr. Strauss, sent you a letter, outlining an analysis of the negotiations for certain power to be furnished by Middle South Utilities, Inc., and The Southern Company.

"Under this proposal, the Atomic Energy Commission's contracting power would be used as a vehicle for the supply of 600,000 kw. of power in the Memphis area.

"With the knowledge of the other Members of the Commission, we are taking this opportunity to bring to

your attention our personal view that the proposed action involves the AEC in a matter remote from its responsibilities. In an awkward and unbusinesslike way, an additional federal agency would be concerned in the power business.

"The proposal under discussion is an outgrowth of the response to the President's budget message, and your letter of December 24, 1953, requesting the AEC to explore the possibility of reducing existing commitments of the TVA to the Commission. In the course of that exploration, it was determined to be unwise to disturb the AEC arrangements with TVA, upon which our production schedules depend. Since that determination, the explorations have taken a different course.

"The present proposal would create a situation whereby the AEC would be contracting for power, not one kilowatt of which would be used in connection with Commission production activities. The creation of such a contractual relationship would place upon the Commission a continuing responsibility during the 25-year life of the contract for stewardship in respect to matters irrelevant to the mission of the Commission.

"It has been our observation in government administration that arrangements which are obviously incongruous at the outset tend to become even less clear-cut because no one can foresee what contingencies may arise over a long term of years. In addition, the proposed action certainly seems a reversal of the sound philosophy embodied in the community disposal legislation recently sent forward to Congress. One motivation for that legislation was the desire to eliminate responsibilities not essentially involved in the Commission's sober and exacting principal mission.

"Of course, if the President or the Congress directs the Commission to accept such a responsibility, we will endeavor to discharge it fully.

"Sincerely,
   "(S) Eugene M. Zuckert,
      "EUGENE M. ZUCKERT,
   *"Member, Atomic Energy Commission.*
   "(S) Henry D. Smyth,
      "HENRY D. SMYTH,
   *"Member, Atomic Energy Commission."*

The statement in the letter to the effect that none of the power to be contracted for by AEC would be used in connection with any AEC production activity was based on the facts that AEC had already entered into firm contracts for power to be supplied to it at Paducah, Kentucky, and at other installations; that AEC had decided not to alter the existing contracts, and that the power to be produced by the project was to be generated near Memphis and used in that area where AEC had no requirements for power. Commissioners Smyth and Zuckert felt that the project was not relevant to any needs of the AEC.

142. On April 15, 1954, Strauss wrote Dodge, reviewing the discussions and negotiations with the sponsors and submitting AEC's analysis of the proposal of April 10, 1954. Strauss stated that AEC had proceeded on the basis that there would be no cancellation of the AEC-TVA Paducah contract for the amount of power to be supplied by the project; that AEC would contract with the sponsors for the power needed by TVA for load growth in the Memphis area on the basis of replacement, and that this approach would assure AEC of continuity and reliability of power at its Paducah installation. In addition, the letter stated as follows:

   "  *   *   *   Consideration of the revised proposal by Dixon-Yates should not overlook the following:

   "(a) The AEC presently has a firm contract with TVA for supply of power.

"(b) Reliability and continuity of power supply to the AEC must be protected.

"(c) The entire difference in cost between the Sponsor's revised proposal and the TVA contract is accounted for by taxes.

"(d) AEC would expect the Bureau of the Budget to obtain the concurrence of TVA to all provisions of the proposal, and any subsequent definitive contracts relating to TVA.

"(e) The proposal provides that the power factor at point of delivery shall be maintained by TVA at no lower than 93%. To maintain this power factor, it may be necessary for TVA to provide reactive KVA in the Memphis area or a penalty may be applied in the form of increased demand charges.

"With the understanding that arrangements would be made through the Bureau of the Budget for TVA to enter into a 25-year contract with AEC to take the power provided for under this proposal subject to all provisions including cancellation, the AEC could enter into a contract with the Sponsors to provide TVA with 600 MW needed for its load growth on a basis of replacement. However, it is our position that any costs involved to AEC over and above the cost of power under our present contract at Paducah should be borne by TVA. Otherwise, the TVA would be further subsidized through an operating expense appropriation to the AEC.

"We feel that higher executive authority or Congress should make this determination. * * *"

143. On April 22, 1954, Cook sent Nichols a memorandum outlining a number of items for discussion with TVA regarding the sponsors' proposal of April 10. In the memorandum Cook stated that before the proposal of April 10 was accepted, AEC should require TVA to agree to accept the power made available under the project for 25 years and that the AEC-TVA Paducah contract should not be changed insofar as TVA's responsibility to serve AEC with power was concerned. However, he suggested that the contract might be modified to provide for the delivery of the Dixon-Yates power, the metering and billing, and the relationship between TVA, AEC, and MVG. He also recommended that under the agreement to be made by TVA and AEC, TVA should pay all of the costs relating to the delivery of power to TVA from the project and that AEC should continue to be liable for all charges to TVA under the Paducah contract.

Attached to Cook's memorandum was a suggested form of agreement to be signed by AEC and TVA. As hereinafter shown, the two agencies never reached an agreement on the matter.

144. On April 20, 1954, Wessenauer, Manager of Power for TVA, wrote to Cook, calling attention to the extraordinary and time-consuming arrangements that would be required for modifying the AEC–TVA Paducah contract and for transferring the Dixon-Yates power to AEC in the event the sponsors' proposal was accepted by the Government.

145. (a) As heretofore stated, on June 16, 1954, Hughes directed AEC to negotiate the contract with the sponsors and instructed TVA and AEC to work out the necessary interagency arrangements (finding 130). Hughes' letter of June 16, 1954, was directed to Harry A. Curtis, Vice-Chairman of TVA's Board of Directors, and stated that TVA would be expected to bear all the costs necessary to receive the power at delivery points and all other costs required for the distribution of the power throughout the TVA transmission system, but that AEC would pay all local, State, and Federal taxes provided for in the contract. His letter further stated that AEC's contract with TVA at Paducah would remain in full force and effect.

(b) On the same day, Hughes wrote Curtis another letter which read in part as follows:

"As set forth in another letter I am sending to you today, arrangements are being made by the Atomic Energy Commission to purchase power under a proposal made by Middle South Utilities, Inc., and the Southern Company. Under this proposal an additional 600,000 KW of firm power will be delivered to the TVA system by the latter part of calendar year 1957 to take care of AEC loads. This arrangement will make available to TVA 600,000 KW of power for use in its system in exchange for power it will be delivering to AEC at Paducah."

(c) On July 2, 1954, Curtis replied to Hughes' letters of June 16, pointing out that TVA had had no opportunity to comment in advance on the instructions given to AEC and TVA and that in TVA's view, the letters were inconsistent with the President's budget message. After quoting from that portion of the presidential message relating to TVA (finding 41), Curtis' letter read in pertinent part as follows:

"As we understand the situation, it was in accordance with this statement in the President's budget message and because the power was to be supplied for AEC's use that the AEC, at the direction of the Bureau of the Budget, solicited the Dixon-Yates proposal, conducted the discussions, and assumed the responsibility for the terms of the proposal. The power was not intended for purchase by TVA, either for the general load growth of the area or to supply new defense loads such as the Oak Ridge addition projected shortly thereafter. * * *

"The instructions of June 16, at least as interpreted by AEC in the testimony before the Joint Committee on Atomic Energy, would not result in furnishing power for AEC as contemplated by the President's budget message. As AEC interpreted the instructions, and that interpretation should be corrected if it is in error, the 600,000 kw of power that would be delivered at the middle of the Mississippi River near Memphis from a plant which would be constructed by Dixon-Yates in Arkansas would be for TVA's use, and not AEC's. According to AEC, it would pay the bills of the Dixon-Yates combine, but adjustments would be made between TVA and AEC whereby the entire cost of this block of power supply would fall upon TVA, including the extra costs required to absorb the power in the TVA system, except for the 'local, state, and Federal taxes payable under the terms of the contract' between AEC and Dixon-Yates, such taxes to be reimbursed to Dixon-Yates from AEC funds. Rather than increasing its commitment from private utilities and reducing its commitments from TVA as contemplated in the President's budget message, AEC is to protect its present power supply sources by maintaining its full contract rights for power to be supplied by TVA. It would be contracting with the Dixon-Yates group, therefore, not on its own behalf but primarily for TVA."

In addition, the letter stated that the Dixon-Yates' proposal would add $3,685,000 a year to the Government's cost, that the location of the proposed plant was far inferior to the Fulton site, and that the most serious aspect of the whole arrangement was the lack of control which the TVA Board would have over the costs that TVA would incur.

The letter concluded with a request that the matter be reconsidered.

(d) Under date of August 18, 1954, Hughes replied to Curtis' letter, stating that TVA's request for reconsideration, on the ground that the instructions previously transmitted by Hughes were inconsistent with the President's budget message, resulted from a misinterpretation of the proposal. The letter stated that the proposal contemplated that AEC would purchase power to replace the power which it would otherwise obtain from TVA and that the proposal did not con-

template that AEC would buy power to supply TVA's requirements; that the arrangement was essentially an interchange of power in kind between AEC and TVA in that AEC would purchase power from the sponsors and trade it to TVA for an equivalent amount of power delivered to AEC at its installations.

In addition, Hughes' letter stated that AEC would pay the costs of procuring the power from the new plant and transmitting it to contract delivery points, while TVA would be expected to bear the cost necessary to receive the power at the delivery points and all costs necessary to distribute and use the power in its transmission system.

Hughes' letter concluded with the following:

"It is expected that the AEC will reduce its commitments from TVA in the amount of approximately 600,000 kilowatts of capacity as contemplated in the President's Budget Message. This will involve a modification of the present contracts between AEC and TVA to reduce the AEC demand by 600,000 kilowatts, with a corresponding reduction in the amounts of energy required by AEC. In exchange, TVA will agree to receive in the Memphis area the same amounts of capacity and energy for the account of AEC and to deliver equivalent amounts, in total, to AEC at its plants.

"As explained in my letter of June 16, 1954, the reduction of 600,000 kilowatts in TVA's present commitments to AEC will make this amount of capacity available to TVA for use in its system. Of this total additional capacity, 500,000 kilowatts will be available to meet the estimated growth in industrial, municipal, and cooperative loads in the TVA area through calendar year 1957. The remaining 100,000 kilowatts will be applicable against the increase of 135,000 to 175,000 kilowatts in AEC load at Oak Ridge, which has developed since the President's Budget Message was trans-

mitted and which, in accordance with my letter of June 16, 1954, TVA should plan to take care of with the new generating capacity currently scheduled for installation through 1957.

"Under the arrangements described above, there appears to be full provision for control by the TVA Board over the costs TVA would incur. The contemplated arrangements will keep the lines of responsibility clear between AEC and TVA. Inasmuch as AEC will have the responsibility for contracting for the power produced by Middle South-Southern, it will bear the costs for producing that power. The Tennessee Valley Authority (in exchange for equivalent power delivered to AEC) will receive and use the power through its transmission system and, therefore, should bear its own costs associated with such transmission and distribution. We understand the TVA responsibility for efficient and economical performance to apply to the use of the power and the operating arrangements from the point TVA receives it as exchange power from the Middle South-Southern producers. I am confident TVA will cooperate with AEC in working out arrangements which will result in maximum efficiency and economy for the Government.

"It will be greatly appreciated if you will now promptly meet with AEC as they have requested to work out the necessary detailed arrangements. If we can be of further help in any of these matters please let us know."

(e) On August 26, 1954, Curtis responded to Hughes letter of August 18, stating that Hughes' letters of June 16 and August 18 presented quite different proposals for consideration by TVA. As to TVA's understanding of these differences, the letter stated in part as follows:

"Under the June 16 letters, we understood that the President had

ordered AEC to enter into a contract with Dixon-Yates to provide 600,-000 kw of capacity surplus to the requirements of its Paducah installations and useful solely for resale to TVA. We understood that except for the item of taxes, the cost of such power would be charged to TVA. Because we believed that such an arrangement transferred the responsibilities of this Board to the members of the Atomic Energy Commission and destroyed the basis of our accountability under the TVA Act by proposing a major and improvident contract on our behalf, we protested. Our understanding that the capacity proposed to be provided by Dixon-Yates was for the use of TVA, not AEC, was not an irresponsible conclusion; it was fortified by the sentence in your letter of June 16 which stated that 'AEC will maintain in force its full contract with TVA at Paducah.' We assumed this to mean that AEC would continue to use the low-cost energy available from TVA's Shawnee plant while purchasing higher cost power from Dixon-Yates for resale to TVA at the higher cost. The Hearing before the Joint Committee on Atomic Energy on June 16–17 offered no evidence that our interpretation was in error. In fact, it appeared that the Atomic Energy Commission spokesmen agreed with us. Mr. Nichols, for example, testified as follows:

"We (AEC) would be billed for that power by Dixon-Yates, and we would take that bill and, still having our contract for Paducah, we would get a credit on our Paducah contract for the amount of the bill from Dixon-Yates, less the taxes. (Hearing, p. 970.)

"In contrast, the second sentence on page 2 of your August 18 letter states 'This (the Dixon-Yates arrangement) will involve a modification of the present contract between AEC and TVA to reduce the AEC demands by 600,000 kw with a corresponding reduction in the amount of energy required by AEC.' You also say that 'inasmuch as AEC will have the responsibility for contracting for the power produced by Middle South-Southern, it will bear the cost for producing that power.' If these latter statements represent the final basis for the discussions which you propose between TVA and AEC, then it would appear that the extra costs of several million dollars a year to be incurred by the Government in accepting the Dixon-Yates proposal are the primary responsibility of other Government agencies rather than of this Board. The only costs to be borne by TVA in such an arrangement would be related to the benefits to be received by TVA and the specific amounts would be appropriate matters for negotiation between TVA's staff and the staff of AEC.

"In this connection we have a deep concern which we present with great reluctance, but which we feel an obligation to express. TVA has negotiated many contracts with AEC; our representatives have met across the table from the staff of AEC and have negotiated in good faith. So far as we know, there was for a long period an unblemished record of mutual confidence and good will between these two agencies. Under conditions which have prevailed in the past this Board would need no further assurance that your August 18 letter does in fact represent a final conclusion and that it is now contemplated that TVA will be involved in this transaction only as the interchange agent to receive power from Dixon-Yates and deliver power to AEC. We would leave the collateral questions of cost adjustment to negotiation, confident that equity would prevail."

The letter concluded with the statement that TVA was concerned about the possibilities of productive negotiations be-

tween AEC and TVA because of several matters, including the scant attention paid to the judgment of TVA's representatives in the analysis of the sponsors' proposals, Cook's failure to reply to the Wessenauer's letter of April 20, 1954 (finding 144), and the fact that AEC had made available to TVA only selected excerpts from the draft of the contract.

A copy of Curtis' letter was sent to Strauss.

146. The sponsors' proposal of February 25, 1954, contained the following statement:

"* * * There is an additional consideration. Since the power to be released by AEC would appear to be for TVA's use in West Tennessee in general and the Memphis area in particular (see the TVA testimony with respect to its proposed Fulton plant), a practical and economical situation can be created if deliveries by the new corporation to you or for your account are made over an interconnection with TVA in that area, and if TVA in turn delivers a like amount of power to the Commission's Paducah facilities from their Shawnee Station. This can be accomplished by locating the facilities of the new corporation near Memphis. This will have the following advantages: (a) it will locate the plant where fuel can be readily obtained via the Mississippi River or by rail; (b) it will locate the plant where interconnections can be readily made with major power systems; (c) it will make it unnecessary for TVA to build transmission lines back from Shawnee to the Memphis area, thus avoiding assessment of further amounts against taxpayers for this purpose; and (d) the additional capacity will not be built in an area which, except for the AEC demand, is already oversupplied with power. * * * *"

The sponsors' second proposal of April 10, 1954, read in part as follows:

"As stated above, our proposal has been formulated with the end in view of supplying power and energy to your Commission, an agency related in the main to national defense, for use in pursuance of your statutory purposes. At the same time, however, we have attempted by our proposal to assist the Government in the solution of a broader overall problem. TVA testimony before Congressional Committees indicates that the power released by your Commission upon acceptance of our proposal will be of use to TVA in West Tennessee, and particularly in the Memphis area. It will therefore be both practical and economical if deliveries by our new generating company are made to you or for your account over interconnections with TVA in the Memphis area, and if TVA, in turn, delivers a like amount of power to your Paducah facilities from its Shawnee Station. To do this, the facilities of the new company will be located near Memphis. This plant site will have the following advantages: (a) it will locate the plant where fuel can be readily obtained via the Mississippi River or by rail; (b) it will locate the plant where interconnections can be readily made with major power systems; (c) it will make it unnecessary for TVA to build transmission lines back from Shawnee to the Memphis area, thus avoiding assessment of further amounts against taxpayers for this purpose; and (d) the additional capacity will not be built in the Paducah area which, if the AEC demand were cancelled, would be oversupplied with power."

147. The term "replacement," which appears in the Power Contract, was coined in the AEC and used by Nichols in his testimony before the Joint Committee on Atomic Energy in June of 1954, when amendments to the Atomic Energy Act of 1946 were being considered. At that time, Nichols pointed out that the initial plan which the Government had considered was one in which the private

power companies were to build a plant at or near the AEC installation at Paducah, so that TVA's obligation to supply power there could be released and the power used to meet the needs of TVA's other customers; that as a result of discussions with the utility representatives and TVA, it was found that the need for the power was in the Memphis area and, that from an engineering point of view, it was decided that it would be better to locate the source of the new power near where the bulk of it was to be used. During the same hearings, Nichols stated that the AEC-TVA Paducah power contract would not be cancelled, but that AEC would contract with the sponsors to supply power needed by TVA for its load growth in the Memphis area in replacement of the power which TVA was supplying to AEC at Paducah. It was Nichols' conception that the agreement to be entered into between AEC and TVA after the Power Contract was executed would not involve a physical release of the power which TVA was supplying to AEC at Paducah but that TVA would no longer submit bills to AEC for the demand and energy charges for power delivered to AEC at Paducah and would credit AEC for an equivalent amount of power supplied through the new plant to be erected by MVG. He understood also that the agreement between AEC and TVA would have to include some adjustment for the increased costs incurred by TVA in obtaining power through the new project.

148. The Atomic Energy Act of 1954 was approved August 30, 1954. Section 164 of the Act (68 Stat. 951) provides in pertinent part as follows:

"The Commission is authorized in connection with the construction or operation of the Oak Ridge, Paducah, and Portsmouth installations of the Commission * * * to enter into new contracts or modify or confirm existing contracts to provide for electric utility services for periods not exceeding twenty-five years * * *. The authority of the Commission under this section to enter into new contracts or modify or confirm existing contracts to provide for electric utility services includes, in case such electric utility services are to be furnished to the Commission by the Tennessee Valley Authority, authority to contract with any person to furnish electric utility services to the Tennessee Valley Authority in replacement thereof."

149. As stated in finding 133, contract negotiations began July 7, 1954, and continued to November 11, 1954, when the Power Contract was signed. TVA did not participate directly in the negotiations but was consulted by the AEC representatives from time to time. During the negotiations, changes in the successive proofs of the contract directly involving TVA were considered and agreed upon by the negotiators.

The various proofs of the contract and the minutes of the sessions show that it was never contemplated that TVA would be a party to the Power Contract.

Most of the drafts of the contract contained the following clause:

"WHEREAS, the AEC is making arrangements with TVA whereby TVA will accept deliveries of power and energy hereunder for or on account of AEC; * * *"

Each proof of the contract contained a counterpart of so much of section 3.02 of the Power Contract as provides:

"SECTION 3.02. *Delivery Arrangements with TVA and Utilization of Power and Energy:* The AEC will arrange with TVA for the acceptance by TVA of power and energy scheduled by or for the AEC and delivered by the Company hereunder and for the delivery of such amount of power and energy by TVA to the AEC; * * *"

150. The last "Whereas" clause of the Power Contract read as follows:

"WHEREAS, this contract is authorized by and executed pursuant to the Atomic Energy Act of 1954, for the purpose of providing electric utility service to the AEC, or to TVA in

replacement of electric utility service furnished to the AEC by TVA, in connection with the construction or operation of the project;"

On November 4, 1954, Nichols submitted to the Joint Committee on Atomic Energy the October 1st proof of the contract and stated that the foregoing "Whereas" clause had been drafted to read as quoted above at the suggestion of the Attorney General's office.

151. In addition to those described above, the contract contained numerous provisions relating to TVA and to the receipt and acceptance by TVA of the power to be generated under the contract.

In its preamble, the contract recited the President's budget message relating to TVA and to plaintiff's intention to furnish power to AEC or to TVA for the account of AEC in replacement of power furnished by TVA to AEC.

Section 1.02 of the contract provided that the primary delivery points should be established by agreement among AEC, plaintiff, and TVA at the Tennessee-Arkansas State line between Shelby County, Tennessee, and Crittenden County, Arkansas.

Section 1.03 provided that secondary delivery points should consist of existing and future direct and indirect connections between the systems of plaintiff and of subsidiaries of the sponsors and TVA.

Section 2.03 stated that plaintiff would cooperate with AEC and TVA in coordination of design and operation of line terminal positions, circuit breakers, and system relay protection and communication and telemetering and control equipment, etc.; that AEC might designate TVA from time to time as its authorized representative to act for AEC in various technical aspects of the contract, and that it was contemplated that any such designation would be worked out after discussions among AEC, plaintiff and TVA.

Section 3.01 provided for the delivery of reduced amounts of energy in the event one or more generating units were shut down by *force majeure* or for overhaul, required reasonable notice of the starting up or shutting down of any such unit, and provided that reasonable notice for the purpose of this section would be established by agreement among plaintiff, AEC and TVA.

Section 3.03 provided that AEC would make arrangements with TVA so that reactive power should not be taken from plaintiff in excess of that which plaintiff had agreed to supply.

Section 3.07 provided that plaintiff would cooperate with AEC and TVA to maintain the agreed upon voltage at primary delivery points so that it would not vary more than plus or minus 5 percent or such other limits as might be mutually agreed upon.

Section 6.01 provided that plaintiff would use its best efforts to see that arrangements for secondary delivery points between subsidiaries of the sponsors and TVA would provide AEC with substantially the same terms and conditions of test and billing adjustment as were provided for primary delivery points.

Section 7.07 authorized the assignment of the right to power and energy under the contract to TVA with TVA's consent to take it, under certain circumstances, or if TVA did not consent, to cancellation by AEC under the conditions set forth.

Appendix A recited in paragraph "A" that plaintiff proposed to acquire rights-of-way in Arkansas and to construct transmission lines to terminal points at the middle of the Mississippi River in the Memphis area for the purpose of delivering electric energy to TVA for AEC as provided in the contract.

In paragraph "D" it provided that the exact number and location of lines to the middle of the Mississippi River and necessary line terminal positions, circuit breakers, system relay protection communications and telemetering and control equipment, would be determined by mutual agreement among AEC, plaintiff and TVA.

Appendix B as to primary delivery points provided that the facilities of plaintiff would be electrically connected to the TVA system at the middle of the Mississippi River near Memphis, Tennessee, and that the exact number and location of primary delivery points were to be mutually agreed upon by AEC, plaintiff and TVA.

Similar provisions existed with relation to secondary delivery points.

In paragraph III this appendix outlined the general method of accounting for energy deliveries and provided it should be agreed upon in detail among plaintiff, AEC and TVA.

The interpretative memorandum of November 11, 1954, provided that the cooperation of the parties contemplated by section 2.03 of the contract would include preparation of operating memoranda or manuals through collaboration of AEC, plaintiff and TVA as might be mutually agreed to be necessary in order to establish operating procedures for the guidance of operating personnel in the several organizations concerned with the carrying out of the provisions of the contract.

The interpretative memorandum further provided that it was the intention that the terms in section 3.01 of the contract, "except as may be mutually agreed to from time to time", and "except upon reasonable notice" with relation to starting up or shutting down any unit, could later be provided for in contemplated agreements among AEC, TVA and plaintiff and be modified from time to time as actual in-service experience was obtained.

152. (a) The authority and power of the AEC to execute the Power Contract and perform the obligations thereby imposed upon it was the subject of an opinion which the Acting Comptroller General submitted to Strauss by letter of October 5, 1954. The opinion read in pertinent part as follows:

"At the time the Atomic Energy Act of 1954 was under consideration by the Congress negotiations for the Dixon-Yates contract had already been undertaken by the Atomic Energy Commission, and a question arose whether the authority of the Commission under section 12(d) of the Atomic Energy Act of 1946, as amended (section 164 of the 1954 act), was broad enough to cover such an arrangement. In order to resolve any doubt on this point Senator Ferguson offered an amendment to the section, the purpose of which was specifically stated to be to authorize the Dixon-Yates contract. Cong. Record, July 19, 1954, p. 10430. The Ferguson amendment was adopted (Cong. Rec., July 21, 1954, pp. 10770–71), and became a part of section 164. * * *

"In my opinion the foregoing language of section 164 and its legislative history authorizes the AEC to execute the Dixon-Yates contract, to obligate the United States to make payments as required by the contract, and to make payment of cancellation charges out of funds now or hereafter made available for expenditure to the AEC."

(b) By authorization of the President, the Attorney General of the United States furnished Strauss an opinion respecting the validity of the proposed power contract. The opinion, which was set forth in a letter dated October 20, 1954, stated in part:

" * * * I have no doubt that the contract, which specifically states as its purpose the providing of electric utility services to the Commission, or to TVA for the account of the Commission, in replacement of electric utility service furnished to the Commission by TVA in connection with the construction or operation of the Commission's installations at Oak Ridge, Paducah, or Portsmouth, is manifestly within the scope of the authority conferred upon the Commission by Section 164. * * * *"

(c) On December 2, 1954, Strauss requested the Comptroller General for a supplemental opinion in view of certain

revisions that had been made in the contract after the Comptroller's opinion of October 5, 1954. On December 13, 1954, the Comptroller General submitted to AEC a supplemental opinion, stating that the revisions in the contract did not affect his conclusions of October 5, 1954, with respect to the authority of AEC to execute the contract and to perform the obligations imposed upon it thereby.

(d) On October 12, 1954, the Acting Comptroller General advised the Chairman of the Joint Committee on Atomic Energy that the execution of the proposed contract was authorized by Section 164 of the Atomic Energy Act of 1954 and that the contract complied with all statutory contract requirements applicable to its execution by AEC. Attached to his opinion was a memorandum containing comments of the various provisions of the proposed contract, including sections 3.04 and 3.05. In the memorandum it was pointed out that these sections of the contract gave AEC the right to sell or dispose of the power to its contractors or to successor project operators for consumption at a project site but that these provisions were meaningless, because no portion of the power was to be consumed at any existing AEC project. It was further stated that while section 3.06 gave AEC the right to transfer the power for use at other Government installations, the right to transfer was limited to power or energy that was no longer required at an AEC project, and that in the event there should be a reduction in TVA's requirements in the Memphis area without a corresponding reduction at an AEC project, AEC could not transfer the surplus power generated by MVG.

It was suggested that the contract be redrafted to conform to the actual situation under which the power was to be delivered.

(e) Prior to the termination of the contract, the United States as *amicus curiae* filed a brief with the Court of Appeals for the District of Columbia on the appeal from the SEC order approving MVG's equity financing. The brief stated in part:

"If there were any doubt, from the face of the statute, that the contract is authorized by the Atomic Energy Act, that doubt would be removed by the legislative history, which demonstrates beyond question that Congress, in enacting Section 164 in its present form, understood that it was authorizing this very contract.

\* \* \* \* \* \*

"The essential emptiness of their position [that this was not a replacement contract under Section 164] is emphasized by the fact that the arguments which they advance are but a stale rehash of matters thoroughly understood and presented at the time of the Senate debate."

(f) On January 18, 1955, the Division of Corporate Regulation of SEC filed in the SEC equity proceedings a brief which, after quoting from the legislative history of Section 164 of the Atomic Energy Act of 1954, stated in part as follows:

"In view of the foregoing [quotation from the legislative history of Section 164 of the Atomic Energy Act of 1954], it seems absurd to argue that the Power Contract is not authorized by section 164."

(g) On July 11, 1955, the General Counsel of the Atomic Energy Commission furnished the Commission an opinion containing the following:

"2. *The MVGC contract is a valid obligation of the Government.*

"The MVGC contract was executed pursuant to authority contained in Section 164 of the Atomic Energy Act of 1954, 68 Stat. 951, 42 U.S.C. § 2204.

\* \* \* \* \* \*

"The MVGC contract is a contract to provide electric utility service to the AEC, or to TVA in replacement of electric utility service furnished to the AEC by TVA. In its purpose and terms, it is clearly within the

express authority of Section 164 of the Atomic Energy Act. The legislative history of the Atomic Energy Act makes it abundantly clear that in enacting Section 164 in its present form, Congress understood that it was authorizing the contract with MVGC."

153. At a meeting on October 5, 1954, the AEC voted to approve the form of the contract with MVG upon the vote of three commissioners present, two of whom, Campbell and Strauss, voted to approve, and one, Murray, abstained. The fourth member, Dr. W. F. Libby, had taken the oath of office as a member of the Commission on the same day, and he withdrew from the meeting because he felt that he was not sufficiently acquainted with the subject to exercise a judgment upon it.

Thereafter, the AEC voted to execute the contract and the record does not disclose that there were any dissenting votes at the time of final approval.

As hereinafter shown, no agreement between AEC and TVA had been made at the time the Power Contract was executed, nor had any arrangements among AEC, TVA and plaintiff been concluded.

154. Clapp's term as Chairman of the TVA expired on May 17, 1954, and from that date until September 1, 1954, the Board consisted of two members, namely, Harry A. Curtis and Raymond R. Paty, with Curtis acting as Vice Chairman.

On June 30, 1954, Strauss wrote Curtis, advising that AEC was proceeding with the negotiation of the contract; that before the drafting of certain provisions of the contract was completed, discussions with TVA would be necessary, and that AEC would soon be ready to begin discussions with TVA on the necessary contractual, operational, and administrative arrangements between the two agencies. He designated Cook and Sapirie to represent AEC in the negotiations with TVA and asked Curtis to designate TVA representatives so that plans could be made for the first meeting.

In the meantime, the exchange of correspondence between Curtis and Hughes occurred, and nothing further was done regarding a meeting between the two agencies until after August 31, 1954, when Cook sent a copy of the August 11 proof of the contract to TVA with the statement that the contract was essentially in final form and that before it was executed, AEC planned to have discussions with TVA regarding those portions of the contract which pertained to TVA.

On September 1, 1954, General Herbert D. Vogel took office as Chairman of the TVA Board. On September 3, 1954, he met with Nichols, and the following joint statement was issued by them on that date:

"The Chairman of the Tennessee Valley Authority met in conference with the General Manager of the Atomic Energy Commission today to develop a plan for the negotiation of an agreement between the two organizations in connection with the power to be procured under the proposed Dixon-Yates contract.

"The Atomic Energy Commission on August 31, 1954, made a copy of the Dixon-Yates contract available to the staff of the Tennessee Valley Authority which is presently engaged in preliminary work designed to obtain the necessary basic data. There are obviously many technical details to be resolved before final agreement between TVA and AEC can be consummated but a meeting of the minds has been achieved on all fundamental issues and the TVA will proceed in good faith and as expeditiously as possible to prepare the necessary data, and it is expected that the technical staffs of both organizations will get together for discussions within the next ten days.

"The Chairman of the TVA and the General Manager of the AEC are agreed that negotiations can proceed between the two agencies in the

same spirit of good will that has exemplified past negotiations."

155. During the period between September 9, 1954 and January 19, 1955, the designated representatives of AEC and TVA met on five occasions in an effort to make an agreement covering the acceptance by TVA of the power and energy supplied by MVG in exchange for the power and energy supplied by TVA to AEC at Paducah, in accordance with section 3.02 of the Power Contract. At the first meeting, a dispute arose between the two agencies as to the interpretation of Hughes' letter of August 18, 1954 (finding 145), particularly with respect to the allocation of the costs involved in the receipt and transmission by TVA of the power supplied by MVG. The cost of the power supplied by MVG exceeded the cost of the power supply which AEC was obtaining at Paducah from the TVA plant at Shawnee, and AEC took the position that its share of such excess costs should be limited to the costs that would have been present if the MVG plant had been constructed at Paducah and AEC had released to TVA 600,000 kw. supplied to AEC by TVA at that installation. On the other hand, TVA stated that TVA had the responsibility of supplying power to its customers at the lowest possible cost and that it was not justified in paying any more for the power received from MVG than the cost at which TVA could have obtained the power from its proposed Fulton plant. The TVA representatives stated they were willing to balance any benefits which TVA might receive by having the MVG power put into its system in the Memphis area rather than having it released at Paducah against any additional cost which TVA might incur in the receipt and transmission of the MVG power.

The interagency dispute over the allocation of costs involved, among others, the following matters:

(a) *Investment in Transmission Lines and Transmission Losses.* In order to utilize the MVG power, it would have been necessary for TVA to build transmission facilities at a cost of several mil-lion dollars to bring the power from the middle of the Mississippi River to Memphis. The amount of power to be supplied by MVG was 600,000 kw., but the load in the Memphis area varied from 450,000 kw. during some hours to 150,000 kw. during other hours. This would have made it necessary for TVA to carry considerable quantities of power, varying in amounts, to locations about 200 miles distant where the excess power could be absorbed.

(b) *Fuel Costs.* To operate the MVG plant, it would have been necessary to transport coal from the West Kentucky and Southern Illinois fields down the Ohio and Mississippi Rivers to the MVG plant at West Memphis, Arkansas, a greater distance than would have been required for the transportation of coal to TVA's proposed Fulton plant. The question of the assessment of the extra transportation costs had to be solved.

(c) *Additional Power for Oak Ridge.* AEC needed an additional 150,000 kw. of power at its Oak Ridge installation, and the two agencies were unable to decide how much, if any, of the MVG power should be transmitted to Oak Ridge to fulfill that requirement and whether the costs in connection therewith should be allocated, or whether all of the MVG power should be credited to AEC by TVA against the power bills at Paducah.

(d) *Curtailment of the MVG Power Supply.* Power under the Power Contract was subject to curtailment under some conditions, such as when more than one generating unit was out of service. Also, if there was a delay in the completion of plaintiff's plant, there would be a deficiency of the power supply at Memphis. The representatives were unable to agree as to whether any such deficiencies in the power supply would be borne by TVA or AEC.

(e) *TVA's Cost for Accelerating Construction of the Shawnee Plant.* In the discussions over the division of costs, TVA sought reimbursement of certain fixed amounts which it claimed it had incurred in accelerating the construction of its Shawnee plant for the pur-

pose of supplying power to AEC at Paducah, but AEC decided that it could not justify the payment of these claimed amounts.

During the discussions between the two agencies, five proposals were presented by TVA and four by AEC. The last interagency meeting was held on January 19, 1955, but one proposal by TVA was submitted as late as April 30, 1955. Although the representatives of both agencies negotiated vigorously and in good faith, they were as far apart at the end of April 1955 as when the negotiations began. Their failure to agree was due to the basic differences in their objectives as explained above.

156. In September 1954, a technical committee composed of representatives of AEC, TVA, and MVG was appointed for working out the technical problems required in the delivery of MVG power to TVA and the transmission of the power in the TVA system. The problems involved included primary delivery points, location of river crossings, terminal positions, metered locations, voltage regulation, and the like.

The committee, designated as the Technical Steering Committee, had conferences on September 28, October 21, and November 8, 1954, and June 20, 1955. One of the proposed routes for the transmission lines involved the placing of transmission towers and lines in the city limits of Memphis, and on December 29, 1954, a TVA representative informed the committee that the city of Memphis objected to the placing of towers and lines within the city limits. As a result, it was necessary for the committee to consider alternate routes. In the beginning, the work of the committee was delayed by the fact that TVA had no appropriation available during the latter part of 1954 or early part of 1955 for anything except primary engineering or general planning on the problem of receiving and transmitting MVG power. As of May 31, 1955, the TVA members expressed their reluctance to proceed with technical details until AEC and TVA had made an agreement. At the meeting of June 20,

1955, a TVA representative stated that TVA felt that it was not worthwhile to discuss any further details relating to the connection of MVG power to the TVA system, because TVA had been advised that the city of Memphis intended to build its own plant and that the city's decision had altered previous concepts to such an extent that TVA would require time to make studies of changes in the system that would be required for acceptance of the 600,000 kw. from MVG without the Memphis load. It was agreed that the committee would meet again on August 1, 1955, but before the date of the scheduled meeting, defendant gave plaintiff notice that the contract would be terminated.

157. In 1952 TVA started negotiations with the city of Memphis for the purpose of renewing the 20-year contract which expired on June 1, 1958 (finding 138). As previously stated, TVA had proposed the construction of its Fulton plant to supply power to the city of Memphis. TVA could not build the Fulton plant without a continuing relationship with the city. That relationship was essential to the acceptance of power by TVA under the Power Contract, because the defendant had decided to have the Power Contract executed in lieu of providing funds for TVA's Fulton plant. The negotiations between TVA and the city of Memphis for renewal of the contract ended when Memphis decided to build its own power plant.

As early as December 2, 1954, Frank Tobey, mayor of Memphis, and Thomas F. Allen, president of the Memphis Light, Gas and Water Division, made public statements through the newspapers that if it developed that the TVA was not permitted to continue to supply Memphis with its power needs, the city would construct its own plant.

On December 20, 1954, in the SEC hearings on MVG's equity financing, Allen testified that he did not believe that Memphis would ever depend upon the MVG plant as a source of power. Dixon, Yates, and their attorneys were present at the time Allen testified. At the hear-

ing, a representative of TVA gave Allen a map prepared by Ebasco, showing the proposed connections of the MVG plant with the TVA terminal stations at the north, south, and east limits of the city of Memphis.

On February 17, 1955, Tobey and Allen made a public statement which was published in a front-page article in the Memphis Press-Scimitar to the effect that Memphis would not accept power from the MVG plant and that if the construction of the plant was commenced in West Memphis, Arkansas, the city of Memphis would take immediate steps to build its own plant. Similar statements were published in a front-page article in the New York Times on February 18, 1955. Dixon, who was in Washington, D. C., at the time, was familiar with the views expressed by the officials of Memphis and responded by statements which appeared in the New York Times and other newspapers on February 18, 1955, to the effect that the MVG contract was with AEC and that his group never had any intention of selling power to the city of Memphis. He further stated that if the city of Memphis wished to build its own plant, it was privileged to do so.

During the negotiation of the Power Contract, no representative of MVG, the sponsors, or AEC discussed the problems of bringing the MVG power into Memphis with its city officials, or inquired of them whether Memphis would accept and use the power supplied by the MVG plant. The officials of Memphis learned what was contemplated by the Power Contract from a representative of TVA.

158. By a joint letter of March 7, 1955, TVA directors Curtis and Paty wrote Hughes, stating that the power to be supplied under the MVG contract would not be ready by 1957 and that there was no certainty that the power would be available in 1958; that the power contract was in litigation; that after a year of negotiation, AEC and TVA had been unable to agree on a method for handling the power to be supplied by MVG; that TVA had participated in such negotiations on the assumption that the power furnished under the Power Contract would be used to meet the TVA load requirements in the Memphis area, but that the city of Memphis had publicly stated that the city would not accept power generated by the Dixon-Yates plant under any circumstances. Curtis and Paty concluded the letter with a request that the Budget Bureau reconsider the construction of TVA's plant at Fulton, Tennessee, and stated that such action would permit cancellation of the Dixon-Yates contract. On the same day, Vogel wrote Hughes, stating that the Curtis-Paty letter was a personal act of the writers and that Vogel did not approve the letter.

By letter of March 17, 1955, to Vogel, Hughes replied that the Dixon-Yates contract was then in effect; that it would accomplish the purposes set forth in the President's budget message, and that there was no reason for exploring other methods to provide additional generating plants for TVA in the same area where replacement power would be furnished to TVA by AEC. The letter also stated that the negotiation of an agreement between AEC and TVA was a matter of two Government agencies working together in the best interests of the country. However, Hughes' letter requested TVA to ascertain as soon as possible whether the city of Memphis would require further service from the TVA system after the TVA contract with the city expired on June 1, 1958.

On April 5, 1955, Vogel wrote Tobey, inquiring whether the city of Memphis intended to renew its contract with TVA. In his reply of May 18, 1955, Tobey stated that under no circumstances would the city of Memphis become a market for Dixon-Yates power, but he failed to indicate whether Memphis would renew its contract with TVA. Instead, his letter stated that Memphis wished to continue as a part of the TVA system and expressed the hope that TVA would obtain the Budget Bureau's approval of the construction of the TVA Fulton plant. A copy of the letter was sent by Vogel to Hughes on June 3, 1955.

159. On June 23, 1955, in a telegram to TVA, Allen reported that the city commission had authorized the Memphis Light, Gas and Water Division to take the necessary steps for providing a generating plant of adequate capacity for Memphis. On the same date, the telegram was confirmed by letter to the TVA Board. Notice of the city's action was given by Wessenauer of TVA to Sapirie of AEC.

On June 28, 1955, Vogel replied to the letter and telegram in a letter to Allen, stating that TVA would proceed on the assumption that Memphis would be in a position to handle its own load after the expiration of the contract with TVA on June 1, 1958. A copy of this letter with copies of Allen's letter and telegram were forwarded by Vogel to Hughes on the same date.

On June 30, 1955, Tobey and Allen telegraphed to TVA that Memphis would not renew its contract with TVA on the expiration of that contract.

160. On June 30, 1955, Vogel wrote to Hughes, referring to the information received from the city of Memphis and to the city's decision not to renew its power contract with TVA. The letter stated in part:

"Because of the decision of the City it will no longer be necessary for TVA to plan capacity installations to meet the load requirements of the Memphis area. Since the Dixon-Yates plant was proposed as a source of supply for the Memphis load, the City's action eliminates the possibility of using its output in the Memphis area, and the transmission costs involved and other factors would make it impracticable for TVA to utilize MVGC power elsewhere on the TVA system. We believe, therefore, that no arrangements between the Atomic Energy Commission and the Mississippi Valley Generating Company should any longer be predicated on the use of the MVGC plant as a source of supply to TVA * * *."

With his letter, Vogel enclosed a formal resolution which was adopted by the TVA Board on June 30, 1955, and which set forth substantially the same matters as were contained in Vogel's letter.

On the same date (June 30, 1955), the White House made public Vogel's letter to Hughes and the resolution of the TVA Board. The White House release read in part as follows:

"The President many months ago recommended that the City of Memphis develop its own power plant to supply the needs of the people of that area for electric energy. In the absence of any action by the City to accept this responsibility, the Federal Government made the necessary plans to provide adequate power facilities for the Memphis area.

"In the light of the notification by the City of Memphis to the Tennessee Valley Authority, the President has requested the Director of the Bureau of the Budget to confer promptly with the Atomic Energy Commission and the Tennessee Valley Authority to determine whether it is in the interest of the people of the area now to continue or to cancel the Dixon-Yates contract."

161. In the light of the action taken by the city of Memphis, Hughes sent letters to both Strauss and Vogel on July 2, 1955. The letter to TVA sought information regarding TVA's proposed plans for new generating capacity and as to any obligations it had for providing back-up power for the city of Memphis in the future. AEC was requested to advise Hughes whether the AEC could make economical use of all or a part of the power that would be made available through the MVG plant and to furnish information on the problems that would be encountered if the contract with MVG should be cancelled. Under date of July 5, 1955, Strauss replied that if AEC was relieved of the proposal to furnish TVA power in replacement for the same amount of power obtained from that

agency at Paducah, there would be no economical way for AEC to use the MVG power. He also supplied information as to the problems involved in the event the Power Contract should be cancelled.

162. During a conference with Strauss on July 8, 1955, Dixon left with Strauss a memorandum setting forth Dixon's views on the consequences of the cancellation of the Power Contract. He stated that the only circumstance present and the only reason given for reviewing the Dixon-Yates contract at that time was the action of the city commission of Memphis and the announcement that the city planned to construct its own power plant. In that connection, his memorandum read:

"If the City of Memphis actually builds and operates its own electric facilities and uses its own resources to do so, then there are some changed circumstances. *Absent solid and irrevocable action to that end, there are no new circumstances.*"

163. In his reply to Hughes under date of July 5, 1955 (finding 161), Strauss stated that AEC had entered into the Power Contract upon instructions from the President and that if a decision to terminate the contract resulted from a review of data furnished by TVA and AEC, AEC assumed that the President would issue directions to AEC.

On July 16, 1955, Hughes sent the following letter to Strauss:

"The President has accepted the commitment made by the Mayor of Memphis at the White House on Monday last that the City of Memphis will construct a power plant adequate to serve the people of his community, and that the City of Memphis will not request any funds from the Federal Government in any way to apply on the cost of construction of that plant. In this situation, there is no longer any requirement for the arrangement made with the Mississippi Valley Generating Company pursuant to my letter of June 16, 1954, to you.

"The President has therefore requested me to convey his direction to the Atomic Energy Commission to take immediately the necessary steps to bring to an end the relationship between the Mississippi Valley Generating Company and the United States.

"This confirms my oral discussion with you on Monday after the President's decision was made."

Thereafter, on August 1, 1955, Dixon received a letter from AEC, stating that the President had directed AEC to terminate the Power Contract.

164. In the electrical industry, "capacity" is the capability of a plant to generate a certain amount of power, while "energy" is the generation of that power for a specific length of time. Capacity is measured in kilowatts. Energy is measured in kilowatt-hours.

In the power industry, the term "displacement" means the transfer of energy through a power system by a receipt of energy on one edge of the system and the delivery of a comparable amount of energy at another end of the system. The same kilowatt-hours delivered are not necessarily the same kilowatt-hours received. "Wheeling", though not a technical term, is commonly used to describe the process by which a specific block of energy is delivered from a utility on one edge of a system to a neighboring utility on another edge of the same system. Since most electric power systems are interconnected with their neighboring utilities, one system frequently assists another in transferring blocks of power from a place where there is an excess to another place where there is a deficiency.

Since the purpose of constructing the MVG plant at West Memphis was to satisfy TVA's need for additional capacity in that area in replacement of capacity furnished by TVA to AEC at Paducah, the arrangements contemplated by the Power Contract do not fall in the category of either displacement or wheeling.

The term "replacement" is not a commonly accepted term in the power indus-

try. As previously stated, the term was coined by the AEC in connection with the project involved here. The arrangement contemplated by the Power Contract was an exchange of both capacity and energy at the MVG plant in West Memphis for capacity and energy which the TVA was obligated to supply to the AEC at its Paducah installation.

## IV. THE WAIVER DEFENSE [3]

165. Section 164 of the Atomic Energy Act of 1954 (68 Stat. 951) provides in part:

"Any contract hereafter entered into by the Commission pursuant to this section shall be submitted to the Joint Committee and a period of thirty days shall elapse while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of adjournment for more than three days) before the contract of the Commission shall become effective: Provided, however, That the Joint Committee, after having received the proposed contract, may by resolution in writing, waive the conditions of or all or any portion of such thirty-day period."

166. The United States House of Representatives, 2d Session of the 83d Congress, adjourned on August 20, 1954, and did not thereafter reconvene.

The United States Senate of the 83d Congress, 2d Session, adjourned on August 20, 1954, and did not reconvene until November 8, 1954, and thereafter met on November 9, 10, 11, 15, 16, 17, 18, 29, 30, and December 1 and 2, 1954, on which last date it adjourned *sine die*.

167. On August 18, 1954, Nichols sent the Chairman of the Joint Committee on Atomic Energy a copy of the sixth proof of the contract dated August 11, 1954, with a letter stating that it would be necessary to begin construction of the power plant at an early date to insure the availability of the power by the fall of 1957. Therefore, Nichols recommended that the Joint Committee consider waiving the 30-day requirement specified in Section 164 of the Atomic Energy Act of 1954.

On the same day Hughes wrote the Chairman of the Joint Committee a letter to the same effect, expressing the hope that the committee would waive the 30-day requirement of the act.

168. On October 6, 1954, the Acting Chairman of the AEC wrote the Chairman of the Joint Committee regarding the October 1 proof of the proposed contract. The AEC Chairman reported that before the draft was approved, AEC had favorable letters from the Federal Power Commission, the General Accounting Office, TVA, the Bureau of the Budget, the Chief of Engineers, and an opinion from the General Counsel of AEC. The writer mentioned the discussions between AEC and TVA, declared that the only question remaining open was the distribution of costs between TVA and AEC, and expressed the opinion that, since the question of the distribution of costs did not involve the terms of the contract between AEC and MVG, the AEC did not believe that it should delay consideration of the contract by the Joint Committee. He concluded the letter with the recommendation that the Joint Committee consider a waiver of the 30-day requirement in Section 164 of the Atomic Energy Act of 1954 in order that the power would be available by the fall of 1957 and to permit MVG to take advantage of the remainder of the construction season prior to high water in the Mississippi River.

169. Hearings before the Joint Committee, 83d Congress, 2d Session, were conducted on November 4, 5, 6, 8, 9, 10, 11, 12 and 13, 1954, on the "Exercise of Statutory Requirements Under Section 164, Atomic Energy Act of 1954." The hearings were printed in a volume (plaintiff's exhibit 148) containing 1,020 pages.

3. Paragraph 24(C) of defendant's answer.

170. On November 11, 1954, the AEC sent the Joint Committee an executed copy of the Power Contract and its supplements, the interpretative memorandum, the letter contract between the sponsors and AEC, a copy of the opinion of the General Counsel of AEC, and two letters from MVG regarding the execution and delivery of the Power Contract.

171. On November 13, 1954, the Joint Committee on Atomic Energy of the 83d Congress adopted, by a vote of 10 to 8, a resolution (defendant's exhibit 125), waiving the conditions of the 30-day period specified in section 164 of the act. The resolution referred to the provisions of Section 164 of the Atomic Energy Act of 1954, the powers and duties of the Joint Committee thereunder, the submission to the Joint Committee by AEC of the contract and other documents described above, the AEC's request that the conditions of the 30-day period of the act be waived, and the fact that the committee had held extended hearings, pursuant to which many changes that would adequately protect the interests of the United States had been made in the contract.

172. On January 28, 1955, the Joint Committee on Atomic Energy of the 84th Congress, 1st Session, by a vote of 10 to 8, adopted a resolution rescinding the resolution of waiver adopted November 13, 1954. The rescinding resolution referred to the provisions of Section 164 of the Atomic Energy Act and to the powers and duties of the Joint Committee, and stated as follows:

"* * * WHEREAS, the Joint Committee by Resolution on November 13, 1954, adopted a resolution purporting to waive 'the conditions of and all of the thirty-day period specified in Section 164,' while Congress was not in session, and

"WHEREAS, the Atomic Energy Commission presented no substantial or compelling reasons to justify the adoption of a waiver resolution while Congress was not in session, and

"WHEREAS, the effective date of said contract by its own terms has not yet occurred, and

"WHEREAS, the hearings of the Committee on this and related questions were incomplete and inadequate, and

"WHEREAS, the action of the then majority of the Joint Committee, in adopting a waiver resolution tended to deprive the 84th Congress of its full opportunity of review and freedom of action with respect to the aforesaid contract.

"NOW THEREFORE, BE IT RESOLVED: (1) that the Joint Committee on Atomic Energy do hereby rescind the resolution of waiver, and

"(2) that it is the sense of the Joint Committee on Atomic Energy that the said contract is not in the public interest and the Committee recommends that the Atomic Energy Commission take appropriate steps to cancel the so-called Dixon-Yates contract."

173. (a) On January 18, 1955, during the proceedings on MVG's equity financing before SEC, the Division of Corporate Regulation of SEC filed a brief (plaintiff's exhibit 21–I), stating that the waiver resolution was valid, although adopted while Congress was not in session.

(b) In the same proceedings before SEC, the AEC filed a brief with respect to the waiver resolution, the brief stating in part:

"We need not repeat the demonstration, made in the reply briefs for the Division of Corporate Regulation and the Proponents, that Section 164 authorizes a waiver while Congress is not in session. Indeed the fact that Section 164 uses the phrase 'while Congress is in session' only in connection with the requirement that a period of thirty days elapse, and contains no requirement that Congress be in session either when the contract is filed or when a waiv-

er resolution is adopted, is indicative of careful draftsmanship, designed to carry out the intent, which was clearly stated by Senators Ervin, Ferguson, Hickenlooper, Hill, Holland and Gore and disputed by no one during the debates on the Atomic Energy Act of 1954, that the Committee could adopt a waiver resolution when Congress was not in session.

\* \* \* \* \* \*

*"Section 164 does not empower the Joint Committee to revoke or rescind a waiver resolution once the contract has become effective.*

"The Joint Committee's resolution of January 28, 1955 appears to assume that a resolution of waiver is subject, for an indefinite time, to a right of reconsideration by the Committee. No such right of reconsideration is conferred by Section 164. To imply it would defeat the purpose of the provision for waiver by the Joint Committee. The evident purpose of that provision was to avoid the delays that might result if a contract could not become effective until thirty days had elapsed while the Congress was in session."

(c) After the SEC's order approving MVG's equity financing was issued, the order was appealed to the United States Court of Appeals for the District of Columbia on March 14, 1955. The brief (plaintiff's exhibit 28) which the United States as *amicus curiae* filed with the Court of Appeals contained the following statements regarding the waiver resolution and the rescinding resolution:

"We are not certain whether petitioners intend, by point 5, to renew the argument made before the SEC that Section 164 did not authorize such a waiver while Congress was not in session. It is evident from the terms and legislative history of the section that it did. In terms, it authorizes not only waiver of part or all of the thirty-day period, but also of 'the conditions of' such period. One of those conditions, whose

waiver is authorized, is the condition that the thirty-day period be a period while Congress is in session. Indeed, if the provision for waiver of the conditions of the thirty-day period is not read as referring to the condition that Congress be in session, it would serve no useful purpose.

\* \* \* \* \* \*

"The contract having become effective, the Joint Committee's Resolution of January 28, 1955, did not operate to render it ineffective. It is clear that Congress, in Section 164, did not reserve to the Joint Committee authority to rescind a prior waiver resolution so as to invalidate an effective contract. To have done so would have defeated the objective of the waiver provision to permit the procedure to be 'expedited' in appropriate cases, for if the waiver were subject to rescision the parties could not safely proceed with their contract until after 30 days had expired while Congress was in session. Reservation in the Joint Committee of a right to invalidate an effective contract would also have raised constitutional problems, which the Senate debates show Congress was careful to avoid.

\* \* \* \* \* \*

"Even if it could be assumed, however, that the waiver action of November 13 either was ineffective or was validly rescinded, the requirements of Section 164 have nevertheless been fully complied with.

"Section 164 requires merely that the contract be filed with the Joint Committee and that a period of 30 days elapse while Congress is in session. The contract had been filed, its terms made public, and the surrounding circumstances fully explored by the exhaustive hearings held last November. By February 4, 1955, there had elapsed 30 days during which Congress had been in session and had had opportunity to take whatever action with respect to the

contract it might deem appropriate. Nothing in Section 164 imposes a requirement that the filing and the period of thirty days occur at the same Congress or session.

\* \* \* \* \* \*

"We find no requirement in the text of Section 164 that the contract be such that it would become effective immediately upon the adoption of a waiver resolution; the section provides only that the contract cannot become effective until the requirements of Section 164 are met. Moreover, as we have pointed out previously, the contract did become effective on Dec. 17, 1954, prior to the reconvening of Congress.

"The minority's position that the contract had not become effective rests on a misconstruction of the contract which would lead to an untenable result. Section 8.22, which defines the effective date of the contract \* \* \*, does not require the receipt of necessary regulatory approvals as a condition to effectiveness. And while Section 8.15 makes the obligations of the parties subject to the receipt of such approvals, this clearly establishes a condition subsequent and does not prevent the contract from being effective on the date specified in Section 8.22."

(d) On July 11, 1955, the date on which plaintiff was advised by AEC that the President had decided to order termination of the Power Contract, the General Counsel of AEC submitted to the Atomic Energy Commission a memorandum of his views as to the effectiveness and enforceability of the contract. With respect to the resolutions of waiver and rescission, the memorandum stated:

"On January 28, 1955, the Joint Committee on Atomic Energy adopted a resolution which purported to rescind the Joint Committee's waiver resolution of November 13, 1954 and which declared it to be the sense of the Joint Committee that the contract is not in the public interest and recommended that AEC take ap-propriate steps to cancel the contract. Section 164 in my view does not authorize the Joint Committee to rescind or revoke a waiver resolution after the contract has become effective. The express purpose of the waiver proviso was to permit expeditious action in appropriate cases when Congress was not in session. This purpose would be defeated if a waiver could be rescinded after the contract became effective. To permit rescission of a waiver resolution would nullify the intent of Congress in enacting the waiver proviso.

"Even if we were to assume that the Joint Committee did have authority to revoke its prior resolution, it would be my opinion that the requirements of Section 164 have been satisfied on February 4, 1955, by the expiration of a 30-day period during which Congress had been in session.

"Accordingly, I conclude that the MVGC contract was executed and became effective pursuant to legal authority and constitutes a valid obligation of the Government."

(e) In a written opinion submitted by the Assistant Comptroller General to the Chairman of AEC on July 29, 1955, the following appeared:

"In our view the conditions of section 164 were satisfied regardless of the effect of the resolution of rescission.

\* \* \* \* \* \*

"We do not believe section 164 requires that contracts submitted to the Joint Committee thereunder be immediately effective upon the granting of a waiver or the lapse of the thirty-day waiting period. The purpose of the requirement in section 164 for a waiting period or a waiver was to afford the Congress an opportunity to review the power to make such contracts and to take appropriate legislative action if it so desired. The thirty-day period is a minimum period during which the

Congress may legislate; any additional postponement of the effective date of a contract would afford even greater opportunity for legislative action. Consequently, it is our view that section 164 fixes a time *before,* which a proposed contract cannot become effective, rather than a time *after* which the contract must be effective. In other words, the section does not require the submission to the Committee of a contract which is immediately effective in all respects upon the expiration of the waiting period or the granting of a waiver. The contract has been on file with the Joint Committee from November 11, 1954, to the present time. Thus, even if the waiver action of November 13, 1954, should be considered invalid, the prescribed waiting period of thirty days expired on February 4, 1955, Congress having been in session since January 5, 1955."

### V. THE PUBLIC UTILITY HOLDING COMPANY ACT DEFENSE [4]

174. Section 12(a) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79*l*(a) provides:

"It shall be unlawful for any registered holding company, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly, to borrow, or to receive any extension of credit or indemnity, from any public-utility company in the same holding-company system or from any subsidiary company of such holding company * * *."

This statute has been implemented by a regulation of the Securities and Exchange Commission which provides as follows:

"*Loans, extensions of credit, donations and capital contributions to associate companies*—(a) General provision.—No registered holding company or subsidiary · company shall, directly or indirectly, lend or in any manner extend its credit to nor indemnify, nor make any donation or capital contribution to, any company in the same holding-company system, except pursuant to a declaration notifying the Commission of the proposed transaction, which has become effective in accordance with the procedure specified in Section 250.23, and pursuant to the order of .the Commission with respect to such declaration under the applicable provisions of the Act." 17 C.F.R. Section 250.45(a), 1949 ed.

175. During the latter part of May 1954, representatives of First Boston and Lehman Brothers submitted to the Metropolitan Life Insurance Company a proposal dated May 18, 1954, relating to MVG's debt financing. It provided in part as follows:

"The contract between the new company and the AEC will be supplemented by contracts between the new company and companies within the systems of the sponsoring companies under which such system companies will assume several obligations to take or pay for, in the aggregate, sufficient power and energy to service the debt securities to the extent that income from the AEC or others may not be sufficient so to do."

Among the documents attached to the proposal was a suggested text of the major terms and conditions of MVG's first mortgage bonds. Paragraph 7 of the text, which was entitled "Security", provided that the first mortgage bonds would be secured by an indenture of mortgage and a deed of trust, constituting a first lien upon all of the plants and real property of MVG and also upon MVG's interests and rights in the AEC contract and in the agreements of the companies within the two sponsoring systems with respect to the purchase of power and energy to the extent such power and energy was not used by AEC.

---

4. Paragraph 24(D) of defendant's answer.

On August 11, 1954, Metropolitan's committee on finance and investment authorized the purchase of up to 78 million dollars of MVG first mortgage bonds. The memorandum of authorization stated that, in the event the Power Contract was terminated, the operating subsidiary companies of the two parent companies would be obligated to purchase the power and make payments sufficient to service the debt to Metropolitan.

176. On August 10, 1954, the sponsors entered into a memorandum of understanding relating to the proposal of April 10, 1954, and to MVG, the new company which was to be organized to construct the power plant under contract with AEC. Paragraph D (I) thereof provided:

"(a) The project facilities to be owned by MVG ("the Facilities") are to be designed to have a net capability of approximately 650,000 kw., of which the excess over Contract Capacity (which will be 600,000 kw. subject to certain adjustments) required to be delivered to AEC under the proposal is reserve capacity. Since such excess is not adequate to provide the equivalent of one generating unit of the Facilities, it will be necessary for MSU and Southern, or their respective subsidiaries, to undertake to furnish MVG for delivery to AEC, without additional charge to AEC, power and energy in an amount sufficient, with one generating unit out of service, to deliver Contract Capacity at the so-called Primary and Secondary Delivery Points referred to in the proposal. Such amount is hereafter referred to as 'back-up supply.'

"(b) AEC may in certain circumstances reduce below Contract Capacity its obligation to take and pay for power.

"(c) From time to time power and energy may be available out of the facilities in excess of that required for delivery to AEC. Such excesses as may be so available, whether or not the AEC has reduced its obligation, are hereafter referred to as 'surplus supply.'"

Paragraph D (II) stated that the sponsors or their subsidiaries would enter into agreements with MVG regarding the surplus supply of power generated by MVG. This paragraph further provided:

"(b) The system of each party hereto shall be obligated to pay its participation ratio of all the cost and expenses (other than expenses paid through energy charges) of MVG to the extent, if any, that such cost and expenses may not be paid or reimbursed out of payments received from the AEC and others. Such costs and expenses shall include debt service charges."

The last paragraph provided that the memorandum was intended as a general working agreement for the project and that it was executed with the knowledge that as the project progressed, many matters which were not provided for in the memorandum, as well as matters which were covered therein, would have to be treated in some other manner than as specified in the memorandum.

177. On October 29, 1954, shortly before the execution of the Power Contract, Daniel James, an attorney for plaintiff, wrote AEC in response to a request for information regarding the provisions of the contract with respect to contemplated arrangements with the systems of the sponsors. After referring to sections 2.02 and 8.16 of the proposed contract, as well as the memorandum of understanding of August 10, 1954, James' letter stated:

" * * * The working out of the actual inter-company power agreement is largely a matter of detail. That agreement, in the nature of things, cannot be too rigid and will not necessarily be preserved in exact detail from year to year. It will have to be flexible enough so that amendments may be made to conform with the changing operating and other conditions which may arise over a 25-year period. The

limitation is clear, however, that this inter-company power agreement, implementing the overriding obligations of the Company to the AEC and of the Sponsoring Companies to the Company, will not and cannot be modified in any way to impair those overriding obligations. The important consideration from the standpoint of the AEC is that the overriding obligations themselves are clearly set forth in the power contract itself and are implemented by the memorandum of understanding. These are summarized above.

"The various power and financing arrangements must be carried out in their natural and normal order. The working out of the power contract establishes certain overriding obligations of the Company to the AEC with respect to securing contractual arrangements for back-up supply and for the sale of surplus power; the power contract has to be finalized before the financing can be finalized; the finalizing of the financing arrangements will establish certain additional overriding obligations respecting purchasing power and payments for it by the systems of the Sponsoring Companies; and then the contractual arrangements among the Companies can be worked out to implement—but not change—the overriding obligations. * * *"

178. The recitals of the Power Contract read in part as follows:

"WHEREAS, the Proposal contemplates, that, of the approximately 650,000 kilowatts of net capability of the new plant, approximately 50,000 kilowatts will be available toward providing the required reserve to supply service hereunder, and inasmuch as such 50,000 kilowatts is not adequate for such purpose when one generating unit is out of service, the Company is making arrangements with the Systems of the Sponsoring Companies so that, in return for the Company's

making available to such systems such 50,000 kilowatts of capacity when no units are out of service, such systems will make available to the Company as additional reserve for the Company's obligation to the AEC, at no additional cost to the AEC, up to approximately 200,000 kilowatts of additional back-up capacity when a unit or units of the Facilities are caused to be shut down; and

\*　\*　\*　\*　\*　\*

"WHEREAS, among the considerations which induced the Sponsoring companies to make the Proposal and to cause the same to be carried out is the reservation to the Company of the right to make use of the Facilities hereinafter described for purposes other than the supply of capacity and energy to or for the AEC at such times and to such extent as such service to or for the AEC does not prevent such other use;"

Section 2.02 of the Power Contract reads as follows:

"Section 2.02. *Interconnections with Sponsoring Companies:* The Company will establish or cause to be established interconnections between the Facilities and the systems of the Sponsoring Companies, directly or indirectly, by means of which there will be afforded additional security of service under this contract from such systems, and an outlet for power and energy produced at the Facilities and from time to time not needed for deliveries to or for the AEC hereunder. The company represents that it is entering into a contract or contracts with the Sponsoring Companies or subsidiaries thereof to provide power to the Company over such interconnections for a period of 25 years after the beginning of initial commercial operation for the purposes of (a) enabling the Company to deliver hereunder the full Preliminary Contract Capacity or the full Contract Capacity, as the case may be, even though

one generating unit of the Facilities may be out of service, and (b) making available from the Facilities to subsidiaries of the Sponsoring Companies or others power which from time to time is not needed by the Company to furnish the power to which the AEC is entitled hereunder. Energy taken by systems of the Sponsoring Companies will be charged to such systems at not less than the incremental cost thereof."

In the interpretative memorandum executed by plaintiff and AEC simultaneously with the execution of the contract, the following provision appears:

"Section 2.02. The Company is to furnish AEC with copies of all agreements contemplated by Section 2.02.and paragraph 1 of Section 8.16 and with copies of any amendments or modifications to any such agreements. The Company is also to furnish AEC with copies of all contracts and commitments and amendments or modifications thereto, entered into between the Company and the institutional investors and banks, or representatives thereof, in connection with the financing of the Company's capital investment, including any bond indenture, mortgage or other evidence of indebtedness issued in connection therewith.

"The term 'incremental cost' which appears at the end of this Section means: 'All of the costs and expenses associated with and experienced by the actual production and delivery of the product, electrical energy, over and above all of the costs and expenses which would have been incurred had there been no such actual production and delivery.' This definition is also applicable to the use of the term 'incremental cost' in the last sentence of paragraph 1 of Section 4.08. The parties will from time to time agree upon procedures for determining incremental cost."

In the event the Power Contract was terminated by AEC, section 7.03 of the contract obligated plaintiff to absorb not less than 100,000 kw. of contract capacity on the date of termination and 100,000 kw. of capacity on each succeeding anniversary of the date of termination until the entire contract capacity was absorbed.

179. Contemporaneously with the execution of the Power Contract, Letter Contract No. AT–(49–1)–815, dated November 11, 1954, was entered into between the sponsors and AEC and provided (1) that in the event power was not delivered under the Power Contract by MVG to AEC at the time fixed for initial deliveries; or (2) in the event of termination of the contract for any cause; or (3) the inability of MVG to deliver 400,000 kw.

"* * * the Sponsoring Companies, or subsidiaries thereof, will be obligated to supply, severally and separately and in the proportions of 80 per cent for the Middle South system and 20 per cent for the Southern Company system, and the Commission will be obligated to pay for, 100,000 kilowatts of firm capacity (hereinafter called "Interim Power")."

Paragraph 3 of the letter contract provided:

"In either event described in Paragraph 1 above, the Commission and the Sponsoring Companies, or subsidiaries thereof, will enter into a formal contract for the supply of Interim Power (hereinafter referred to as the "Interim Power Contract"). Such contract will include, in addition to the provisions described in Paragraphs 1 and 2 above, the following terms and conditions * * *."

180. Plaintiff's debt financing was to be obtained through bonds purchased by the Metropolitan Life Insurance Company and New York Life Insurance Company and by loans made by The Chase Manhattan Bank and other banks which agreed to take plaintiff's notes. It was a complicated financial transaction and the discussions between the lending institutions and plaintiff's representatives

regarding the details thereof extended from the latter part of May 1954, to sometime in April 1955.

On January 14, 1955, as a result of suggestions made by the insurance companies, plaintiff's attorneys prepared and distributed a new proof of the proposed bond purchase agreement. At the same time, plaintiff's attorneys prepared and distributed to First Boston, Lehman Brothers, the sponsors, and various subsidiaries of the sponsors a memorandum outlining the principal changes that had been made in the bond purchase agreement and the intercompany agreement. The following appears in the memorandum:

### "Intercompany Agreement

"This Agreement in effect provides for the sale of surplus power of MVG, not taken by the AEC to the Participating Companies and provides for an overriding obligation of the Participating Companies to pay enough to service the debt of MVG to the extent that the AEC's payments do not do so. The capacity charge under the AEC Power Contract is designed to pay all the debt service charges of MVG, but the creditors look to the Intercompany Agreement as security for the payment of their bonds and notes in the event that the AEC contract is cancelled or in the event that the Power Contract should not produce the desired results.

"The scope of the obligations to be undertaken by the Participating Companies is one in which the creditors have evinced the greatest interest. The draft Intercompany Agreement which was attached as Exhibit A to the proof of August 25 of the Bond Purchase Agreement as prepared by us provide in effect that the Participating Companies would take and pay for power and energy in specified proportions so that in the event that no power and energy was available for sale to them there would be no obligation to make any payments, whether or not MVG had enough money for debt service purposes. The insurance companies have stated that this type of provision, which was used in the EEI case, was unsatisfactory to them: they want provisions like those obtained in the OVEC situation. The draft Intercompany Agreement which is attached to the new proof of the Bond Purchase Agreement is intended to indicate the type of provisions the insurance companies would like. The principal substantive differences are contained in paragraphs 1 and 2(c) of the Intercompany Agreement. Under the new proof the Participating Companies would be paying not for power and energy but for the right to receive power and energy and there would be a force majeure clause, substantially the same as that included in the AEC contract. As a result the Participating Companies would be obligated to pay for the right to receive power and energy whether or not they obtained any power and energy and would also be obligated to pay for the right even if due to force majeure, such as an explosion, strike, etc., MVG was in no position to deliver any power and energy to them. It is of course expected that 50,000 kilowatts will be available for sale to the Participating Companies most of the time so that if things work out as expected there would be little difference between our suggestions and those of the insurance companies. The insurance companies point out, however, that their provisions would result in liability for payment by the Participating Companies in the following situations (among others) where no liability would exist under our original draft:

"(a) if the AEC Power Contract is cancelled and force majeure occurs which makes it impossible for MVG to deliver power to the Participating Companies;

"(b) if the AEC Power Contract remains in effect, but does not produce sufficient revenues to service MVG's debt, and MVG due to force majeure is unable to furnish power and energy to the Participating Companies;

"(c) if at a time before the plant is complete, when no revenues are being received from the AEC, MVG has no funds available to service debt.

"We have emphasized in discussions with counsel for the insurance companies that, whatever provisions we agree to, the Participating Companies would under no circumstances undertake obligations which amounted to a guarantee of MVG's debt. The obligations reflected in the revised proof come closer to a guarantee than do the obligations originally suggested by us in the August 25 proof. It should be noted, however, that they are not dissimilar from the OVEC obligations which counsel in that case were satisfied were not guarantees. It should also be noted that the amounts to be paid by the Participating Companies will be designed to cover amortization and interest and not the principal of the Bonds and Notes due otherwise than pursuant to regular amortization schedules. The insurance companies have suggested that the amounts paid by the Participating Companies also cover other mandatory redemptions, but this suggestion appears unacceptable.

"In the light of the revisions which have been made in paragraphs 1 and 2(c) of the Intercompany Agreement, revisions of the Whereas clauses have been made in order to emphasize the business advantages to the Participating Companies of the Intercompany Agreement and thereby minimize the possibility of their obligations being construed as guarantees. Changes have been made in paragraph 6 for the same reason. A specific provision has also

been inserted in paragraph 7 to the effect that the obligations of the Participating Companies will terminate in the event of recapture. This was not a necessary provision under our original language, but becomes necessary if the insurance companies' suggestions are to be followed."

With respect to section 6.04 of the proposed bond purchase agreement, the memorandum further stated:

"§ 6.04. This Section, as a condition to the obligation of the insurance companies, requires that the important MVG contracts continue in full force and effect. The condition is in substance carried forward to each closing. The insurance companies have requested that one of the agreements which must be in full force and effect is the agreement (the "Supplemental and Surplus Power Agreement") between MVG, Middle South Utilities, Inc., Alabama Power Company, Georgia Power Company, Gulf Power Company and Mississippi Power Company, as to the purchase of supplemental power and the sale of surplus power, as represented in § 2.02 of the Power Contract. In view of the representation contained in the Power Contract, there can probably be no objection to following this suggestion. There would, however, seem to be no necessity for a legal opinion on this agreement unless the AEC asks for it.

"The insurance companies also want a condition that the AEC-TVA arrangements as to the delivery of power be in full force and effect. We are trying to find out what the status of these arrangements is. Initially it does not seem appropriate to make the obligations of a private company depend on arrangements between two Government agencies which we contend do not affect MVG's rights under the Power Contract. The insurance companies also want opinions from private counsel as to the validity of the AEC-

TVA arrangements. It would again seem inappropriate to have private counsel pass on the validity of arrangements between two Government agencies."

181. A conference between the banks and plaintiff's representatives with respect to the bank credit agreement was held on February 9, 1955, and the agreements of the parties were set forth in a memorandum of the same date. There were three conferences between the insurance companies and plaintiff's representatives in January and February 1955 with respect to the bond purchase agreement. As a result, a memorandum of agreement was prepared. It was dated February 17, 1955, and provided in part as follows:

"1. The Intercompany Agreement will be signed by Middle South and Southern, and not by the subsidiaries of either System.

"2. In the Intercompany Agreement, Middle South and Southern in consideration of the right to receive power and energy, whether or not available, will agree to pay or cause to be paid an aggregate amount sufficient to provide revenue which, when added to revenue derived by MVG from AEC and any other sources, will be sufficient to enable MVG to pay, when due, all of its operating and other expenses and all of its taxes and to pay, when due, interest on and regular required amortization of the bonds and the notes.

"3. The obligations of Middle South and Southern shall be several, separate and distinct, and in the amounts of 80% for Middle South and 20% for Southern. In cases where power and energy are purchased from MVG by any operating company of either System, assurance of payment for such power and energy shall be the responsibility of such operating company's parent company only.

"4. In the Intercompany Agreement, Middle South and Southern will agree to pay or cause to be paid to MVG an aggregate amount sufficient to enable MVG to pay its expenses and taxes and service its debt (as per paragraph 2 above) in the event that MVG is unable otherwise to pay such expenses, taxes and debt service because of failure on the part of AEC or others to pay on schedule amounts due MVG for power and for energy, with the provision that any such payments by Middle South and Southern for this reason shall be repaid to Middle South and Southern by MVG after the amounts due from AEC or others have been collected by MVG.

"5. The Intercompany Agreement *may* include a force majeure clause containing a requirement that non-delivery or non-availability of power or energy on account of force majeure shall not relieve Middle South and Southern from their respective obligations to pay MVG amounts necessary pursuant to paragraph 2 above.

\* \* \* \* \* \*

"7. There shall be executed as a condition precedent to the first bank closing a 'supplemental and surplus power agreement' between MVG and the Arkansas, Louisiana and Mississippi companies of the Middle South System and the four Southern System companies, to which the seven subsidiaries shall be signatories, directly or indirectly, providing for the purchase by such subsidiaries from MVG of surplus power and energy, and the supplying to MVG of back-up power and energy. This agreement will not be pledged under the MVG mortgage."

The bank credit agreement, the bond purchase agreement, the intercompany agreement, and the back-up and surplus power agreement were thereafter prepared in final form, in substantial conformity with these agreements.

182. The bank loan agreement was executed on April 21, 1955, and article

1 thereof contained the following definitions:

"a. *Back-up and Surplus Power Agreement:* The term 'Back-up and Surplus Power Agreement' shall mean the agreement or agreements referred to in section 2.02 of the Power Contract.

\*    \*    \*    \*    \*    \*

"j. *Intercompany Agreement:* The term 'Intercompany Agreement' shall mean the agreement among the Company, the Sponsoring Companies, the Trustee under the Mortgage and The Chase Manhattan Bank as representative of the Banks, substantially in the form attached hereto and marked Exhibit A.

\*    \*    \*    \*    \*    \*

"n. *Power Contract:* The term 'Power Contract' shall mean, collectively, (i) the agreement dated November 11, 1954, No. AT(49–1)–814 between the Company and The United States of America, acting by and through the Atomic Energy Commission, as modified by Supplement No. 1 dated November 11, 1954, to said agreement No. AT–(49–1)–814, and (ii) the interpretive memorandum, dated November 11, 1954, with respect to said agreement No. AT–(49–1)–814 with attached letter agreement of the same date between the Company and the Atomic Energy Commission, copys of all of which have been delivered to the Banks."

Article 6 is entitled "Conditions to Obligations of Banks at First Borrowing." Section 6.01 states that the obligations of each bank at the first borrowing shall be subject to the satisfaction of the conditions set forth in this article. Section 6.08, entitled "Contracts", provides:

"The Power Contract, the Intercompany Agreement, the Bond Purchase Agreements, the Engineering Agreement, and the Back-up and Surplus Power Agreement, shall have been duly entered into by the respective parties thereto."

The section further provides that except as the Power Contract may have been terminated or cancelled pursuant to the provisions thereof, or as the back-up and surplus power agreement may have been modified pursuant to its terms, "each of said agreements shall be in full force and effect and shall not have been terminated or modified otherwise than as permitted by the provisions thereof."

Article 7 is entitled "Conditions to Obligations of Banks at Secondary Borrowings." Section 7.01 provides that the obligations of the banks at any secondary borrowing shall be subject to the satisfaction, as of the secondary borrowing date, of the conditions set forth in section 6.08, among others.

183. The bond purchase agreements with the two insurance companies, also dated April 21, 1955, contained the same definitions of "back-up and surplus power agreement," "intercompany agreement" and "power contract," as the bank credit agreement.

Article 6 of the bond purchase agreement was entitled "Conditions To First Borrowing Under Bank Credit Agreement." Section 6.04 entitled "Contracts," required that the Power Contract, the intercompany agreement, the engineering agreement and the back-up and surplus power agreement shall have been duly entered into by the respective parties thereto. Section 7A.01 and 7B.01 required compliance with section 6.04 on each closing for bonds under the agreement.

The proposed mortgage and deed of trust securing the bonds, a copy of which was attached to the bond purchase agreement, provided that there should be pledged under said mortgage, among other things, all of plaintiff's right, title and interest under the Power Contract and the intercompany agreement. In section 5.26 of the mortgage, plaintiff was to covenant that:

"There will at all times be in effect an agreement between the Company and one or more subsidiaries of each Sponsoring Company making availa-

ble to the systems of the Sponsoring Companies power and energy which from time to time is not needed by the Company to meet its obligations under the Power Contract, and containing provisions with respect to the payment for such power and energy, all as contemplated by paragraph 4 of the Intercompany Agreement. So long as the Power Contract remains in effect, there will also at all times be in effect an agreement between the Company and one or more subsidiaries of each Sponsoring Company complying with the provisions of clause (a) of the second sentence of Section 2.02 of the Power Contract."

184. The intercompany agreement, although not executed, had been prepared in final form and was attached as an exhibit to the bond purchase agreement. This was to be an agreement to be signed by plaintiff, the sponsors, the trustees under the mortgage securing the bonds, and a representative of the banks which had signed the bank credit agreement.

The recitals to the intercompany agreement read in part as follows:

"WHEREAS, it is anticipated that MVG will have available for sale to others, as provided in the Power Contract or after the expiration or earlier termination thereof, power and energy from its generating station to the extent not required to meet its obligations to the Atomic Energy Commission under the Power Contract; and

"WHEREAS, MVG desires to sell such power and energy to the systems of the Sponsoring Companies and they desire to be entitled to purchase the same, upon the terms and conditions herein set forth;"

After reciting the obligations of the insurance companies to purchase bonds, and of the banks to make loans, the recitals continued:

"WHEREAS, the inducements to said insurance companies and said banks in agreeing to make said loans include the agreements of the Sponsoring Companies herein contained, including the agreements to pay for the right to purchase power and energy from MVG and to supply equity capital to MVG, all as herein provided; and"

Paragraph 1 of the agreement provided as follows:

"1. (a) MVG will make available or cause to be made available to the systems of the Sponsoring Companies all such power and energy as MVG may have available after fulfilling its obligations, if any, under the Power Contract. Such power and energy is herein referred to as power and energy.

"(b) The systems of the Sponsoring Companies will be entitled, in the respective percentages set forth in paragraph 3(b) hereof, to purchase power and energy and, subject to the provisions of paragraph 3 hereof, the Sponsoring Companies will pay or cause to be paid, in such respective percentages, for the right hereby granted to purchase power and energy, whether or not MVG shall have any power or energy available, an aggregate amount sufficient to provide revenue which, when added to all other revenues, if any, of MVG, including amounts received upon sales to the Atomic Energy Commission and amounts received upon sales to companies in the systems of the Sponsoring Companies, will be sufficient to enable MVG to pay when due all its operating and other expenses and all its taxes, to pay when due interest and regular required amortization on all bonds outstanding under the Mortgage from time to time (herein called the "Bonds") as provided in the Mortgage, and to pay when due interest and Mandatory Regular Prepayments (under § 4.01(A) of the Bank Credit Agreement) on the Notes as provided in the Bank Credit Agreement. The term 'regular required amortization' shall not in-

clude payments on account of principal at rates greater than those initially set forth in the sinking fund or amortization schedules for the Bonds; and the term 'operating and other expenses' shall not include any payments on the principal of indebtedness, whether at stated or accelerated maturity.

"(c) If any company in the system of a Sponsoring Company shall default in making payment to MVG under any contract or other arrangement providing for payments by such company for power and energy which such system is entitled to purchase under paragraph 1(b) hereof, or for the right to purchase power and energy, such Sponsoring Company will promptly make such payment or cause the same to be made. Any amount for which MVG shall have a valid claim against a Sponsoring Company under this paragraph 1(c) shall be deemed to constitute an amount received upon sales to companies in the systems of the Sponsoring Companies, within the meaning of paragraph 1(b) hereof, for the purpose, but only for the purpose, of determining the amounts, if any, due from the other Sponsoring Company. Except to the extent stated in the foregoing sentence, nothing in this paragraph 1 (c) shall be deemed to affect the obligation of the Sponsoring Companies, or either of them, under paragraph 1(b) hereof."

Paragraph 3(e) and paragraph 4 of the agreement provided as follows:

"(e) MVG shall not be held responsible or liable for any loss or damage to the system of either Sponsoring Company on account of non-delivery or non-availability of power and energy hereunder at any time caused by Act of God, fire, flood, explosion, strike, civil or military authority, insurrection or riot, act of the elements, failure of equipment, utilization of the entire net available capacity of MVG in compliance with the Power Contract as in effect from time to time, or for any other cause beyond its control; and non-delivery or non-availability on account of any such causes shall not relieve the Sponsoring Companies from their respective obligations under the provisions of paragraph 1 hereof.

"4. Subject to the provisions hereof, each Sponsoring Company or one or more of its subsidiaries will enter into an agreement or agreements from time to time with MVG or with MVG and the other Sponsoring Company or one or more subsidiaries of either Sponsoring Company, containing provisions, among others, relating to the purchase of and payment for power and energy. The Sponsoring Companies and their subsidiaries may provide in such agreement or agreements for deliveries of power and energy and payments therefor, as among themselves, other than in the percentages specified in paragraph 3(b); but no such agreement shall be in derogation of this agreement or relieve either Sponsoring Company from its obligations hereunder, which obligations shall continue for the purposes hereof as if such other agreement or agreements provided for deliveries of power and energy and payments therefor on the basis of the percentages set forth in paragraph 3(b) hereof. Each subsidiary of a Sponsoring Company shall make payments directly to MVG for all power and energy delivered to or for the account of such subsidiary (less any applicable credits for losses or for back-up or other power and energy delivered by such subsidiary to or for the account of MVG), and each such other agreement shall so provide. Copies of any such agreements, including amendments and supplements thereto, will be filed by MVG with the Trustee and with the Representative within five days after they become effective."

185. The back-up and surplus power agreement had not been executed, but was in substantially final form, and its execution had been authorized by the boards of directors of the subsidiaries who were to be signatories. This agreement was to be executed between plaintiff and the following subsidiaries of the sponsors: Mississippi Power & Light Company, Arkansas Power & Light Company, Louisiana Power & Light Company, Alabama Power Company, Georgia Power Company, Gulf Power Company and Mississippi Power Company, and was to continue until January 1, 1989, or the retirement of plaintiff's power plant from service, whichever should be later, unless sooner terminated by mutual agreement of the parties.

Section 0.2 defines the following terms as used in the agreement:

"*Back-up* shall mean power and energy furnished to or for Mississippi Valley from time to time in order to enable it to continue service to the AEC as provided in Section 2.02 (a) and the first sentence of Section 3.01 of the Power Contract.

\*　\*　\*　\*　\*　\*

"*Power Contract* shall mean the contract dated November 11, 1954, by and between Mississippi Valley and the United States of America, acting by and through the AEC— Contract No. AT–(49–1)–814–, Supplement No. 1 thereto dated November 11, 1954, and the Interpretative Memorandum re Power Contract, with covering letter dated November 11, 1954, all of which are included in Exhibit A hereto;

\*　\*　\*　\*　\*　\*

"*Surplus* shall mean power and energy available from the Power Plant from time to time in excess of power and energy deliverable to the AEC under the Power Contract;

\*　\*　\*"

With respect to the supply of back-up power to plaintiff, sections 3.1 and 3.2 of said agreement provided:

"3.1 *ALM Obligations as to Back-up:* Subject to the provisions of §§ 3.6 and 6.2, the ALM Companies shall be obligated to supply and shall supply, in the aggregate, 80% of the back-up power required by Mississippi Valley. The distribution of this obligation among such companies and accounting for payments received either in kind or in cash for back-up energy so supplied shall be, as among the ALM Companies, in accordance with the Memorandum or with such other basis on which they may mutually agree reflecting a rational relationship of the load of each such company to the aggregate loads of all of them.

"3.2 *Southern Companies' Obligations as to Back-up:* Subject to the provisions of §§ 3.6 and 6.2, the Southern Companies shall be obligated to supply and shall supply, in the aggregate, 20% of the back-up power required by Mississippi Valley. The distribution of this obligation among such companies and accounting for payments received either in kind or in cash for back-up energy so supplied shall be, as among the Southern Companies, in accordance with the following percentages of the total back-up or with such other basis on which they may mutually agree reflecting a rational relationship of the load of each such company to the aggregate loads of all of them:

| | |
|---|---|
| Alabama PC ............ | 8% |
| Georgia PC ............. | 8% |
| Gulf PC ................ | 2% |
| Mississippi PC .......... | 2%" |

With respect to surplus power that might be generated by plaintiff, the agreement provided, in sections 4.1 and 4.2:

"4.1 *ALM Entitlement to Surplus:* Subject to the provisions of § 6.2, the ALM Companies together shall be entitled to receive an aggregate of 80% of surplus power. Such surplus power entitlement shall be distributed among the ALM Companies in accordance with the Memo-

randum or with such other basis on which they may mutually agree reflecting a rational relationship of the load of each such company to the aggregate loads of all of them. Subject to the provisions of this agreement, the scheduling of the surplus to which the ALM Companies are entitled shall be handled by the Middle South System Operator referred to in the Memorandum or such other person as may succeed to the powers and functions of such System Operator.

"4.2 *Southern Companies' Entitlement to Surplus:* Subject to the provisions of §§ 4.4 and 6.2, the Southern Companies together shall be entitled to receive an aggregate of 20% of surplus power. Such surplus power entitlement shall be distributed among the Southern Companies in accordance with the following percentages of the total amount of surplus or with such other basis on which they may mutually agree reflecting a rational relationship of the load of each such company to the aggregate loads of all of them:

| | |
|---|---|
| Alabama PC | 8% |
| Georgia PC | 8% |
| Gulf PC | 2% |
| Mississippi PC | 2%" |

186. The intercompany agreement was not required by the terms of the Power Contract. It was a lending document which was to be pledged to secure the payment of MVG's debt. As already stated, it was decided that the intercompany agreement should be signed by both sponsors and that none of the operating subsidiaries of the sponsors would sign it.

The back-up and surplus power agreement was required under section 2.02 of the Power Contract and, as stated, it was to be signed by plaintiff and by the subsidiaries of the sponsors. As security for the bonds, the insurance companies had a first mortgage on MVG's plant, a pledge of the Power Contract, and a pledge of the intercompany agreement, which the insurance companies relied upon as an obligation of the sponsors to pay for the right to receive power from MVG, whether or not the power was available. Although the intercompany agreement provided that the back-up and surplus power agreement would be entered into, the intercompany agreement did not specify the terms to be contained in the back-up and surplus power agreement. It was an operating agreement and not a lending document. The lending institutions were not interested in the provisions of the back-up and surplus power agreement. However, since the sponsors were holding companies, the lending institutions wished to make sure, as a matter of mechanics, that there should be an agreement in effect for the surplus power to be taken by the operating subsidiaries.

187. With respect to the back-up and surplus power agreement, the SEC in its decision of February 9, 1955, stated that the record before it indicated that the operating companies would be fairly treated in the amounts they would receive for interim and back-up power and in the amounts they would be charged for any surplus power they took.

188. In the SEC equity financing proceedings, the SEC Division of Corporate Regulation filed a reply brief (plaintiff's exhibit 21–I) in which it was urged, among other things, that the Power Contract and related arrangements, did not violate Section 12(a) of the Public Utility Holding Act of 1935. After pointing out that the back-up and surplus power agreement was a direct obligation of the operating subsidiaries rather than of Middle South or Southern, the brief stated:

"We submit that, under all of the circumstances, no indemnity of the type envisaged by section 12(a) of the Act is or will be created by the Power Contract and the related intercompany arrangements."

189. In its decision of February 9, 1955, approving MVG's equity financing, the SEC stated:

"We do not consider that any indemnity within the meaning of Section 12(a) is involved. The obligation to supply MVG with interim and back-up power and to absorb cancelled power would be the direct obligation of the operating companies, not of the holding companies. While the arrangements among the system companies have not been finally determined, the record shows that the arrangements for the supply of back-up energy interim power, and absorption of power will be between MVG and the operating companies of each system, that MVG will pay those subsidiaries for such power, and neither Middle South nor Southern will obtain any payments from the AEC for power. It is proper under the Act for construction projects and operations to be planned and carried forward on a basis meeting the purposes of the system as a whole, and for the holding company to make contracts in furtherance of such coordinated operations with the intent that the operating aspects of such contracts shall be carried out by the system operating companies. The creation of the attendant reciprocal benefits and undertakings involved in such arrangements does not in our view automatically result in an indemnity of the holding company within the meaning of Section 12(a)."

## VI. Lack of Regulatory Approvals Defense [5]

190. Section 8.15 of the Power Contract is as follows:

"*Regulatory Approvals and Indebtedness:* The obligations of the parties hereunder shall be subject to the following:

"(1) the receipt of all regulatory approvals, in form and substance satisfactory to the Company, necessary to permit the Company to perform all the duties and obligations to be performed by it hereunder or necessary to permit it to issue shares of its capital stock to the Sponsoring Companies and to issue the indebtedness referred to herein;

"(2) the execution and performance by institutional investors and banks of contracts or commitments, in form and substance satisfactory to the Company, providing for the issuance by the Company and the purchase by such investors and banks of the indebtedness referred to in the recitals of this contract; * * * *"

Section 8.22 of the Power Contract is as follows:

"*Effective Date:* The effective date of this contract shall be the latest of the following: (a) the date when this contract is executed and delivered by the parties hereto; (b) the date when item (3) of Section 8.15 shall be delivered to the Company; (c) the date when item (4) of Section 8.15 shall be delivered to the Company; or (d) the date on which the time shall have elapsed during which the contract must remain on file with the Joint Committee on Atomic Energy pursuant to Section 164 of the Atomic Energy Act of 1954 or the date when said Joint Committee shall have waived such requirement as provided in said Section."

191. As previously stated (findings 8 and 9), the Power Contract became effective on December 17, 1954. Both parties agreed that those provisions of section 8.22 of the Power Contract which were covered by the letter agreement had been satisfied, that the Power Contract was effective, and that the letter agreement was no longer in force.

192. On November 17, 1954, plaintiff Middle South and Southern filed with the SEC an application to authorize plaintiff to issue 55,000 shares of its common stock having a par value of $100 per share and to permit Middle South to ac-

---

5. Paragraph 25 of defendant's answer.

quire 43,450 of such shares and Southern to acquire the remaining 11,550 shares, all having an aggregate par value of $5,-500,000.

Hearings on the application began in the SEC on December 7 and were concluded December 21, 1954. The State of Tennessee and the Memphis Light, Gas & Water Division appeared in opposition to the application. The findings and opinion of SEC approving the issuance and sale of plaintiff's common stock were issued February 9, 1955.

The State of Tennessee filed a petition for rehearing and this was denied by the SEC on February 18, 1955. On March 14, 1955, the State of Tennessee filed a petition for review of the SEC order in the United States Court of Appeals for the District of Columbia.

After intervening in the action in the Court of Appeals, plaintiff, Middle South, and Southern filed a motion to dismiss Tennessee's petition for review on April 13, 1955. Oral argument was heard on the motion and the Court of Appeals deferred its decision until after argument on the merits.

193. The Court of Appeals heard oral argument on the appeal of the State of Tennessee on June 6, 1955, but no decision was rendered prior to defendant's termination of the contract in July 1955. On September 12, 1955, the Court of Appeals remanded the case to SEC for reconsideration of its order of February 9, 1955. The court's action was taken pursuant to SEC's motion to remand in view of the fact AEC had been directed to cancel the Power Contract. The court's order of remand stated:

> "The Court expresses no view with respect to the questions in controversy between the parties, and nothing in this order shall be deemed decisive of any such question. This order is without prejudice to any right, which may be possessed by any person aggrieved, to judicial review of the Commission's final action in the matter."

194. By the time the Power Contract was terminated, MVG had issued and sold to Middle South and Southern only 11,000 shares of common stock, whereas the remaining 44,000 shares of common stock, the issuance and sale of which had been authorized by the SEC order of February 9, 1955, had not been issued. On November 4, 1955, SEC entered an order in which reference was made to the order of February 9, 1955, to the proceedings in the Court of Appeals, to defendant's cancellation of the contract, and to the remand by the Court of Appeals. In view of such circumstances, the SEC entered an order rescinding the authority of the plaintiff to issue and of Middle South and Southern to acquire the 44,000 unissued shares of the common stock of MVG. SEC retained jurisdiction of the question as to the action to be taken respecting the 11,000 shares of plaintiff's common stock that had been acquired by Middle South and Southern.

195. On April 22, 1955, plaintiff advised AEC that bond purchase agreements, involving an estimated total commitment of $77,362,000 by the Metropolitan Life Insurance Company and New York Life Insurance Company had been executed on April 21, 1955. In the same letter AEC was informed that bank credit agreements, involving an estimated total commitment of $27,086,000 by 24 banks, had been executed on April 21, 1955. The bonded indebtedness was to be secured by 3⅝ percent first mortgage bonds, and the debt to the banks was to be secured by the execution and delivery of notes bearing interest at 3¼ percent. All participating banks had signed the bank credit agreement by May 15, 1955.

196. Plaintiff's application for approval of the financing to be obtained from the insurance companies and the banks was filed with the SEC on April 22, 1955. A hearing on the application was set for May 6, 1955, but postponed until June 6, 1955. The hearing began on June 7 and ended on June 17, 1955. The SEC had made no decision on the

application as of July 11, 1955, when the defendant decided to cancel the Power Contract.

197. On November 23, 1954, plaintiff and the sponsors filed with the Arkansas Public Service Commission an application to authorize plaintiff to issue and the sponsors to acquire shares of plaintiff's common stock. An order approving the application was entered on December 21, 1954.

198. On December 29, 1954, plaintiff applied to the Commissioner of Internal Revenue for approval of plaintiff's proposed method of charging depreciation, and this method was accepted by the Commissioner on March 8, 1955.

199. On January 3, 1955, plaintiff applied to the District Engineer of the Memphis District of the Corps of Engineers for permission to construct coal unloading and water condensing structures in the Mississippi River, West Memphis, Arkansas. The permit was granted February 11, 1955.

200. On February 18, 1955, plaintiff applied to the Arkansas Public Service Commission for a certificate of Public Convenience and Necessity. After a hearing, the Commission granted the certificate on March 9, 1955.

201. In March 1955 certain officers and directors of Middle South and Southern, including Yates and Barry of Southern, and Dixon, Canaday, and Sanders of Middle South, filed an application to hold interlocking positions on plaintiff's board pursuant to the provisions of Section 305(b) of the Federal Power Act, 16 U.S.C.A. § 825d(b), and Part 45 of the Rules and Regulations of the Commission.

On April 4, 1955, the State of Tennessee intervened in the proceedings and objected to the approval of the applications. As of May 4, 1955, both parties had filed a memorandum of law with the Commission but no action had been taken by it. On July 2, 1956, each application was withdrawn by the applicant on the ground that on July 30, 1955, the AEC had advised MVG that AEC had been directed to terminate the Power Contract.

202. Among the regulatory approvals that were contemplated by section 8.15 (1) of the Power Contract was the approval by the Civil Aeronautics Authority of the lighting of the transmission towers. Such approval could not have been obtained until near the end of the construction period.

203. (a) The question of the extent to which the effectiveness and enforceability of the Power Contract were affected by the lack of regulatory approvals was fully treated in the opinion the General Counsel of AEC submitted to the Atomic Energy Commission on July 11, 1955. The opinion read in part as follows:

"* * * those described in paragraphs (1) and (2) [of Section 8.15] have not been fully satisfied at this date. A question has been raised as to whether the conditions stated in Section 8.15 limit the effectiveness of the contract so that the contract will not become effective and binding on the parties until these conditions are fully satisfied.

"The intention of the parties, as derived from the contract as a whole, is clear—that the contract was to become effective on the date specified in Section 8.22 (December 17, 1954). Section 8.15 does not purport to fix the effective date of the contract. It is significant that conditions (3) and (4) of Section 8.15 are identical with events (b) and (c) of Section 8.22. In Section 8.22 these two events must occur before the contract becomes effective. The inference is clear that the other two conditions of Section 8.15; viz., the receipt of regulatory approvals and the execution and performance of financing commitments, do not go to the effective date and do not prevent the contract from being presently in effect.

"An interpretation of Section 8.15 as imposing limitations on the effec-

tiveness of the contract would be clearly inconsistent with other substantive provisions of the contract. Condition (2) of Section 8.15 involves the execution and performance by institutional investors and banks of contracts or commitments providing for the issuance by the Company and the purchase by such investors and banks of the Company's long-term debt issuances. It was clearly understood by the parties that the performance of these financing arrangements would involve a serious [series] of transactions providing for the periodic take-down of funds by MVGC during the period of construction of its plant. The last of these transactions would undoubtedly occur towards the end of the construction period—at a date two years or more after the effective date of the contract.

"If the binding effect of the contract were to be delayed until performance of the last of these transactions, then all of the provisions of the contract bearing on the rights and obligations of the parties during the construction period would be nugatory until that last transaction was completed. The obligations of MVGC to design and construct the Plant would be unenforceable. The company's obligation to supply Preliminary Contract Capacity upon completion of the first generating unit would be unenforceable if such completion preceded the completion of the last financing transaction. The right granted to AEC under Section 7.07 to assign to TVA the right to power under the contract, and the rights and obligations of the parties in the event of cancellation of the contract during the construction period would all be meaningless if the contract were not to be effective during the construction period. During this period, the valuable right of the Government to recapture the plant under the provisions of Section 7.09 would be an illusory one. MVGC would not be bound by the many statutory and regulatory requirements, such as those contained in the Anti-Discrimination, Security and Eight-hour law provisions of the contract. Certainly, the parties could not have intended—and did not intend—that all of these provisions, so carefully negotiated to fix the rights and obligations of the parties during the construction period, were to have no force and effect until the last borrowed dollar had been paid over by the lending institutions.

\* \* \* \* \* \*

"It is my opinion that the conditions stated in Section 8.15 are conditions subsequent—such conditions that the non-occurrence of any one of them may excuse the parties from further performance of the contract. Thus, if it should develop at some future date that the Company was unable, after a reasonable time, to obtain the requisite regulatory approvals and debt financing, both parties would be relieved of liability on account of any failure to perform thereafter their contract obligations. The existence of these conditions subsequent imposes upon the parties certain obligations in the form of implied conditions of the contract. There is an implied obligation on both parties to proceed in good faith and with due diligence to perform such actions as may be required of the respective parties in order to permit the satisfaction of the conditions. AEC has satisfied its obligation in this respect by furnishing to MVGC the opinions referred to in Conditions (3) and (4). MVGC has proceeded with due diligence to take the necessary steps towards obtaining the required regulatory approvals and has executed the agreements for its debt financing.

"There is a further implied obligation of the parties in this situation to refrain from any action that would prevent the fulfillment of any

615

of the conditions subsequent. A party would not be relieved of its obligations under the contract due to the non-fulfillment of one of the conditions if the failure to fulfill the condition were due to its own action. If, for example, AEC were to repudiate the contract and, as a result of that repudiation, SEC failed to approve the MVGC debt financing, AEC could not assert that it was relieved of its obligations under the contract because of the non-fulfillment of Condition (1) of Section 8.15."

(b) Substantially the same conclusion was expressed in the Comptroller General's opinion (plaintiff's exhibit 96) sent to the AEC on July 29, 1955.

(c) In the brief which the United States filed as *amicus curiae* in the Court of Appeals before the contract was terminated (plaintiff's exhibit 28), there was a statement which is in accord with the material quoted in (a) above.

## VII. LACK OF MUTALITY DEFENSE

204. In this defense, which is set forth in paragraph 26 of defendant's answer, the defendant is relying upon the provisions of section 8.15 of the Power Contract. Aside from the provisions of the Power Contract (plaintiff's exhibit 1), no evidence was offered in support of this defense.

## VIII. DAMAGES

### A. *General*

205. The only provisions of the Power Contract relating to termination and cancellation are sections 7.02 and 7.07. The first of these, which is entitled "Termination", is applicable only after the commencement of commercial operation of the third unit of the plant, or 42 months after the effective date of the contract, whichever is earlier. Section 7.07 is entitled "Cancellation Prior to Completion" and provides in part as follows:

"1. If, prior to the commencement of commercial operation of the third unit of the Facilities, the power requirements of the AEC at the Projects are so reduced that it will no longer require service hereunder, the AEC may assign to TVA the right to power and energy hereunder in accordance with the terms hereof. Acceptance of such assignment by TVA and notice thereof to the Company by the AEC shall have the effect of the delivery of a notice of termination by the AEC at the earliest date possible under Section 7.02. If the AEC advises TVA that such assignment to it is available and ascertains that TVA has concluded that it does not need the power hereunder during the period which such assignment would cover, the AEC shall be entitled to cancel this contract by delivering a written notice of cancellation to the Company, and such notice shall have the effect set forth in paragraph 2 or paragraph 3 of this Section, whichever is applicable.

"2. If a notice referred to in paragraph 1 of this Section shall be delivered to the Company prior to the time when the Company shall have incurred expenditures on account of the cost of the Facilities as referred to in Section 4.02 which, together with the costs (estimated where necessary) of cancellation of commitments made in that connection, shall equal $40,000,000, this contract shall terminate on such date after the delivery of such notice as shall be specified therein. In such event, the AEC shall pay to the Company as cancellation costs such amount or amounts that there shall be available for distribution to the Sponsoring Companies net assets, including at cost to the Company land acquired for the site of the Facilities, equivalent to the investment of the Sponsoring Companies in the equity of the Company up to the effective date of such cancellation, after payment and satisfaction of all reasonable liabilities, costs, indebt-

edness, cancellation or revocation costs and damages, and all other reasonable costs, expenses, charges and losses resulting from such cancellation, including carrying charges on indebtedness of the Company to the earliest practicable date for the retirement thereof after the receipt of payment by the AEC under this paragraph, together with any premium payable upon the redemption of such indebtedness; and the AEC shall be entitled to, and shall remove from the site of the Facilities at its own cost and expense and within a reasonable time, all items of personal property theretofore acquired by the Company and not returned or returnable to a vendor in connection with the cancellation or revocation of a contract or commitment, and may remove from the site of the Facilities at its own cost and expense and within a reasonable time all items of property acquired by the Company which have been so attached to the land or any structure thereon as to become realty, provided any injury to the land caused by such removal shall be made good. The AEC shall have the right, in lieu of reimbursing the Company for cancellation charges or payments on any purchase contract or order, to take over such purchase contract or order upon the agreement by the AEC to assume all liabilities thereunder and hold the Company harmless therefrom. The AEC shall make payment of amounts payable hereunder from time to time and as soon as practicable to the end that the aggregate amounts payable by it hereunder shall be reduced so far as possible and the Company will undertake to cooperate with the AEC for that purpose."

206. In section 1.09 of the Power Contract, "Project" is defined to include an AEC installation at Oak Ridge, Paducah, or Portsmouth, or "any other installation for which it may become lawful for the AEC to receive electric utility service under this contract."

As previously stated, AEC has no installation at West Memphis, Arkansas, or in that area.

At the time the Power Contract was cancelled, there had been no reduction in the power requirements of AEC at its Oak Ridge, Paducah, or Portsmouth installations. Instead, AEC then needed additional power at its Oak Ridge installation. The defendant did not cancel the contract as a result of a reduction in AEC's requirements for power at any of its installations. It cancelled the contract when the city of Memphis decided to erect its own generating facilities and the defendant determined that it would have no need for the power to be generated by plaintiff's plant.

In the discussions between plaintiff's representatives and AEC after August 1, 1955, plaintiff's representatives took the position that the provisions of section 7.07 of the Power Contract applied to the cancellation. Plaintiff's representatives offered to waive that portion of section 7.07, which related to reductions in the power requirements of AEC, but the offer to waive was not accepted by AEC.

207. MVG was organized for the sole purpose of making the Power Contract and for constructing and operating the facilities provided for therein. Until the date of termination, MVG had engaged in no business other than that directly concerned with the Power Contract and the construction of the facilities contemplated in the contract.

Except for activities directly related to the cancellation of the contract and the prosecution of this action, the only business activity which MVG has engaged in since termination has been the renting of the plant site for farming purposes.

### B. *Mitigation of Damages*

208. When plaintiff learned by telephone on July 11, 1955, that the President had decided to order termination of the Power Contract, it immediately notified

Ebasco. On July 15, 1955, Ebasco was directed to stop all work on the project, to terminate all purchase orders, to cancel all contracts, and to transfer all personnel at the site except employees needed to shut down the job. On July 13, 1955, Ebasco discussed cancellation of purchase orders with the Westinghouse Electric Corporation and the Babcock & Wilcox Company. By July 30, 1955, all contracts at the site had been terminated and work on the major items of equipment had been suspended. The personnel at the site had been removed as rapidly as possible and the engineering work was terminated to the fullest extent practicable.

AEC did not give plaintiff formal notice of termination until August 1, 1955. Although there were some discussions about plaintiff's obligations to third parties and as to steps that could be taken to minimize the damages, the AEC representatives told plaintiff that AEC had received no directive as to post-termination activities and could not give plaintiff any instructions pertaining thereto. Plaintiff continued to keep AEC informed as to the steps it was taking to close out the project until AEC ended the post-termination discussions in October 1955. The evidence shows that plaintiff was diligent in its efforts to mitigate damages following defendant's termination of the contract.

209. Since the filing of the petition, the following claims described in paragraph 16 of the petition have been withdrawn without cost to either party:

| | |
|---|---|
| The Babcock & Wilcox Company | $204,216.40 |
| Bowers & Wood Manufacturing Co. | 15,978.72 |
| Elliott Company | 11,890.02 |
| Fisher Steel Corporation | 14,949.20 |
| The Griscom-Russell Company | 5,961.60 |
| Westinghouse Electric Corporation | 1,208,743.00 |
| Worthington Corporation | 6,613.92 |
| Total | 1,468,352.86 |

C. *The Claim of Dickmann-Pickens-Bond Construction Co.*

210. This claimant entered into a contract with Ebasco, as agent for plaintiff, for the furnishing, driving, and concreting of the concrete piles for the facilities to be constructed pursuant to the Power Contract at West Memphis. At the time of termination, the claimant had moved equipment to the site but had driven no piles. The parties have agreed that the sum of $14,553.03 is a fair and reasonable charge for the services performed, and that if the court determines that the defendant is liable on the merits and is obligated to reimburse plaintiff for the services of the claimant, judgment may be entered in the amount stated above.

D. *The Claim of Jackson Life Insurance Company*

211. This claim was settled by plaintiff. The amount of the settlement is included in plaintiff's claim and the facts pertaining thereto are set out in the findings relating to plaintiff's claim.

E. *The Claim of J. A. Jones Construction Company*

212. Pursuant to written contract entered into between Ebasco, as agent for MVG, and the J. A. Jones Construction Company, the claimant, its joint venturers and subcontractors, performed work at the site, including yard grading, embankment filling, the concreting of foundations, and related work. It has been stipulated that the fair and reasonable value of the work is the sum of $243,160.33, of which plaintiff has paid $100,000 that is now included in its claim. The parties have agreed that the unpaid balance of $143,160.33 includes an item of $11,027.79 due the Oman Construction Company for the rental of equipment, and that if judgment is entered for $143,160.33 on this claim, the $11,027.79 may be deducted for direct payment to Oman Construction Company.

F. *The Claim of Pandick Press, Inc.*

213. This claim is for the cost of printing documents for plaintiff. In

connection therewith, the parties have agreed that the categories of documents printed and the amounts which are the fair and reasonable costs of the services performed by the claimant as to each category are as follows:

| | |
|---|---|
| Contract Drafts | $17,412.97 |
| Corporate Organization | 300.96 |
| Financing | 16,170.84 |
| SEC Approval | 5,394.65 |
| Back-up and Surplus Power Agreement | 1,608.81 |
| Court of Appeals Proceedings | 2,450.53 |
| Total | 43,338.76 |

Plaintiff has paid $5,000 on account to the claimant, leaving a balance of $38,338.76 due. The $5,000 is included as a part of plaintiff's claim hereinafter set out.

Defendant reserved the right to contend that any or all of the work performed by the claimant is not a proper item of damage. The following is a brief summary of the facts relating to each category of printing:

(1) The item of $17,412.97 covers the cost of printing numerous copies of many drafts of the contract documents. As previously stated, nine separate proofs of the Power Contract were printed during the period of the negotiations. As a particular proof became unusable, it was mutually agreed that new proofs would be obtained. The number of copies to be printed was generally based on the number of copies requested by the AEC, since plaintiff's representatives did not use many copies.

(2) The item of $300.06 is for the cost of printing the articles of incorporation and the bylaws of plaintiff in connection with its corporate organization.

(3) The sum of $16,170.84 is the amount charged for printing the mortgage and deed of trust, the bond purchase agreement and the bank credit agreement. These costs were incurred in connection with the financing obtained by plaintiff from institutional investors and banks as referred to in section 8.15(2) of the Power Contract.

(4) The item of $5,394.65 covers the costs of printing various documents filed by plaintiff with the SEC in connection with its efforts to obtain SEC approval of its equity and debt financing pursuant to section 8.15(1) of the Power Contract.

(5) The sum of $1,608.81 represents the cost of printing the back-up and surplus power agreement which MVG was required by section 2.02 of the Power Contract to enter into with the eight subsidiaries of the sponsors.

(6) The item of $2,450.53 covers the cost of printing briefs and other documents filed in the Court of Appeals in connection with the appeal from the SEC order in the equity financing proceedings.

### G. The Claim of Reid & Priest

214. The claimant is a law firm which was retained by plaintiff about July 22, 1954, to render legal advice with respect to Federal, State, and local taxes, but the legal services were limited almost entirely to matters relating to Federal taxes. The services included consultation with officers of plaintiff regarding the tax consequences of the proposed power contract, analysis of the proposed contract in light of the provisions of the Internal Revenue Code, and tax advice regarding language to be included in the proposed contract. The firm also prepared and filed an application pursuant to section 4.09 of the Power Contract for a ruling from the Internal Revenue Service on the tax consequences of sinking fund depreciation with respect to the proposed West Memphis plant.

The parties have agreed that the sum of $6,500 is a fair and reasonable fee for

the services performed and that the firm incurred disbursements of $597.12. The parties have also stipulated that if the plaintiff is entitled to recover and that if defendant is obligated to reimburse plaintiff for claimant's services, judgment in the sum of $7,097.12 may be entered on this claim.

### H. *The Claim of House, Moses & Holmes*

215. This law firm, now known as House, Holmes, Roddy, Butler & Jewell, was retained shortly after plaintiff was incorporated under the laws of Arkansas on July 19, 1954, to represent plaintiff on legal matters in Arkansas. The firm rendered opinions as to plaintiff's legal status in Arkansas and obtained from the Arkansas Public Service Commission (a) a certificate of Public Convenience and Necessity, (b) authority for the issuance and sale of plaintiff's common stock, and (c) authority for plaintiff's debt financing. The firm also rendered an opinion as to plaintiff's liability under Arkansas tax laws.

The parties have agreed that if the court holds that defendant is liable and is obligated to reimburse plaintiff for the value of such service, a judgment in the sum of $7,500 may be entered on this claim.

### I. *The Claim of Arthur Andersen & Co.*

216. This firm was retained by plaintiff to render accounting services to it. The major categories of work performed, and the charges therefor, which are reasonable, were as follows:

(a) Assistance and consultation on accounting matters applicable to power contract with AEC ............. $ 3,635.71

(b) Preparation of projections of debt amortization, depreciation and income for statements used in application to Treasury Department ...................... 3,976.42

(c) Preparation of memorandum on accounting matters relating to power contract and discussion thereof with staff of FPC and AEC ......................... 329.29

(d) Review and consultation on accounting aspects of indenture, bond purchase agreement, bank credit agreement and supplementary agreement .............. 321.43

(e) Preliminary review of Ebasco charges, and review of final engineering and construction costs .......... 851.00

(f) Review and consultation on Ebasco's proposed construction estimating and cost control procedures ........ 1,253.14

(g) Preparation of various monthly reports of expenditures made and obligations incurred .................. 1,033.29

(h) Assistance in preparation of preliminary memorandum of accounting records, procedures and forms ...... 516.15

(i) Consultation and advice from time to time on miscellaneous accounting matters ..................... 332.14

(j) Examination of February 28, 1955, balance sheet required to be filed with bond purchasers under proposed bond purchase agreement .................. 617.43

(k) Review of proposed procedures for settlement of claims of contractors and venders in connection with cancellation of contract ............................. 3,442.57

(l) Miscellaneous and unclassified ..................... 295.43

TOTAL ....................................... 16,604.00

These services were performed, and disbursements were made during the following periods of time:

|  | Fee | Disbursements |
|---|---|---|
| July 26 through November 10, 1954 | $ 6,377.86 | $ 440.21 |
| November 11, 1954 through July 11, 1955 | 6,416.71 | 147.69 |
| July 12, 1955 through October 12, 1956 | 3,809.43 | 757.33 |
| TOTAL | 16,604.00 | 1,345.23 |

However, due to minor bookkeeping discrepancies, this firm billed plaintiff for a fee of only $16,425 and disbursements of $1,344.66. Plaintiff has paid $1,300 on the account and that payment is included in its claim. The payment reduces Arthur Andersen & Company's claim to the net amount of $16,469.66.

### J. The Claim of Middle South Utilities, Inc.

217. The claimant is one of two parent companies of the plaintiff. The parties have stipulated that the books of the claimant reflect an account receivable from the plaintiff in the amount of $4,651.86, consisting of the following:

| Expenses applicable to so-called equity proceedings before the SEC | $4,455.37 |
|---|---|
| Telephone toll calls | 160.16 |
| Express charges | 16.61 |
| Photoprints | 6.43 |
| Hotel expense | 13.29 |

The parties have also agreed that such charges are fair and reasonable for the articles purchased or the services performed. However, with respect to the first item of $4,455.37, it is the defendant's position that this amount is not a proper charge against either the plaintiff or the defendant. The disputed item of $4,455.37 includes the sum of $2,429.63 paid for three copies of the transcript of the SEC hearing on MVG's stock financing, and $2,025.37 paid for the printing of documents filed in the same SEC proceeding. One copy of the transcript referred to was for examination, study, and use by the officers and employees of plaintiff and of Middle South in Washington, D. C., during and after the pendency of proceedings before SEC; a second copy was for the examination, study, and use by the officers and employees of plaintiff and Middle South in New York, N. Y., during and after the pendency of the proceedings before SEC, and the third copy was for examination, study, and use by the law firm of Cahill, Gordon, Reindel & Ohl, which was counsel for plaintiff and for Middle South in the SEC proceedings. The sum of $1,619.75 of the amount paid for copies of the transcript was an unnecessary expenditure and is not a proper charge against either plaintiff or defendant.

The Power Contract recited that Middle South and Southern had caused MVG to be organized and had agreed to subscribe to and purchase its capital stock. As previously stated, section 8.15 of the Power Contract provided that the obligations of the parties thereunder were subject to the receipt of the regulatory approvals that were needed to permit plaintiff to issue and sell shares of its capital stock to Middle South and Southern. Middle South and Southern joined in the application filed by MVG in SEC,

because it was necessary under Section 10 of the Public Utility Holding Act of 1935 for Middle South and Southern, as holding companies, to obtain SEC authority to acquire the common stock of MVG.

### K. *The Claim of The Southern Company*

218. This claimant is the other parent company of plaintiff. The parties have stipulated that the books and records of Southern reflect an account receivable from plaintiff in the amount of $29,391.29, of which $6,095.43 represents amounts expended directly by Southern and the balance of $23,295.86 represents payments made by Southern to Southern Services, Inc., for professional services. It is also agreed that the amounts paid are fair and reasonable costs for the articles purchased and the services performed.

Southern's claim includes the following categories of expenditures:

| | |
|---|---|
| Cost of transcript of proceedings before Joint Committee on Atomic Energy | $1,643.20 |
| Cost of printing U-1 material to be filed with SEC re equity financing | 1,254.54 |
| Cost of transcript of oral argument before SEC | 133.41 |
| Cost of transcript of proceedings before SEC on equity financing | 2,420.40 |
| Cost of printing U-1 material to be filed with SEC re debt financing | 643.88 |
| Payments to Southern Services, Inc., for salaries, overhead and travel expenses of its personnel on the following categories of work: | |
| (a) Assistance in formulating the proposal of April 10, 1954 to AEC | 2,446.55 |
| (b) Assistance in negotiating the power contract | 2,999.28 |
| (c) Studies with respect to the integration of plaintiff's power facilities with the Southern system, as required by the power contract, and preparation for and presentation of evidence relating thereto at the SEC equity proceedings | 13,547.82 |
| (d) Study and advice in connection with plaintiff's proposed power arrangements with systems of the sponsoring companies as contemplated by Section 2.02 of the power contract | 650.45 |
| (e) Study and advice in connection with plaintiff's arrangements with Ebasco for engineering and construction services in relation to plaintiff's facilities | 1,934.42 |
| (f) Participation in work of joint AEC-TVA-MVG Committee for cooperation established for purposes of compliance with Section 2.03 and similar requirements of the power contract | 1,717.34 |

———◆———

Defendant contends that the first five items in the foregoing table represent costs incurred by Southern in seeking authority from SEC to acquire plaintiff's stock and that such expenditures are not a proper charge against either plaintiff or defendant. As stated in the preceding finding, Southern and Middle South joined plaintiff in the application filed with SEC in order to obtain approval for Middle South and Southern to purchase plaintiff's common stock, as re-

quired by Section 10 of the Public Utility Holding Act of 1935. The sums expended by Southern in the SEC proceeding include $3,808.35 paid directly by it, and $13,547.82 (item (c) in the table above), paid to Southern Services, Inc.

In addition to its general contention respecting Southern's expenses in the SEC stock proceeding, defendant takes the position that the amounts paid for a transcript of proceedings before the Joint Committee on Atomic Energy ($1,643.20), for a transcript of the oral argument before SEC ($133.41), and for a transcript of the equity proceedings before SEC ($2,420.40) were unnecessary and unreasonable. Three copies of each of the transcripts were purchased. One copy was for the use of Southern in New York where the chairman of the board had his office, one copy was for Southern's use in Birmingham, Alabama, where the chairman of the executive committee had his office, and the third copy was for the use of Southern's counsel, Winthrop, Stimson, Putnam & Roberts. The sum of $2,798.01 of the amount paid for copies of such transcripts was an unnecessary expenditure and is not a proper charge against either plaintiff or defendant.

Defendant denies liability for the remainder of the items listed in the table and which are amounts paid to Southern Services, Inc., on the ground that the interpretative memorandum entered into between plaintiff and AEC on November, 11, 1954, contained the following provision:

"Section 4.02. It is understood that the cost of the Facilities, as defined in the second sentence of this Section, shall not include any travel or similar expenses incurred by or salary paid to any officer or employee of Middle South Utilities, Inc. or The Southern Company in the preparation and presentation of the proposals made by the Company to AEC or in the negotiation of the Contract. The foregoing statement is not intended to create any implication as to the allowability or non-allowability of any other item of cost."

### L. The Claim of the Arkansas Power & Light Company

219. The claimant is a utility company which agreed with plaintiff to supply the temporary electric power and energy required during the construction of the plant at West Memphis. The claimant made expenditures in installing the electric facilities at the site and incurred costs in the removal of the facilities upon advice that the contract had been cancelled and that plaintiff had no need for the power. The parties have stipulated that if the court holds that plaintiff is entitled to recover on the claim, the amount of the recovery shall be the sum of $7,484.09.

Frequently, the Arkansas Power & Light Company builds temporary facilities to furnish power at a site during the construction of a plant. Generally, the company makes no charge for installing and removing the facilities but looks to the revenue derived from the sale of power for its profit on the transaction.

Sometime during June 1955, the president of the Arkansas Power & Light Company wrote plaintiff, offering to provide power on the basis of a stated minimum charge to be paid by plaintiff during the entire construction period. Plaintiff considered that the quoted minimum charge was too high, and Canaday telephoned claimant's president that the proposal was unacceptable to plaintiff. Thereupon, claimant's president replied that his company would proceed to erect the facilities and that the basis of its compensation could be worked out later. The Power Contract was terminated before an agreement as to the consideration to be paid the claimant was made. Thereafter, the Arkansas Power & Light Company submitted the above described claim to plaintiff.

### M. The Claims of The First National City Bank of New York and of White & Case

220. These claims are treated together, since the same facts pertain to each.

The bank had been selected as trustee in the proposed mortgage and deed of trust to be executed by plaintiff as security for the payment of its bonds. The mortgage and deed of trust was prepared, printed, and dated as of April 1, 1955, but it was never signed. Article 15, section 15.01 of the mortgage (plaintiff's exhibit 43, p. 137), provided that the trustee would receive reasonable compensation for all services rendered by it and that such compensation, plus reasonable compensation of the trustee's counsel and reasonable expenses incurred by the trustee, would be paid by plaintiff on demand from time to time as the services were rendered or the expenses incurred.

The services performed by the bank as prospective trustee included the review of various proofs of the proposed mortgage, the proposed bond purchase agreement, the proposed intercompany agreement, and the proposed bank credit agreement. The trustee also consulted with White & Case, its counsel, and studied the documents described above to determine whether they were administratively workable and were satisfactory from the standpoint of the trustee.

The law firm of White & Case, counsel for the trustee, reviewed the various proofs of the documents referred to in the preceding paragraph, as well as a draft of proposed excerpts from minutes of the meeting of plaintiff's stockholders and a draft of proposed excerpts from minutes of the meeting of plaintiff's board of directors. The firm also rendered advisory service to the trustee regarding these documents for the purpose of ascertaining that they afforded the customary protection to the trustee and would be satisfactory from its standpoint.

No written contract or other agreement was entered into between plaintiff and the trustee or between plaintiff and White & Case for the payment of the services included in these claims. However, since the mortgage and deed of trust provided for the payment of compensation to the trustee and to its counsel and since the services were rendered by both at plaintiff's request, plaintiff's position is that it is obligated to pay them. The parties have agreed that if the court determines that plaintiff is entitled to recover herein and is obligated to reimburse plaintiff for the services performed by the bank and by White & Case, judgment may be entered on the bank's claim in the amount of $500 and on the claim of White & Case for $500.

### N. The Claim of Mississippi Valley Generating Company

221. Plaintiff in its own right claims the sum of $618,674.85, consisting of the following major items:

Payment to Ebasco on 1954 billing ...... $216,559.47
Payment to Ebasco as agent for MVG ... 183,861.29
MVG charges ........................ 218,254.09

The claim has been audited, and it has been agreed that the amount stated above correctly reflects the entries on the books of MVG. However, MVG overpaid Ebasco's 1954 bill by the sum of $16.78, which is to be deducted from the claim.

### (a) Payment to Ebasco on 1954 Billing

222. Ebasco commenced working for plaintiff about March 1, 1954, under work orders. The working agreement between the parties was resolved into a written contract which became effective April 20, 1955. Ebasco performed many services for plaintiff and incurred a substantial amount of expenses in plaintiff's behalf before the MVG-Ebasco contract was effective.

223. On June 1, 1955, Ebasco submitted to plaintiff a bill for $216,559.47 covering Ebasco's services in the period from March through December 1954. Plaintiff paid the bill on June 8, 1955,

charging $208,845.63 thereof to an account entitled "Construction Work in Progress", and the balance of $7,713.84 to "Unamortized Debt Discount and Expense."

224. It is defendant's position that the amounts paid by plaintiff to Ebasco in 1954 do not represent the fair and reasonable value of the services performed and the costs incurred by Ebasco and that such charges were not necessary or proper for the performance of the contract.

225. With the exception of the amount of $7,713.84, the total charges paid by plaintiff to Ebasco in 1954 were incurred in the following months:

| | |
|---|---|
| March | $9,973.07 |
| April | 13,403.00 |
| May | 2,773.04 |
| June | 2,713.40 |
| July | 27,113.96 |
| August | 24,793.44 |
| September | 38,178.16 |
| October | 34,141.45 |
| November | 32,013.43 |
| December | 23,742.68 |

226. The services performed by Ebasco during the period from March through June 1954 consisted largely of preliminary engineering and the making of estimates for the facilities to be constructed under the Power Contract. As previously stated in finding 95, Ebasco furnished the basic estimates which were correlated by the engineers of the sponsors for the preparation of the proposal of April 10, 1954. The cost of such services is included in Ebasco's 1954 bill which was paid by plaintiff. Much of the information furnished by Ebasco for the preparation of the proposal was data of the kind that was ultimately needed for the construction of the contract facilities. Ebasco's records were not kept in such a way as to differentiate between its charges for services in preparing the data for the April 10 proposal and for similar information required in construction planning, but it is reasonable to conclude that Ebasco's charges for the month of March 1954 in the sum of $9,973.07 were primarily for service rendered in assisting the sponsors to prepare the proposal of April 10, 1954.

Prior to July 1, 1954, Ebasco's engineers traveled to Washington, D. C., for the purpose of providing information to representatives of the defendant and to the sponsors for a better understanding of the proposal of April 10, 1954. While an accurate determination of the cost of such services cannot be made from Ebasco's records, a fair and reasonable approximation thereof is the sum of $7,000.

227. After July 2, 1954, Ebasco's work on the engineering, design, and construction planning of the contract facilities proceeded at an accelerated rate, because of the target date for the completion of the first generating unit of the power plant. Much of this work was completed before the Power Contract was executed and included the conceptual design of the plant, surveys and subsurface exploration at the site, studies and consultations regarding the specifications for the major items of equipment, planning for subcontract work and for construction housing, discussions with Government and State engineers on the location of the plant, and other construction planning. The evidence shows that most of the services performed and expenses incurred by Ebasco from July 2 to November 10, 1954, related to the construction of the power plant and other facilities. However, the following services do not fall in that category:

(1) The charge of $7,713.84 (referred to in finding 223), covered the preparation by Ebasco of statements of anticipated operating results, cash flow statements, and other data for the consideration of the institutions which were to provide MVG's debt financing. In order to finance the construction and to avoid delays, it was necessary to anticipate the cash requirements and to make adequate provision for the same. The services of competent engineers were required for these purposes, and the evidence establishes that Ebasco's charge of $7,713.84 was a fair and reasonable amount for the work.

(2) During the negotiation of the Power Contract from July 1 through November 10, 1954, Seal of Ebasco participated in most of the negotiating sessions. His services were paid for by the sponsors and are not included in any claim in this action. In addition, Ebasco's engineers spent some time and travel in furnishing information needed by the negotiators, but the extent of Ebasco's charges for such work cannot be ascertained from the record.

(3) In December 1954, Ebasco's engineers rendered some services in preparing for and in testifying at the SEC equity proceedings. Here again, the charge for such services cannot be ascertained from the records.

228. Ebasco's charges for 1954 were incurred in the following periods and (exclusive of the audit adjustment of $16.78) in the following amounts:

| | |
|---|---|
| March to June | $ 28,862.51 |
| July to November 10 | 137,716.76 |
| November 11 to December 31 | 49,963.42 |
| Total | 216,542.69 |

(b) Ebasco, as Agent for MVG

229. Plaintiff's cost in this category amounted to $183,861.29, and the parties have agreed that this amount correctly reflects the entries appearing on plaintiff's books. The amount claimed represents out-of-pocket expenses which were incurred during the periods and in the amounts as follows:

| | |
|---|---|
| March 1 to November 10, 1954 | $ 54,847.01 |
| November 11 to December 31, 1954 | 8,804.79 |
| January to July 1955, inclusive | 112,457.64 |
| Subsequent to July 1955 | 7,751.85 |

Expenditures prior to November 11, 1954, represent field engineering work on land acquired under option in March 1954. The work consisted of field surveys, the drilling of test holes, soil testing, the grading of an access road, and other preparatory work which was necessary for the construction of the power plant and appurtenances. The defendant contends that it is not liable for the portion of such expenses that were incurred prior to November 11, 1954, the date the Power Contract was executed, and also claims two offsets.

For the first of these offsets, it is defendant's position that the highest and best use of the land acquired for the site of the plant is for industrial purposes and that the cost of the following described work, performed partly in 1954 and partly in 1955, is of permanent value to plaintiff:

| | |
|---|---|
| Field surveys—C. H. Bond Engineering Co. | $10,000.28 |
| Equipment rental for surveys | 1,456.25 |
| Water testing service | 202.48 |
| Automobile rental | 199.77 |
| Maps and engineering data | 39.42 |
| Test drilling for location survey—Ebasco | 3,367.13 |
| Borings—Eustis Engineering Co. | 44,015.08 |
| Borings—Eustic Engineering Co. | 2,577.00 |
| Soil testing—Barrow Agee Laboratories | 7,253.00 |
| Soil testing—Barrow Agee Laboratories | 1,851.66 |
| Test piles—Consolidated Contractors | 19,951.31 |
| Foundation consultant—Arthur Casagrande | 445.00 |
| Total | 91,358.38 |

Aside from the work done by plaintiff, the land has never been used for industrial purposes and is now operated as a farm. The area in which the work was performed was damaged for farming purposes, because the steel pipes that formed the test piles protrude from the ground and interfere with the plowing.

The total tract comprises about 600 acres and was first considered for purchase by the Mississippi Power & Light Company. The tract as a whole will fit into the long-time plans of Middle South. The value, if any, added to the land by the expenditures described above depends upon whether the land will be used for industrial purposes and particularly upon whether any plant erected thereon will be sufficiently similar to the MVG plant in type, size, and location that the data obtained can be used to decrease the costs of planning and construction. Such value, if any, is not presently determinable.

The second offset asserted against the claim in category (b) relates to the sale of certain capital assets. During 1955, Ebasco, as agent for plaintiff, acquired a number of capital assets for the construction work. The assets consisted of automobiles, prefabricated buildings, building supplies and equipment, and office supplies. The property was acquired at a total cost of $60,820.85 and was sold, largely during May and June of 1956, for a total of $35,642.06. The expenses of maintaining and disposing of the property amounted to $3,707.64, and the net amount realized was $31,934.42. The defendant asserts that if the property had been sold in 1955, it would have brought higher prices and that the cost of maintenance and sale would have been considerably reduced. In the post-termination discussions between plaintiff and AEC in July or August 1955, the AEC representatives directed plaintiff not to dispose of the above-described property, stating that it could be taken into the AEC stores in the event the parties were able to agree upon some basis of settlement. Plaintiff was not able to obtain specific directions from AEC about the disposition of the assets and the settlement discussions ended in October 1955. On November 23, 1955, plaintiff was advised that the defendant would not recognize any obligations of the contract. The evidence shows that that amount realized from the sales, as well as the expenses incurred in connection therewith, is fair and reasonable.

No other questions have been raised regarding the amount claimed in the category of "Ebasco as Agent for MVG."

## (c) MVG Charges

230. Plaintiff's claim under this heading amounts to $218,254.09 for expenses incurred during 1955, and the first classification under which these charges are grouped covers the following partial payments and payments on account:

| | |
|---|---|
| J. A. Jones Construction Company ........ | $100,025 |
| Pandick Press ......................... | 5,000 |
| Arthur Andersen & Co. ................. | 1,300 |
| Winthrop, Stimson, Putnam & Roberts .... | 4,000 |
| Ebasco .............................. | 16,000 |
| Cahill, Gordon, Reindel & Ohl ........... | 11,000 |
| Assignee of Jackson Life Insurance Company ........................... | 10,000 |
| Total ......................... | 147,325 |

It is conceded that the $100,000 paid to J. A. Jones Construction Company was a fair and reasonable payment, but defendant urges that the remaining $25 paid to that company was not a reasonable or necessary expense. After the termina-

tion of the Power Contract, one of Jones' subcontractors threatened to bring suit. In order to forestall this action and to allow time for further discussions with AEC, plaintiff and Jones entered into a written agreement, providing that neither Jones nor any of its subcontractors would sue plaintiff pending a final determination of its claim against defendant. The twenty-five dollars was paid as a consideration for the agreement.

On May 27, 1955, plaintiff entered into a contract with Jackson Life Insurance Company, one of the use-plaintiffs, for the purchase from the latter of "200,000 yards of sand, and as much sand in addition thereto, not to exceed 500,000 yards for the price of $0.10 per yard." Prior to the termination of the Power Contract, 19,978 yards of sand had been removed. Jackson Life Insurance Company insisted that it be paid for 200,000 yards of sand, and plaintiff's counsel advised that the insurance company's contention was valid. Thereafter, the assignee of Jackson Life Insurance Company filed suit against plaintiff to recover the sum of $18,002.20 representing the value of the 200,000 yards of sand, less the amount

previously paid for the sand already removed. Plaintiff settled the suit by an agreement of March 29, 1956, whereby plaintiff paid the assignee a cash consideration of $10,000, and plaintiff received a deed granting to it and its assigns the right, without further payment, to remove 100,000 yards of sand, dirt, or soil from the site at any time prior to March 26, 1966. Plaintiff has no need for the sand or other material, and there is no demand for it at the present time. However, considering the period of time allowed for the removal of material and the prospect of plaintiff's use or sale of some portion thereof, the fair and reasonable value of plaintiff's sand deed is the sum of $2,500.

With respect to the remaining items set forth in the table above (totaling $147,325), the parties have agreed that if judgments are rendered in behalf of such claimants and the judgments are reduced by the amount of the payments previously made by plaintiff, it is entitled to credit therefor.

The second group of claims in this category consists of the following:

| | |
|---|---|
| Organization expense | $ 1,836.33 |
| Capital stock expense | 945.55 |
| Unamortized debt discount and expense | 33,020.00 |
| Miscellaneous general administration expense | 35,127.21 |
| Total | 70,929.09 |

Plaintiff's organization expense consists of $1,201 spent for United States documentary tax stamps on 11,000 shares of its capital stock and the sum of $626.33 expended in connection with its organization as a corporation under the laws of Arkansas. Under the uniform system of accounts of the Federal Power Commission, these items are properly chargeable to organization expense, but the defendant contends that they do not constitute proper items of damage in this action.

The item of $945.55, also disputed by the defendant, represents plaintiff's share of the cost of printing a brief and other

documents filed by plaintiff in the Court of Appeals on the appeal from the SEC order in the equity proceedings.

In order to obtain the approval of the Arkansas Public Service Commission for the approval of plaintiff's bond issue and bank loans, plaintiff paid the State a fee of $33,000, plus $20 for certified copies required by the financial institutions which provided plaintiff's debt financing. Plaintiff's efforts to obtain a refund of the fee after the cancellation of the Power Contract were unsuccessful. Defendant denies that this expense is a proper item of damage.

Liability for the payment of the claim for general administrative expense in the amount of $35,127.20 is disputed to the extent of $27,500. This amount represents interest at the rate of six percent per annum that was charged to construction on the $1,100,000 paid to plaintiff by the sponsors for its capital stock. The claim is for the period from February 11, 1955, when the stock was sold, until July 11, 1955, when the Power Contract was terminated. Section 4.02 of the Power Contract states that the elements of cost included in the term "construction" shall be determined in accordance with the uniform system of accounts of the Federal Power Commission and that system provides for an interest charge on equity capital during the period of construction. Section 4.02 of the interpretative memorandum provides in part:

"In computing the Interest during Construction component of the cost of the Facilities the rate of return on equity capital is not to exceed 6%."

### O. The Claim of Ebasco Services, Inc.

231. Ebasco's claim is for its services and expenses for the year 1955, its charges for the year 1954 having been paid by plaintiff and included in plaintiff's claim as shown in preceding findings. The original claim was in the amount of $589,430.76, but it has been reduced to $570,727.59, as a result of a payment of $16,000 on account by plaintiff (now included in plaintiff's claim), by various credits, audit adjustments, and a waiver. The original claim included the sum of $546,328.14 for services and expenses during the period from January through July 1955, and $43,102.62 for services and expenses from August through November 1955 in connection with activities following the termination of the Power Contract. With allowances for the adjustments and credits above referred to, there is no question regarding the accuracy of the claim. The following findings relate to those portions of the claim which are disputed by defendant.

(1) Ebasco's claim for the period from January through July 1955 is based upon its written contract with plaintiff, which became effective April 20, 1955. Prior to the execution of the contract, plaintiff submitted the contract to AEC and received its approval of Ebasco as architect-engineer on the project. The contract provided that Ebasco was to be reimbursed for its costs, except for certain costs which were to be absorbed by it, and also provided that Ebasco would receive a fixed fee of $1,800,000 to be paid as follows: 18 monthly installments of $60,000, beginning with the first full month of the contract period, 16 monthly installments of $30,000 thereafter, and the balance of the fee to be considered as retentions payable upon completion of the work. In the event the contract was terminated by MVG, Ebasco was to be paid its costs and the fee earned up to and including the month in which the termination occurred "plus the proportional part of all retentions." Ebasco's claim includes a fee in the amount of $180,000, which defendant contends is excessive and unreasonable.

Under the terms of its contract with plaintiff, Ebasco is due a fee of $180,000 for its services during May, June, and July 1955. The portion of Ebasco's fee that was retained was $160,000, which is 8.89 percent of the total fee payable, or 9.75 percent of the aggregate of the monthly payments. The proportional part of the retention that is applicable to the $180,000 of accrued monthly payments is 9.75 percent or $17,560. However, Ebasco has made no claim for the proportional part of the retentions. Ebasco absorbed $106,162.12 of the costs it incurred under its contract with plaintiff. It also expended $2,200 in preparing material which plaintiff submitted to AEC in justification of the employment of Ebasco. Since the fee payments did not begin under the contract at the time Ebasco started working for MVG, the accumulated payments were lower in proportion to the total fee than the percentage of services rendered at that time by Ebasco to the total services required.

The record as a whole establishes that the fee claimed by Ebasco is fair and reasonable.

(2) After the termination of the Power Contract, an AEC staff auditor tabulated certain salary payments which the defendant claims Ebasco was obligated to absorb under the terms of the MVG-Ebasco contract. The payments include the sum of $3,239.15 which the auditor listed under the heading of "Construction Management", $115.28 listed under the heading of "Insurance Department", and $3,661.42 listed under the heading of "Washington Office."

Sections V(h) and (k) of the MVG-Ebasco contract required Ebasco to absorb the costs of the services of its New York office construction staff and the services of a construction manager, who was to organize the field office staff and exercise general supervision over the project. The evidence does not show that Ebasco was not required by its contract to absorb the $3,239.15 paid for such services.

Under its contract, Ebasco was required to absorb the services of its New York insurance personnel in connection with all insurance coverages relating to the work, but the evidence shows that the $115.28 was compensation paid to design engineers for time spent in consulting with insurance engineers for recommendation as to the location of equipment for the purpose of avoiding fire hazards. The amount was not paid to insurance engineers for handling insurance coverages.

The item of $3,661.42 represents salaries paid to Ebasco's employees in Washington, D. C. It was deducted from Ebasco's claim by the AEC auditor on the basis of a statement made to him by an Ebasco official to the effect that part of the amount was for clerical and staff assistance rendered to the sponsors during the preparation of the April 10, 1954, proposal and that the remainder was paid to Ebasco employees during May, June, and July 1955, when they were engaged in obtaining priorities and permits from various Government agencies in connection with the construction of the plant.

The auditor made no segregation of the payments between the two types of services, but we have concluded that approximately $2,161 consists of Ebasco's charge for services rendered in connection with the preparation of the April 10 proposal and is included in the expenditures for this purpose as shown in finding 226. As to the remaining $1,500.42, which was charged for services rendered in obtaining priorities and permits from various Government agencies in connection with the construction of the plant, plaintiff has failed to establish that the cost of these charges was not to be absorbed under the terms of the contract between plaintiff and Ebasco.

(3) The defendant's AEC auditor prepared a statement of Ebasco's overhead charges for the months of May and June 1955, including $32,098.44 for May and $32,644.79 for June. These sums amounted to about 10 percent of Ebasco's overhead on all work during these months, and the defendant contends that such charges are not related to Ebasco's contract and that their elimination would reduce the claim of $16,600. Ebasco's direct and indirect costs are determined in accordance with an accounting system submitted to and approved by the SEC. The overhead is accumulated under six general categories, and through an elaborate system of calculations, monthly rates are arrived at and apportioned to direct labor costs. The evidence shows that there is no improper allocation of overhead in Ebasco's claim with the exception of the three following accounts:

| | 1955 | |
| --- | --- | --- |
| | *May* | *June* |
| Excess of termin. reserve accrual over actual | $1,872.08 | $2,622.00 |
| Accrual for additional legal services | 2,000.00 | 2,000.00 |
| Accrual of machine accounting installation costs | 1,250.00 | 1,550.00 |

Plaintiff has not proved whether these items represent true liabilities or are mere estimates. Accordingly, it is reasonable to exclude them from the overhead base used in making allocations to MVG work and such exclusion results in a reduction of approximately $960 in Ebasco's claim.

(4) Included in Ebasco's claim for the period prior to July 31, 1955, is the sum of $281.70, which represents compensation paid to Ebasco's engineers for planning the facilities and space that would be required for the accounting organization of plaintiff in the operation of the generating plant at West Memphis. Although a separate work order was issued for such work under date of May 23, 1955, the work order was for the type of engineering work required by the MVG-Ebasco contract, and the order stated that Ebasco was to be reimbursed for the costs pursuant to Section VIII of that contract.

Also included in Ebasco's claim for the period before July 31, 1955, is the sum of $8,476.67 for services paid to Ebasco's personnel for the preparation of data required by the institutional investors in connection with the bond purchase and bank credit agreements, as well as for the draft of the mortgage. The data included a preliminary estimate of the results of operating the plant and other details. The record shows that the life insurance companies which purchased plaintiff's bonds relied in part on Ebasco's report in making the commitment to buy the bonds. The services rendered were not specifically provided for in the MVG–Ebasco contract but were performed under a work order dated May 23, 1955, stating that the costs were to be reimbursed pursuant to Section VIII of the MVG-Ebasco contract.

Defendant contends that neither of the above items is a proper item of damage.

(5) For its services during the period from August through November 1955, Ebasco did not charge on the basis provided for in its contract with plaintiff. Ebasco considered that the contract was terminated because of the termination of the Power Contract. Therefore, Ebasco billed plaintiff for the services of designers and draftsmen at twice their rate of compensation and for the services of engineers and other technical personnel at 2½ times their rate of compensation, plus social security taxes. These were the customary per diem rates charged by Ebasco. The total charge includes $35,666.31 for personal services and $7,393.74 for out-of-pocket expenses. Defendant contends that since the MVG-Ebasco contract provided that Ebasco's overhead would be limited to a charge of 65 percent of total salary compensation, the above claim should not exceed the sum of $35,120.65. However, had Ebasco rendered bills to plaintiff in accordance with the terms of its contract after July 31, 1955, Ebasco would have been entitled to receive the monthly installments of its fee, plus a proportion of the retained fee, plus its expenses and overhead, less the costs it was required to absorb under the language of the contract. The evidence shows that the amount claimed is fair and reasonable.

(6) Ebasco's claim includes a relatively small amount for the services of its engineers in preparing for and testifying at the hearings held before the SEC and the Arkansas Public Service Commission in 1955 in connection with plaintiff's applications to those agencies. The records in evidence do not establish the amount charged for such purposes in 1955.

(7) When plaintiff notified Ebasco on July 1, 1955, to terminate work on the project, Ebasco did so as expeditiously as possible. However, in view of AEC's failure to give plaintiff instructions on post-termination activities and the possibility that Ebasco might be required to continue with the work, it completed the partially finished design drawings of the plant. Ebasco has retained the original tracings, one copy of each drawing, copies of engineering studies on the project, and copies of various specifications it prepared. The defendant contends that these records are of value to Ebasco and that the claim should be re-

duced by an amount equal to 10 percent of the cost of Ebasco's preliminary and design engineering from July 1, 1954, through July 1, 1955. The evidence does not establish that the drawings, studies, or specifications would be used by Ebasco on any other jobs, that they would be used for reference purposes, or that they have any value to Ebasco.

### P. *The Claims of Cahill-Gordon, Winthrop-Stimson, Willkie-Owen, and Milbank-Tweed*

232. The petition includes claims in behalf of four other New York City law firms. They are Cahill, Gordon, Reindel & Ohl (hereinafter called Cahill-Gordon), Winthrop, Stimson, Putnam & Roberts (hereinafter called Winthrop-Stimson), Willkie, Owen, Farr, Gallagher & Walton (hereinafter called Willkie-Owen), and Milbank, Tweed, Hope & Hadley (hereinafter called Milbank-Tweed).

Since Cahill-Gordon and Winthrop-Stimson both represented plaintiff and since other pertinent facts are applicable to the claims of each of the four firms, the claims will be considered together.

### (a) The Claim of Cahill, Gordon, Reindel & Ohl

233. The claim of this law firm is in the amount of $246,198.76. It covers a period from February 22, 1954 through November 29, 1955. Of the amount claimed, $235,000 is for services rendered, and $11,198.76 is for out-of-pocket disbursements in connection with such services. Plaintiff has paid $11,000 of such disbursements, leaving a net claim of $235,198.76.

234. Cahill-Gordon is and has been general counsel for Middle South and for MVG since it was incorporated on July 19, 1954. Before that date and commencing on February 22, 1954, the firm rendered services and gave advice in connection with various matters for the account and benefit of the proposed new corporation that was later organized as MVG.

The services of the firm were rendered in close cooperation with Winthrop-Stimson, general counsel for Southern. The services of Cahill-Gordon are fully described in plaintiff's exhibit 109 and defendant's exhibit 259. The following is a summary of the principal services performed by the firm during the four periods mentioned below:

### (1) *February 22 through April 10, 1954*

Beginning on February 22, 1954, the firm assisted in drafting the sponsors' proposal of February 25, 1954, and considered various legal problems that the project would create with respect to Middle South and Southern, and the relationships among the companies in their systems and with MVG. The first proposal was prepared and submitted under great pressure, because of the insistence of the Budget Bureau on the need for speed. Cahill-Gordon participated in the review of the first proposal, and assisted in the drafting of the proposal of April 10, 1954. In the period between the two proposals, the attorneys conferred with representatives of the sponsors and the companies in their systems in an effort to work out appropriate intercompany relationships.

The hours of work spent by Cahill-Gordon on the above-described matters during the first period amount to 155.

### (2) *April 11 through June 24, 1954*

In the three months' interval after the filing of the April 10 proposal, Cahill-Gordon worked on and gave attention to proposed amendments to the Atomic Energy Act, to preliminary matters relating to the organization and incorporation of MVG, and to the various Federal and State regulatory proceedings that would have to be conducted in the event a contract was entered into with the Government. The firm also reviewed AEC's contracts with EEI and OVEC, and thereafter prepared the first draft of the proposed power contract, proofs of which were distributed to the sponsors. These activities required 152 hours of work by claimant during the interim period.

### (3) *July 3 through November 11, 1954*

The proof of the Power Contract prepared by Cahill-Gordon formed the basis for the first negotiation session held with AEC on July 7, 1954. Thereafter, the Cahill-Gordon partner in charge of the work on the project attended 17 sessions at the AEC office in Washington, D. C., and presided over the MVG group during the meetings with AEC. The negotiations were arduous because of the complexity of the subject matter, the various changes proposed by the defendant from time to time, amendments to the Atomic Energy Act during the same period, the great public interest in the project, and the criticism and attacks directed against it. The partner in charge had to do this work away from his home office. The daily sessions often lasted for 10 hours or more, and the attorney worked many nights and on Sundays.

While the contract was being negotiated, an attorney from the firm attended sessions of the Joint Committee on Atomic Energy and helped MVG officers prepare for public hearings, although they were not called to testify.

Cahill-Gordon also participated in the revision of the draft of the interim power agreement, prepared by Winthrop-Stimson. This work culminated in the letter agreement of November 11, 1954.

During the same period, Cahill-Gordon began work in New York on the stock financing documents and prepared a draft of an application to SEC, requesting authority for the issuance and sale of plaintiff's stock. As previously stated, the application was filed in SEC on November 17, 1954.

As early as May 1954, Cahill-Gordon conferred with plaintiff and its financial agents regarding plaintiff's debt financing and studied the memorandum outlining the basic terms of the proposed financing. In August and September, Cahill-Gordon prepared the first drafts of the bond purchase agreement, including the mortgage, and the bank credit agreement. The bond purchase agreement, when completed, was a document of 15 printed pages with an attached inercompany agreement of 7 pages, and a mortgage of 187 printed pages. The bank credit agreement contained 16 printed pages and had attached thereto various documents, including a form of note and a form of an opinion to be given by the counsel for the banks. Although Cahill-Gordon was assisted in this work by the opinions and suggestions of other counsel, the firm retained primary responsibility for the drafting of the financing documents and for clearing changes and additions thereto.

The firm also devoted some time to the preparation and revision of the articles of incorporation and bylaws of MVG.

During the period stated, the firm's records show that it spent 1095.50 hours on the various matters outlined above.

### (4) *November 11, 1954 through July 10, 1955*

During this period, the firm devoted a total of 3,486.25 hours to a variety of matters, including MVG's stock financing, purchase of MVG stock by Middle South, bond financing, bank financing, and regulatory approvals related to these matters.

The application relating to MVG's stock was vigorously contested in the SEC by the State of Tennessee and the Light, Gas and Water Division of the City of Memphis. Cahill-Gordon, with Winthrop-Stimson, prepared an answer to the motion of the State of Tennessee, et al., to intervene in the proceedings, participated as counsel in the SEC hearings, and filed proposed findings of fact and a reply brief. The Cahill-Gordon partner presented oral argument on behalf of MVG and Middle South. After the SEC order was appealed to the United States Court of Appeals for the District of Columbia, the two firms filed a petition to intervene on behalf of Middle South and Southern, a motion to dismiss the petition for review, an answer, a brief and reply brief. They also argued the question on the merits and, after the

case was remanded to SEC because of the termination of the Power Contract, the two firms filed in the SEC an amendment to the application, calling attention to the termination of the Power Contract.

During this same period, the firm completed the drafting and negotiation of the various documents required in connection with MVG's bond and bank financing. The work was difficult and time-consuming because of the complexity of the documents and the fact that the positions of the secured and unsecured creditors were more opposed than in the usual situation. As already stated, both sets of lending documents were signed in April 1955. Negotiation was delayed and rendered more difficult because of the recapture provision in section 7.09 of the Power Contract, which was not agreed upon until near the end of the negotiations between AEC and MVG. The firm was called upon to prepare and submit to the lenders legal opinions as to the validity of the bond purchase and bank credit agreements, the Power Contract, and the intercompany agreement.

Cahill-Gordon also drafted the back-up and surplus power agreement required by section 2.02 of the contract and had it in final form at the time the contract was cancelled by the defendant.

In connection with the approvals required to be obtained from the Arkansas Public Service Commission, Cahill-Gordon cleared with local attorneys as to the content of the documents filed in Arkansas and had a senior associate present at the hearings in that State.

Cahill-Gordon, with the assistance of Winthrop-Stimson, prepared the application filed in SEC for authorization of plaintiff's debt financing and participated in the SEC hearings in which MVG was opposed by the same parties who intervened in the equity proceedings. The two law firms filed a brief, proposed findings of fact and conclusions, but before any action was taken by SEC, the Power Contract was terminated.

Other activities in which representatives of the firm were engaged during this period consisted of advice given to plaintiff regarding the retention of Ebasco as architect-engineer, the filing of applications with the Federal Power Commission on behalf of officers of MVG and Middle South, and legal services related to the laying of the transmission lines of the MVG plant across the Mississippi River.

### (5) *July 12, 1955 through November 29, 1955*

After the defendant gave notice that the contract would be terminated, the firm assisted MVG with the grave legal and practical problems arising out of its commitments and obligations for the projected power plant. Cahill-Gordon gave advice and assistance regarding arrangements for terminating the various purchase orders and subcontracts at the least possible cost, attended conferences with AEC in an effort to agree upon cancellation costs, rendering an opinion upon the conflict of interest question raised by the AEC, and counseled MVG on how to mitigate the damages sustained by various claimants.

Cahill-Gordon, with the assistance of Winthrop-Stimson, also prepared and filed the petition in this court. Of the total of 623.25 hours of service recorded by Cahill-Gordon during this period, approximately 63½ hours were devoted to the preparation of the plaintiff's petition in this case and to other work directly related thereto.

The records of Cahill-Gordon show recorded time of 5,512 hours in performing the services covered by its claim. Approximately 40 percent of this total were hours spent by partners and 60 percent were hours spent by associates, principally senior associates. Although the services were not charged for on an hourly basis, Cahill-Gordon's average hourly charge amounted to $42.63.

Under a tentative arrangement made for bookkeeping purposes, the hours devoted to services rendered were charged to five separate accounts. The distribu-

tion of such hours among the several accounts throughout the five periods referred to above is shown in the following table:

| Accounts | Hours of services by periods | | | | | |
|---|---|---|---|---|---|---|
| | Feb. 22 through Apr. 10, 1954 | Apr. 11 through June 24, 1954 | July 3 through Nov. 11, 1954 | Nov. 11, 1954, through July 10, 1955 | July 12 through Nov. 29, 1955 | Total |
| MVG General | 155 | 116.25 | 882.00 | 448.25 | 617.50 | 2,219.00 |
| Bond financing | | 35.75 | 166.25 | 822.50 | 2.50 | 1,027.00 |
| Common stock financing | | | 7.25 | 1,069.00 | .50 | 1,076.75 |
| Middle South stock financing | | | | 678.00 | .25 | 678.25 |
| Bank financing | | | 40.00 | 468.50 | 2.50 | 511.00 |
| Total | 155 | 152.00 | 1,095.50 | 3,486.25 | 623.25 | 5,512.00 |

While an exact computation cannot be made, a reasonably correct determination shows that the amount claimed in behalf of Cahill-Gordon includes $2,707.01 for preparing the petition in this case.

235. Sometime prior to the execution of the Power Contract, there was a tentative understanding among plaintiff, the sponsors, Cahill-Gordon, and Winthrop-Stimson that a portion of the charges for the services of the two law firms would be paid for by the sponsors on the theory that they would have an investment in MVG and that the investment would be of value to them. The result of this temporary arrangement would have been to allocate approximately 24 percent of Cahill-Gordon's charges to Middle South, and 40 percent of Winthrop-Stimson's charges to Southern. The understanding was reached at a time when there was no thought that defendant would terminate the Power Contract. After the sponsors' investment had been converted from an apparent asset to a liability by the cancellation of that contract, the temporary arrangement was abandoned and the total charges claimed by the two firms in this action were charged to plaintiff on the premise that all of such legal services had been rendered in aid of enabling MVG to obtain and carry out the Power Contract and, therefore, that the expenses should be borne by plaintiff. The sponsors also considered that this action was proper because of their opinion that

the provisions of section 7.07 of the Power Contract contemplated that they would be made whole if the contract was cancelled.

(b) The Claim of Winthrop, Stimson, Putnam & Roberts

236. The claim of this law firm is for $108,128.67. It covers the period from February 5, 1954 through November 29, 1955, in which there were 2,785.43 hours of service charged on the firm's books. Of the amount claimed, $104,000 is for service rendered, and $4,128.67 is for out-of-pocket expenses. Plaintiff has paid $4,000 of these expenses, thereby reducing the net claim of the firm to the sum of $104,128.67. Winthrop-Stimson has been counsel for Southern for many years and joined with Cahill-Gordon in representing plaintiff.

A complete statement of the nature of the services rendered by Winthrop-Stimson during the time pertinent to the claim appears in plaintiff's exhibit 110 and defendant's exhibit 260. As stated, Winthrop-Stimson participated with Cahill-Gordon in rendering the services described in finding 234 (1–5). Therefore, except as otherwise indicated by the context, the facts set forth in finding 234 (1–5) and finding 235 are applicable to the claim of Winthrop-Stimson. In addition, Winthrop-Stimson prepared the initial draft of the intercompany agreement, prepared and furnished to AEC an

opinion showing that Southern and its subsidiaries were authorized to engage in the undertakings required by the Power Contract, performed extensive research regarding the effect of the Public Utility Holding Act of 1935 on the arrangements contemplated by the Power Contract, and dealt exhaustively with one of the legal problems presented in the SEC proceedings, namely, a showing that MVG's plant was capable of economical and efficient operation as a part of Southern's integrated system within the standards of the Public Utility Holding Act. Although Cahill-Gordon prepared the first drafts of many of the documents described in finding 234, Winthrop-Stimson not only reviewed the drafts but did research on the legal questions involved, submitted memoranda pertaining thereto, and prepared appropriate revisions to be incorporated in the final drafts of such documents.

237. The records of Winthrop-Stimson show recorded time of 2,785.43 hours for the period covered by its claim. Of the total hours of service, 1,503.59 hours were spent by partners and 1,281.84 were spent by associates. The average charge per hour was $37.82.

The following table shows the six classifications to which the services were charged during the periods stated:

| Classifications | Hours of services by periods | | | | |
|---|---|---|---|---|---|
| | Feb. 5 to June 30, 1954 | July 2 to Nov. 10, 1954 | Nov. 11, 1954, to July 11, 1955 | July 12 to Nov. 29, 1955 | Total hours |
| Southern Co., general Re: MVG | 203.25 | 453.75 | 18.00 | .............. | 675.00 |
| SEC hearings | .............. | 167.25 | 824.75 | .............. | 992.00 |
| Appeal from SEC order | .............. | .............. | 382.18 | 8.75 | 390.93 |
| Debt financing | .............. | .............. | 366.00 | .............. | 366.00 |
| Power contract | .............. | .............. | 14.00 | .............. | 14.00 |
| Termination of power contract | .............. | .............. | .............. | 347.50 | 347.50 |
| Total hours by periods | 203.25 | 621.00 | 1,604.93 | 356.25 | 2,785.43 |

During the first period covered by the foregoing table, Winthrop-Stimson spent 15 hours in the preparation of a proposal, which was submitted by Southern to TVA on February 9, 1954.

In November 1955, the firm devoted approximately 7 hours in assisting Cahill-Gordon in the preparation of the petition filed in this suit.

238. There was some duplication in the services rendered by Cahill-Gordon and by Winthrop-Stimson during the period covered by the claims of the two firms. Since the proposed power plant involved relationships among MVG, Southern, and the subsidiaries of the Southern system, Southern requested that its counsel, Winthrop-Stimson, participate with Cahill-Gordon in the joint enterprise of the sponsors. It was defendant's wish that more than one sponsoring company participate in the proposal. In view of the intercompany arrangements contemplated by the Power Contract, the obligations assumed by Southern and its subsidiaries, and the magnitude and complexity of the resulting legal problems, Southern's request was reasonable. Moreover, in view of its acquaintance and relationship with Southern and its subsidiaries, Winthrop-Stimson was in the best position to facilitate the power arrangements between MVG and Southern's subsidiaries.

Although records are not available for exact computations, a reasonably correct determination shows that the amount claimed in behalf of Winthrop-Stimson includes $567.30 for 15 hours spent in preparing a proposal from Southern to TVA, and the sum of $264.74 for 7 hours spent in drafting plaintiff's petition.

## (c) The Claim of Willkie, Owen, Farr, Gallagher & Walton

239. The claim of this law firm is in the amount of $75,787.85, of which $75,-000 is for services rendered, and $787.85 is for disbursements. The firm was retained on or about August 16, 1954, to act as special counsel for the Metropolitan Life Insurance Company and New York Life Insurance Company in connection with their respective commitments to purchase an aggregate principal amount of not to exceed $92,914,000 of plaintiff's first mortgage bonds. By the terms of section 9.06 of the bond purchase agreement, plaintiff became obligated to pay the reasonable fees and disbursements of Willkie-Owen, whether or not the transactions contemplated in the agreements were consummated.

240. A complete statement of Willkie-Owen's services appears in plaintiff's exhibit 107 and defendant's exhibit 257. The following is a summary of the matters set forth in the exhibits:

Since the Power Contract was to be assigned as security for the payment of bonds, Willkie-Owen studied the memoranda describing plaintiff's proposed debt financing and examined all aspects of the Power Contract, including the provisions of the Atomic Energy Act of 1954 and the action to be taken by certain governmental agencies pursuant to the terms of the Power Contract. This was done in August 1954 in order to advise the insurance companies of the basic problems involved in the financing. During September, October, and early November, Willkie-Owen examined and revised the drafts of the proposed bond purchase agreements, the subscription agreements, the intercompany agreement, and the mortgage and deed of trust. The firm's progress on these matters was directly affected by the negotiation of the Power Contract and particularly by the inclusion in the final draft of that contract of a provision giving the Government the right to recapture the power plant and other facilities. This development was of particular concern to the bond purchasers and much time was required in working out a solution that was satisfactory.

In the interest of the bond purchasers, Willkie-Owen studied the reported proceedings of the Joint Committee on Atomic Energy and the subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee.

In December 1954, the firm prepared for the bond purchasers a list of 34 substantive matters disclosed by a review of the financing documents and the Power Contract. After extended discussion, agreement was achieved between plaintiff and the bond purchasers on these and additional matters.

Willkie-Owen gave attention to the SEC hearings, particularly to the position taken by the State of Tennessee and others regarding the validity of the Power Contract.

During January and February 1955, Willkie-Owen attended conferences between plaintiff and the bond purchasers, as a result of which a business understanding was reached. Thereafter, the firm began a detailed step-by-step revision of the bond purchase agreements, the intercompany agreement, and the mortgage. From February 15 to March 24, 1955, the law firm worked under continuous pressure in order to get the financing documents in final form as soon as possible and thus enable plaintiff to file its application for SEC approval of the debt financing.

From February 1, 1955, until the bond purchase agreements were signed on April 21, 1955, Willkie-Owen devoted a substantial amount of time in determining whether and to what extent the interests of the bond purchasers were affected by the resolution of rescission of the Joint Committee on Atomic Energy, by a letter from the Chairman of the Joint Committee to the effect that the bonds were not legal investments, and by the appeal from the SEC equity proceedings.

Willkie-Owen reviewed plaintiff's application for SEC approval of the debt

financing and advised the officials of the insurance companies regarding the testimony to be given by them in that proceeding. Late in June 1955, the firm rendered a formal opinion on new legal questions raised by one of the bond purchasers.

After June 1955, the firm's services were largely devoted to reviewing the SEC proceedings relating to plaintiff's debt financing and to the consideration of questions raised by the cancellation of the Power Contract. At the time of borrowing under the bank credit agreement and at the first closing of the bond purchase agreement, Willkie-Owen would have been required to render opinions covering almost every phase of the transaction in which the bond purchasers were interested. Since the Power Contract was cancelled, Willkie-Owen was never in fact called upon to submit these opinions, but the form and substance had to be agreed upon and the exact language had to be prepared and attached to the bond purchase agreements. Therefore, the firm had to make a complete examination of the legal questions involved before the execution of the bond purchase agreements in order to determine whether or not the firm could give the opinions required by the bond purchasers.

In performing the legal services described, a total of 1,792¾ hours were spent by Willkie-Owen, of which 837¾ hours were spent by partners, and 955 hours were spent by associates. The records of the firm show that the time was spent as follows: 335 hours between August 16 and November 11, 1954, when the Power Contract was signed; 1,185¾ hours from November 11, 1954 to April 21, 1955, when the bond purchase agreements were signed; 252½ hours between that date and July 11, 1955, when the Power Contract was cancelled, and 19½ hours thereafter. Of the total time spent, 1,753¾ hours were devoted to the bond purchase agreements, 29 hours to the SEC hearings, and 10 hours to other matters. The average hourly charge for Willkie-Owen's services was $41.84.

### (d) The Claim of Milbank, Tweed, Hope & Hadley

241. The claim of this law firm is in the amount of $15,000 for services rendered over a period of 15 months, from August 10, 1954 to December 5, 1955. The firm was retained as special counsel for The Chase Manhattan Bank and 23 other participating banks in connection with the commitments of the banks to lend plaintiff up to $27,086,000, pursuant to a bank credit agreement dated and executed April 21, 1955. Under section 9.04 of the agreement, plaintiff became obligated to pay the reasonable fees and disbursements of Milbank-Tweed whether or not the transactions contemplated were consummated.

242. A complete description of the services rendered by Milbank-Tweed is contained in plaintiff's exhibit 108 and defendant's exhibit 258. The principal services rendered were:

(1) Participation in the drafting and negotiation of the bank credit agreement and the related intercompany agreement, including attendance at the numerous conferences incident thereto.

(2) Study and analysis of the Power Contract and related documents, the bond purchase agreement, and the mortgage securing the bonds, and advice to the banks concerning the validity and enforceability of these documents.

(3) The drafting of instruments evidencing the corporate proceedings required to authorize the bank loans, and the preparation of an opinion to be furnished by the firm pursuant to the bank credit agreement.

(4) Consultation with plaintiff regarding the proceedings before SEC and the Arkansas Public Service Commission.

(5) Advice to the banks concerning the legal questions raised by the cancellation of the Power Contract and the rescission by SEC of the order authorizing the issuance and sale of plaintiff's stock.

(6) The negotiation and drafting of an agreement terminating the banks' commitments to plaintiff.

In performing these services, a total of 465½ hours were spent by the firm, of which 70 were spent by a senior partner, 367 by a senior associate, and 28 by other partners and associates. Of this time, 103¾ hours are recorded as having been spent between August 10 and November 11, 1954, the date of signing of the Power Contract; 248¼ hours between that date and April 21, 1955, the date of the bank credit agreement; 74 hours between that date and July 11, 1955, the date of cancellation of the Power Contract; and 39½ hours subsequent to that date. All time recorded on the firm's books was charged to one account entitled "Re: MVG Co.". The average charge per hour for the firm's services was $32.19.

### (e) Reasonableness of the Attorneys' Fees

243. Three eminent members of the New York bar who are senior partners of firms of standing, experience, and size comparable to the four firms asserting claims in this suit were called as witnesses by plaintiff. The three expert witnesses testified that the fee claimed by each of the four firms is fair, reasonable, and in line with fees that would have been charged by comparable firms in New York City for similar work. No testimony to the contrary was adduced by defendant.

244. In addition to the facts which have been set forth in the preceding findings, the following facts are pertinent to the reasonableness of the fees charged by the four law firms:

(1) While attorney's fees for the type of services rendered are not determined by multiplying the hours spent by some fixed rate, the time devoted to the work and the division of time between partners and associates are factors of importance. The average attorney in one of these firms records about 1,500 chargeable hours a year. The time devoted by each firm to the services rendered was approximately equivalent to the uninterrupted services of one man for the following periods of time:

| Firm | Total period of services | Equivalent time for one man |
|---|---|---|
| Cahill-Gordon | 21 months | 44 months. |
| Winthrop-Stimson | 22½ months | 22⅓ months. |
| Willkie-Owen | 17 months | 14⅓ months. |
| Milbank-Tweed | 17 months | 3¾ months. |

At the time the services were performed, the salaries paid to associates in such firms varied from $4,500 per annum for juniors to $20,000 per annum for senior associates; the latter figure includes bonuses. Not less than one-half of the gross receipts of each law firm was required for the payment of overhead, including the salaries of associates.

(2) The total fees charged by the four firms, equated to an hourly basis, averaged less than $40 per hour. At the time the services were rendered, the fees charged represented the "going" rates in New York City for legal services of the kind involved here.

(3) In the transactions in which the attorneys were employed, five major private interests were involved—the plaintiff, the 2 sponsors, 2 insurance companies, and 24 banks. At least four agencies of the Federal Government, two States, and two cities had a definitive interest in the matter. In addition, the work of the attorneys was affected by the activities of several congressional committees.

(4) Approximately 120 million dollars in financial commitments were involved. There is no fixed ratio between the amount of money in a transaction and the fees charged for legal services rendered in connection therewith. Also, the percentage of fees to the amount of the securities generally diminishes as the sum of the securities is increased. How-

ever, the amount of money in the transactions with which the four firms were concerned was a substantial sum and the percentage of their fees to that sum is in line with fees charged by other New York attorneys in similar cases.

(5) The partners from the four firms are lawyers of wide experience and demonstrated ability in their respective fields of specialization; each has a good reputation and a high standing in his profession. The associates who worked with them were competent for the tasks assigned to them. Each of the attorneys displayed a high degree of professional competence.

(6) The services of the attorneys, particularly those of Cahill-Gordon and Winthrop-Stimson, were rendered under considerable strain and pressure. In the beginning, the defendant announced that the power from the proposed plant would be needed by the fall of 1957. The negotiation of the contract was conducted against a moving target in that the bill, which became the Atomic Energy Act of 1954, was under consideration by Congress during a substantial part of the negotiating period. Some of the provisions in and amendments to the bill had a direct bearing upon the kind of contract which could be entered into. The Power Contract was the object of great public interest, and it was necessary for the attorneys to consider almost every provision of the contract in light of the criticism and attacks directed against the project. Near the end of the negotiations, a difficult question from the standpoint of the four law firms was presented by AEC's insistence upon the inclusion of the recapture provision in the Power Contract. The factor of strain and pressure continued to some extent after the execution of the Power Contract because of the vigorous opposition encountered by the attorneys' clients in the SEC equity and debt financing proceedings and the delay which resulted therefrom.

245. In view of the character, scope, and complexity of the work performed by the attorneys, the time they devoted to the work, the legal experience and skill required, the circumstances under which the services were rendered, and the contributions made by the four firms to the solution of the many problems presented to them, the fees charged by them and claimed in this action are fair and reasonable.

### Q. *Post-Petition Claims*

246. In paragraphs 19 and 22 of the petition, plaintiff alleged that:

"The plaintiff will also incur additional expenses prior to the satisfaction of the judgment herein, the amount of which will be supplied by amendment hereto."

With respect to post-petition claims, the parties have stipulated that the trial be limited to the issue of plaintiff's right to recover, with the determination of the amount of recovery, if any, reserved for further proceedings. In order to expedite the presentation of this issue to the court, the parties have agreed upon the general nature of such expenses, without prejudice to defendant's right, among others, to contest the actual incurrence of the expenses and performance of the services, if it is held that plaintiff is entitled to recover for them.

The names of post-petition claimants and a statement of the general nature of services performed or expenses incurred by them follow:

(a) *Ebasco* rendered services between December 1955 and February 1956 incident to the termination and settlement of commitments under its contract with plaintiff, including closing out purchase orders, disposing of surplus equipment, and maintaining construction accounting records. From December 1956 through October 1957 Ebasco also rendered services in examining data and records in support of the petition, and testifying at the trial. Finally, Ebasco made certain nonservice expenditures for plaintiff, including various forms of automobile insurance, and workmen's compensation, public liability and property damage insurance.

(b) *Cahill-Gordon* rendered services and made disbursements in connection with the trial of this case, including factual and legal research in preparation for the trial and the conduct of the trial itself. It also rendered services in connection with the claims of the use-plaintiffs and in connection with the termination of the Power Contract.

(c) *Winthrop-Stimson* also rendered services and made disbursements, in connection with the trial of this case. In addition to legal and factual research in preparation for trial, it prepared its own claim and that of Southern, and conferred with Government representatives with respect thereto, and testified in support of its own claim for services. Its representatives were also present during the trial of the case.

(d) *Mississippi Valley Generating Company* made disbursements or incurred costs subsequent to the filing of the petition, including costs relating to (1) the sale of fixed assets, (2) the reproduction of documents, (3) freight, (4) insurance, (5) telephone calls, (6) printing the pleadings, (7) travel, and (8) reporting certain testimony.

(e) In addition to the foregoing, claims are asserted on behalf of Ebasco; Cahill-Gordon; Winthrop-Stimson; plaintiff; Milbank-Tweed; Willkie-Owen; Middle South; and Southern, for "compensation for the loss of the use of their money represented by their respective claims".

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of one million eight hundred sixty-seven thousand five hundred forty-five dollars and fifty-six cents ($1,867,545.56), said sum representing that amount found to be due the plaintiff on a portion of its claim. The amount of recovery on the remaining portion of the claim will be determined in further proceedings pursuant to Rule 38(c).